EXHIBIT
1

## IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| Melanie Hogan Sluder and | ) | |
| Ricky Shawn Curtis, Individually | ) | |
| and as Independent Administrators | ) | |
| of the Estate of Alexis Marie Sluder, | ) | |
| Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | 4:24-cv-00181-WMR |
| v. | ) | |
| | ) | |
| Rebecka Phillips, Maveis Brooks, | ) | |
| Russell Ballard, David McKinney, | ) | |
| Monica Headrick, Sharon Ellis, | ) | |
| | ) | |
| Defendants. | ) | |

---

## FIRST AMENDED COMPLAINT AT LAW

For their Complaint at Law, Plaintiffs Melanie Hogan Sluder and

Ricky Shawn Curtis, in their personal capacity and as administrators of the

Estate of Alexis Marie Sluder, by and through their attorneys, Romanucci

and Blandin, LLC, and The Boone Firm, P.C., state as follows:

**INTRODUCTION**

1.  In the late hours of August 26, 2022, five Defendant correctional employees and one sheriff's department sergeant learned that sixteen-year-old Alexis Sluder had taken dangerous substances and chose to place Alexis at the Elbert Shaw Regional Youth Detention Center instead of transferring her to a medical facility or calling 9-1-1.

2.  Shortly after entering the facility, Alexis experienced a painful overdose lasting over four hours, during which she convulsed, writhed in pain, breathed heavily, sweated profusely, and cried to the camera surveilling her, "Someone please help me. I took something."

3.  Defendants were aware that Alexis was in pain and suffering a medical emergency but chose not to transport her to a medical facility, call an emergency medical service like 9-1-1, nor take any other reasonable measures to provide her access to necessary medical services.

4.  Defendants Phillips, Brooks, and Ballard physically watched Alexis Sluder convulse, writhe in pain, sweat profusely, breathe heavily, and cry for over four hours, but chose not to transport her to a medical facility, call an emergency medical service like 9-1-1, nor take any other reasonable measures to provide her access to necessary medical services.

2

5.    Defendants McKinney and Headrick were also made aware that Alexis Sluder had ingested dangerous substances and was suffering a medical emergency multiple times over the course of several hours but chose not to transport her to a medical facility, call an emergency medical service like 9-1-1, nor take any other reasonable measures to provide her access to necessary medical services.

6.    Defendant Ellis, a Gilmer County sergeant, was made aware that Alexis Sluder had ingested dangerous substances and was experiencing a medical emergency but refused to transport her when requested.

7.    Gilmer County had an unconstitutional policy of precluding officers from transporting individuals from the RYDC even when such transport was necessary for the safety of the individual.

8.    No one responded to Alexis Sluder's medical emergency until after she had already fallen unconscious.

9.    Efforts to resuscitate Alexis Sluder failed, and she was pronounced dead on August 27, 2022, less than a month before her seventeenth birthday.

10.    At all times relevant, Alexis Sluder was confined in correctional custody where she could not take measures of her own to procure medical treatment, and thus was at the mercy of Defendants' judgment.

11. At all times relevant, Defendants had a duty to take reasonable measures to ensure the safety of Alexis Sluder.

12. At all times relevant, Defendants knew that, without close monitoring and immediate medical treatment, the dangerous substances that Alexis Sluder had ingested posed a substantial risk of serious harm.

13. Defendants knew that Alexis was suffering serious physical symptoms indicative of a medical emergency and that he condition posed a substantial risk of serious harm if she did not receive immediate medical treatment.

14. Defendants disregarded that risk by failing to take reasonable measures such as transferring her to a medical facility, calling 9-1-1 or another means of emergency medical treatment or transportation, or monitoring her closely while she was in the facility.

## **JURISDICTION**

15. This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 1983, 1988.

16. Venue is proper in the Northern District of Georgia under 28 U.S.C. §1391(b) because all activities, incidents, events, and occurrences giving rise to this cause action occurred in County of Whitfield, City of Dalton, State of Georgia.

17. Upon information and belief, Rebecka Phillips resides in County of Murray, City of Chatsworth, State of Georgia.

18. Upon information and belief, Maveis Brooks resides in County of Gordon, City of Calhoun, State of Georgia.

19. Upon information and belief, Russell Ballard resides in County of Murray, City of Chatsworth, State of Georgia.

20. Upon information and belief, David McKinney resides in County of Floyd, City of Rome, State of Georgia.

21. Upon information and belief, Monica Headrick resides in County of Catoosa, City of Ringgold, State of Georgia.

22. Upon information and belief, Sharon Ellis resides in County of Gilmer, State of Georgia.

## **PARTIES**

23. At all times relevant, Defendant Sergeant Maveis Brooks was an employee and agent of the State of Georgia and acted within the scope of her employment. She is sued in her individual capacity.

24. At all times relevant, Defendant Officer Rebecka Phillips was an employee and agent of the State of Georgia and acted within the scope of her employment. She is sued in her individual capacity.

25.    At all times relevant, Defendant Nurse Monica Headrick was an employee and agent of both Augusta College and the State of Georgia. She acted within the scope of her employment. She is sued in her individual capacity.

26.    At all times relevant, Defendant David McKinney was an employee and agent of the State of Georgia and acted within the scope of his employment. He was the Facility Director of the Elbert Shaw Regional Youth Detention Center ("the RYDC"). He is sued in his individual capacity.

27.    At all times relevant, Defendant Cadet Russell Ballard was an employee and agent of the State of Georgia and acted within the scope of his employment. He is sued in his individual capacity.

28.    At all times relevant, Defendant Sergeant Sharon Ellis was an employee and agent of Gilmer County. She is sued in her individual capacity.

29.    At all times relevant, the State of Georgia contracted with Augusta University to delegate to Augusta College all or part of the State of Georgia's responsibility to provide medical and mental health services to juvenile detainees at the Elbert Shaw Regional Detention Center ("the RYDC").

30.    At all times relevant, Augusta University was a public university and medical center owned, managed, administered, governed, and funded by the State of Georgia.

31.    At all times relevant, the Department of Juvenile Justice was an agency created, operated, managed, supervised, controlled, and administered by the State of Georgia.

32.    The Department of Juvenile Justice is the exclusive state agency for developing and administering a comprehensive state plan and program for child welfare and youth services.

33.    At all times relevant, the Elbert Shaw Regional Youth Detention Center ("the RYDC") was operated, managed, supervised, controlled, and administered by the State of Georgia.

## FACTS COMMON TO ALL COUNTS

34.    On August 26, 2022, Alexis Sluder was arrested by the Deputy Kevin Potts of the Union County Sheriff's Office at 2257 Highway 515 W, Blairsville, Georgia for "Possession of Methamphetamine," "Possession of Drug Related Objects," and "Theft by Shoplifting."

35.    Alexis Sluder received a ticket for Possession of Methamphetamine before being booked in any correctional facility.

36.  During the initial arrest, Deputy Potts handcuffed Alexis Sluder, placed her in the back of a police vehicle, transported her to the Union County Jail, and placed her in a holding cell.

37.  Gilmer County Sheriff's Office Sergeant Sharon Ellis arrived at the Union County Jail to transport Alexis Sluder to the Elbert Shaw Regional Youth Detention Center ("the RYDC").

38.  During the transport from the Union County Jail to the RYDC, Alexis Sluder sat in an unusual position, crouched over with her knees up to her ears.

39.  During the transport, Sergeant Sharon Ellis noticed a white substance on the seat of the vehicle where Alexis Sluder had been sitting.

40.  The white substance was tested after Alexis was booked and determined to be methamphetamine.

41.  On August 26, 2022, at approximately 9 p.m., Alexis Sluder was booked into the Elbert Shaw Regional Youth Detention Center ("the RYDC").

42.  Upon transporting Alexis Sluder to the RYDC, Sergeant Sharon Ellis informed Defendant Sergeant Maveis Brooks and other RYDC employees that she had found methamphetamine on Alexis Sluder's person.

43.     Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis
        Brooks, Defendant Cadet Russell Ballard, Defendant Director David
        McKinney, Defendant Nurse Monica Headrick, and other RYDC
        employees knew she had been arrested for possession of controlled
        substances and drug related objects.

44.     At approximately 9. p.m. on August 26, 2022, Alexis Sluder was
        evaluated by Gilmer County Sergeant Sharon Ellis, Badge No. 535.

45.     Sergeant Sharon Ellis documented her evaluation on a Delivering
        Officer/Worker Courtesy Form (herein referred to as "Delivering Officer
        Form").

46.     The Delivering Officer Form was reviewed by Amanda Stewart Smith.

47.     Upon information and belief, Amanda Stewart Smith was at all
        relevant times an employee of the State of Georgia's Juvenile Justice
        Department.

48.     On the Delivering Officer Form, Gilmer County Sergeant Sharon Ellis
        noted the following:

49.     Alexis Sluder did not appear intoxicated or otherwise impaired.

50.     Alexis Sluder did not appear to be injured.

51.     Alexis Sluder did not act in a violent or self-destructive way.

52.     Alexis Sluder did not seem depressed or scared about being detained.

53.   Alexis Sluder did not act strangely.

54.   Sergeant Sharon Ellis did not have any reason to think Alexis Sluder would harm herself.

55.   Alexis Sluder "refused to follow instructions in the vehicle. Spit on floorboard, again."

56.   Sergeant Ellis failed to note that methamphetamine or any other foreign substance was found on Alexis Sluder's person.

57.   The Delivering Officer Form instructed RYDC Intake Staff of the following: "If the child seems intoxicated, under the influence of drugs, severely injured, or any indication of Self Harm possibility you must immediately contact ON SITE Mental Health or Medical. If they are not onsite you must contact the Director, Assistant Director on site, or the ADO if no one listed is at the facility at the time of entrance."

58.   At approximately 9:07 p.m. on August 26, 2022, Alexis Sluder underwent a Medical Screening.

59.   The documentation of Alexis Sluder's medical screening reflected the following:

60.   Alexis Sluder had "medical problems," had previously been hospitalized, and was taking medication.

61.   Alexis Sluder had recently been sexually abused.

62.     Alexis Sluder had "depression bipolar anxiety schizophrenia" and took "abilphy Lexapro and one unknown."

63.     Alexis Sluder had no medications on her person during booking.

64.     At approximately 9:13 p.m. on August 26, 2022, Alexis Sluder underwent a Mental Health Screening.

65.     The Mental Health Screening was conducted by Amanda Stewart Smith and Xan Overman.

66.     The documentation of Alexis Sluder's Mental Health Screening reflected the following information:

67.     Alexis Sluder was not charged with a serious offense.

68.     When asked why she was at the RYDC, Alexis Sluder responded "because I ran away."

69.     When asked if she has felt like hurting or killing herself in the past month, Alexis Sluder answered "Yes."

70.     When asked if she had ever done anything on purpose to hurt herself, Alexis Sluder answered "Yes."

71.     When asked if she was thinking about harming or killing herself at the time of the screening, Alexis Sluder answered "Yes."

72.     When asked if she had been in counseling for emotional, psychological, or behavioral problems in the past year, Alexis Sluder answered "Yes."

73.   When asked if she had been prescribed medication for emotional, psychological, behavioral, or attention problems in the last year, Alexis Sluder answered "Yes."

74.   When asked if she had been prescribed medication for emotional, psychological, behavioral, or attention problems in the last thirty days, Alexis Sluder answered "Yes."

75.   When asked if she had ever been in a treatment facility for emotional, psychological, or behavioral problems, Alexis Sluder answered "Yes" and explained that she had been to a facility in April, May, June, and July of 2021, and another facility three weeks prior.

76.   When asked if anyone had ever touched her private sexual body parts in a way that she didn't want them to, Alexis Sluder answered "Yes," and explained that she had been sexually abused four days prior.

77.   When asked if she had ever seen things that other people can't see, Alexis Sluder answered "Yes" and explained that she sometimes sees shadow people that are not there.

78.   When asked if she had ever heard voices or other noises that people cannot hear, Alexis Sluder answered "Yes."

79.   When asked if she abused alcohol or drugs within the last year, Alexis Sluder answered "Yes" and explained that she had taken "meth &

various pills today marijuana 1 week ago cocaine 1 month ago liquor beer 1 to 2 weeks ago."

80. When asked if she had ever overdosed on drugs or alcohol, Alexis Sluder answered "Yes" and explained that she had been hospitalized in July 2022.

81. During her Mental Health Screening, Alexis Sluder's answers warranted four "Warning" notations and four "Caution" notations.

82. The questions pertaining to Alexis Sluder's drug and alcohol use were explicitly excluded from the "Warning" and "Caution" totals.

83. During her Mental Health Screening, Alexis Sluder told Amanda Stewart Smith and Xan Overman that she had taken the meth she had on her that evening prior to her arrest as the police were walking towards the vehicle, which Smith and Overman noted on the Screening documentation.

84. Alexis Sluder advised Amanda Stewart Smith that "she had ate the meth she had on her when the cops came and she realized she might be going to jail" and that "she had taken other unknown items earlier in the day as she felt suicidal over the last 3 weeks and currently feels this way."

85.    Amanda Stewart Smith notified via email Michelle S. Kittle, Monica
       Headrick, Xan Overman, David McKinney, Kristen Nix, Lieutenant
       Charles Barbee Jr., Sergeant Maveis Brooks, and Christoper Ackerman
       that Alexis Sluder had taken meth during her arrest, had taken other
       substances, and was suicidal.

86.    Upon learning that Alexis Sluder had taken meth during her arrest,
       had taken other substances, and was suicidal, a conversation occurred
       amongst several RYDC employees, including Defendant Officer
       Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant
       Officer Russell Ballard, Defendant Director David McKinney, and
       Defendant Nurse Monica Headrick.

87.    During their conversation, Defendant Officer Rebecka Phillips,
       Defendant Sergeant Maveis Brooks, Defendant Officer Russell Ballard,
       Defendant Director David McKinney, and Defendant Nurse Monica
       Headrick discussed Alexis Sluder's symptoms, medical risks, and
       options regarding her treatment and placement.

88.    After their conversation regarding Alexis Sluder's medical risks and
       options regarding her treatment and placement, Defendant Officer
       Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant
       Officer Russell Ballard, Defendant Director David McKinney, and

Defendant Nurse Monica Headrick determined that Alexis Sluder should be taken to the hospital.

89.    Defendant Sergeant Sharon Ellis was asked to transport Alexis Sluder to the hospital.

90.    Defendant Sergeant Sharon Ellis declined to transport Alexis Sluder to the hospital.

91.    Defendant Sergeant Sharon Ellis told RYDC staff that she was not permitted to transport Alexis Sluder to the hospital because she had already released Alexis Sluder into the custody of the State of Georgia, so she no longer had jurisdiction to transport Alexis Sluder.

92.    The State of Georgia, the Department of Juvenile Justice, and the RYDC retain vehicles and staff capable of transporting juveniles between facilities and to other locations, such as court or medical facilities.

93.    The State of Georgia, the Department of Juvenile Justice, and the RYDC employees have access to phone lines that would have permitted them to call 9-1-1 or another emergency medical transportation service.

94.    Despite their recognition that Alexis Sluder should be transported to a hospital, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant Officer Russell Ballard, Defendant Director

David McKinney, and Defendant Nurse Monica Headrick elected not to transport Alexis to a medical facility or to call 911, an ambulance, or emergency medical services.

95. Alexis Sluder was placed in the G-100 Hall on Level III observation "due to the statements made in intake process."

96. According to the policies of the State of Georgia, the Department of Juvenile Justice, and the RYDC, juveniles placed in G-100 Hall on Level III observation are required to be monitored constantly by facility staff.

97. Alexis Sluder was placed in a room that was equipped with a video camera that was intended to facilitate RYDC officials' ability to constantly monitor her.

98. Alexis Sluder was placed in a room with constant video monitoring due to the medical and mental health concerns indicated during her Medical Screening and Mental Health Screening, including her intake of dangerous substances.

99. Defendant Ballard was stationed in the nearby control room.

100. From the control room, Defendant Ballard had access to the live video feed being broadcasted from G-100 Hall.

101. Throughout the evening that Alexis Sluder was in custody, Defendant Ballard watched the live video feed of Alexis Sluder.

102. Throughout the evening that Alexis Sluder was in custody, Defendant Rebecka Phillips and Defendant Maveis Brooks were stationed in the same room as Alexis.

103. It was the responsibility of Defendant Rebecka Phillips and Defendant Maveis Brooks to maintain constant, in-person supervision of Alexis Sluder while she was in G-100 Hall on Level III monitoring.

104. After being placed in her cell, Alexis began to suffer a medical emergency due to the drugs that she had ingested earlier that day.

105. During her medical emergency, Alexis Sluder convulsed.

106. During her medical emergency, Alexis Sluder writhed in pain.

107. During her medical emergency, Alexis Sluder thrashed about the room in an extremely unnatural way.

108. During her medical emergency, Alexis Sluder sweated profusely.

109. During her medical emergency, Alexis Sluder breathed extremely heavily.

110. During her medical emergency, Alexis Sluder cried.

111. Alexis Sluder's overdose symptoms lasted over four hours.

112.   Alexis Sluder's symptoms made it apparent that she was in pain and needed medical services.

113.   Defendant Rebecka Phillips was consistently present in G-100 Hall with Alexis Sluder for the entire medical emergency.

114.   Defendant Maveis Brooks was intermittently present in G-100 Hall with Alexis Sluder during the medical emergency.

115.   Defendant Russell Ballard watched the medical emergency on the video feed from the control room.

116.   For the last two hours of the medical emergency, Alexis Sluder lay on the ground nearly motionless.

117.   At one point during her medical emergency, as she lay on the ground, Alexis Sluder reached out and grasped towards Defendant Rebecka Phillips' ankle.

118.   As Alexis Sluder lay on the ground and reached towards Defendant Rebecka Phillips' ankle, Defendant Rebecka Phillips stood over her, watched, and did nothing to help her.

119.   At one point during her medical emergency, Alexis Sluder turned to the camera and said audibly "Someone please help me. I took something."

120.    Defendant Rebecka Phillips and Defendant Maveis Brooks were in
        earshot of Alexis Sluder when she said "Someone please help me. I took
        something."

121.    Defendant Rebecka Phillips and Defendant Maveis Brooks knew Alexis
        Sluder was suffering a medical emergency, as evidenced by the fact
        that they called Defendant Director David McKinney and Defendant
        Nurse Monica Headrick several times to discuss her symptoms and
        potential course of action.

122.    During the more than four hours of Alexis Sluder's overdose, Defendant
        Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks,
        Defendant Officer Russell Ballard, Defendant Director David
        McKinney, and Defendant Nurse Monica Headrick engaged in several
        conversations regarding Alexis Sluder's medical emergency.

123.    Over multiple phone calls, Defendant Sergeant Maveis Brooks and
        Defendant Officer Rebecka Phillips explained to Defendant Director
        David McKinney and Defendant Nurse Monica Headrick what kinds of
        symptoms Alexis Sluder was suffering.

124.    During their conversations, Defendant Officer Rebecka Phillips,
        Defendant Sergeant Maveis Brooks, Defendant Officer Russell Ballard,
        Defendant Director David McKinney, and Defendant Nurse Monica

Headrick discussed that they did not have enough officers on staff to transport Alexis Sluder to a hospital without violating a policy set forth by the State of Georgia, the Department of Justice, and the RYDC.

125. During the medical emergency, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant Officer Russell Ballard, Defendant Director David McKinney, and Defendant Nurse Monica Headrick asked Sergeant Sharon Ellis to transport Alexis Sluder to a hospital or other emergency medical facility.

126. Defendant Sergeant Sharon Ellis refused to transport Alexis Sluder even after she learned about her medical emergency.

127. There is no policy set forth by the State of Georgia, the Department of Justice, and the Dalton RYDC preventing State employees from calling 9-1-1 or another emergency medical services to transport juveniles to the hospital in a medical emergency.

128. Alexis Sluder was not suspected of a violent crime.

129. Alexis Sluder was not arrested for a violent crime.

130. There was no legitimate penological interest in keeping Alexis Sluder from going to the hospital.

131. Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant Officer Russell Ballard, Defendant Director David

20

McKinney, Defendant Nurse Monica Headrick, and Defendant Sharon Ellis were all responsible for Alexis Sluder's safety on August 26, 2022, and August 27, 2022.

132. There were several ways that the Defendants could have given Alexis Sluder access to medical care.

133. Defendant Rebecka Phillips could have transported her to a hospital or other emergency medical facility.

134. Defendant Maveis Brooks could have transported her to a hospital or other emergency medical facility.

135. Defendant Russell Ballard could have transported her to a hospital or other emergency medical facility.

136. Defendant David McKinney could have transported her to a hospital or other emergency medical facility.

137. Defendant Monica Headrick could have transported her to a hospital or other emergency medical facility.

138. Defendant Sharon Ellis could have transported her to a hospital or other emergency medical facility.

139. Defendant Rebecka K. Phillips could have requested another State employee to transport her to the hospital.

140.    Defendant Maveis Brooks could have requested another State employee to transport her to the hospital.

141.    Defendant Russell Ballard could have requested another State employee to transport her to the hospital.

142.    Defendant David McKinney could have requested another State employee to transport her to the hospital.

143.    Defendant Monica Headrick could have requested another State employee to transport her to the hospital.

144.    Defendant Sharon Ellis could have requested another Gilmer County employee to transport her to the hospital.

145.    Defendant Rebecka Phillips could have called 9-1-1 or another emergency medical service.

146.    Defendant Maveis Brooks could have called 9-1-1 or another emergency medical service.

147.    Defendant Russell Ballard could have called 9-1-1 or another emergency medical service.

148.    Defendant David McKinney could have called 9-1-1 or another emergency medical service.

149.    Defendant Monica Headrick could have called 9-1-1 or another emergency medical service.

150.   Defendant Sharon Ellis could have called 9-1-1 or another emergency
       medical service.   Instead, having come to an agreement that they
       would not transport Alexis Sluder themselves due to policy, Defendant
       Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks,
       Defendant Officer Russell Ballard, Defendant Director David
       McKinney, Defendant Nurse Monica Headrick, and Defendant Sharon
       Ellis allowed Alexis Sluder to suffer a medical emergency in extreme
       pain without any medical attention or transport to a medical facility for
       over four hours.

151.   Finally, at approximately 3:12 a.m. on August 27, 2022, Defendant
       Officer Rebecka Phillips advised over the radio that Alexis Sluder "was
       not breathing properly."

152.   Upon hearing Defendant Officer Rebecka Phillips' advisement over the
       radio, Sergeant Maveis Brooks left the intake section of the Dalton
       RYDC and headed towards G-100 Hall.

153.   Upon arriving at G-100, Sergeant Maveis Brooks assessed Alexis
       Sluder and eventually advised Defendant Control Room Operator
       Cadet Russell Ballard to call 9-1-1.

154.   Soon after Sergeant Maveis Brooks advised Defendant Cadet Ballard to
       call 9-1-1, Alexis Sluder stopped breathing.

155. Defendant Cadet Russell Ballard called 9-1-1 and advised of a medical emergency at the RYDC.

156. Defendant Sergeant Maveis Broks performed CPR.

157. Defendant Officer Rebecka Phillips retrieved the AED out of a nearby closet.

158. Defendant Officer Rebecka Phillips began CPR compressions as Sergeant Maveis Brooks set up the AED.

159. Sergeant Maveis Brooks applied the AED.

160. Alexis Sluder was pronounced dead at 4:26 a.m. on August 27, 2022.

161. Alexis Sluder's immediate cause of death was found to be Methamphetamine Toxicity.

162. The Georgia Bureau of Investigation's autopsy found that the cause of Alexis's death was drug toxicity due to 17 milligrams per liter of methamphetamine and .51 milligrams per liter of amphetamine.

163. As a result of the events involving Alexis Sluder on August 26 and 27, 2022, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Cadet Officer Russell Ballard, and Defendant Director David McKinney were terminated from their employment at the RYDC.

164. At all times relevant, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant Cadet Russell Ballard, Defendant

24

Director David McKinney, Defendant Nurse Monica Headrick, and Defendant Sharon Ellis were aware that Alexis Sluder entered RYDC with medical risks that required heightened observation, including that she had taken all of the drugs on her prior to being admitted into the RYDC.

165. At all times relevant, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant Cadet Russell Ballard, Defendant Director David McKinney, Defendant Nurse Monica Headrick, and Defendant Sharon Ellis aware that Alexis Sluder entered the RYDC with several mental health risks that required constant observation, including recent suicide attempt and ideation, recent drug abuse, and a history of mental illness.

166. At all times relevant, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant Cadet Russell Ballard, Defendant Director David McKinney, Defendant Nurse Monica Headrick, and Defendant Sharon Ellis were aware that Alexis Sluder was placed on Level III observation, which was a heightened level of observation, that required constant monitoring of Alexis Sluder's health, safety, and well-being due to her medical and mental health risks.

167. Despite their knowledge of Alexis Sluder's need for heightened observation, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, and Defendant Cadet Russell Ballard did not continuously monitor Alexis Sluder's health, safety, and well-being.

168. Despite their knowledge of Alexis Sluder's need for heightened observation and medical risks, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant Officer Russell Ballard, Defendant Director David McKinney, Defendant Nurse Monica Headrick, and Defendant Sharon Ellis did not respond reasonably to Alexis Sluder when she became visibly distressed.

169. Despite their knowledge of Alexis Sluder's need for heightened observation and medical risks, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant Officer Russell Ballard, Defendant Director David McKinney, Defendant Nurse Monica Headrick, and Defendant Sharon Ellis did not respond reasonably to Alexis Sluder when she stated her need for help.

170. Despite their knowledge that Alexis Sluder had taken drugs before entering the RYDC and of Alexis Sluder's need for heightened observation, Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, and Defendant Cadet Russell Ballard did not respond

reasonably to Alexis Sluder when she informed them through the camera that she needed help because she had taken something.

171. Defendant Officer Rebecka Phillips, Defendant Sergeant Maveis Brooks, Defendant Officer Russell Ballard, Defendant Director David McKinney, Defendant Nurse Monica Headrick, and Defendant Sharon Ellis became aware that Alexis Sluder was suffering from a medical emergency but did not respond until after she had been rendered unconscious.

172. Brooks, Phillips, and Ballard were indicted by a grand jury in the Superior Court of Whitfield County for Cruelty to Children in the First Degree for "malicious caus[ing] Alexis Marie Sluder, a child under the age of eighteen (18) years, cruel and excessive physical pain by depriving said child of the necessary medical care she needed while in the lawful custody of said defendants and by not contacting emergency medical authorities in a timely manner."

173. Brooks, Phillips, Ballard, McKinney, and Headrick were indicted by a grand jury in the Superior Court of Whitfield County for Cruelty to Children in the Second Degree for "with criminal negligence, caus[ing] Alexis Marie Sluder, a child under the age of eighteen (18) years, cruel and excessive physical pain by depriving said child of the necessary

27

medical care she needed while in the lawful custody of said defendants by not contacting emergency medical authorities in a timely manner."

174. Defendant McKinney directed Sergeant Brooks not to call 9-1-1 multiple times.

175.  Defendant Headrick directed Sergeant Brooks not to call 9-1-1 multiple times.

176. At the Dalton RYDC, on the night of the incident, the chain of command was set up such that Defendant McKinney was the highest-ranking supervisor responsible for responding to serious incidents when subordinates made him aware of such incidents.

177. By 10 p.m. on the night of the incident, all Defendants were aware that Alexis had been vomiting, had a fever, was bleeding from her mouth, was not properly swallowing, was unusually stiff, was accumulating foam at her mouth, and was breathing abnormally.

178. Defendant McKinney is not medical personnel and has no medical training.

179. Defendant McKinney believed that Alexis Sluder's vomiting was a sign that she was getting better, not worse, which influenced his decision to not refer or facilitate a transfer of Alexis Sluder to emergency services or a hospital.

180. Defendant McKinney repeatedly instructed Sergeant Brooks regarding what medical care Alexis required.

181. DJJ policy prohibits non-medical personnel from making medical decisions.

182. DJJ policy requires medical staff to make decisions regarding "the need for medical services staff to return to the facility for assessments after clinic-hours" and "[d]etermining the need for youth to be transported off-site for medical [ ] services" in concurrence with a Medical Director and a physician.

183. In 2015, the United States Department of Justice released a report (DOJ Report) outlining several systemic and chronic deficiencies in the Georgia Department of Juvenile Justice's Regional Youth Detention Centers.

184. The DOJ Report found the following:

   a. "Each RYDC is staffed with one nurse, who is on-site eight hours each weekday, and on-call on nights and weekends. The nurse must conduct sick call, manage and distribute medication, review intake medical screenings, arrange outside appointments and consultations, and respond to emergencies, in addition to performing the required physical examinations on new intakes.

Each RYDC contracts with a private physician to provide two hours per week of medical service. **This level of staffing is inadequate, given the population of the RYDCs and the rapid population turnover, leading to dangerous lapses in medical care.** Often, screening forms are not completed by the line staff or sufficiently reviewed by the medical staff; physicals are not completed in a timely manner or are only partially completed; medical conditions requiring treatment or monitoring are missed; response to sick call requests can be delayed for days; and medical records are incomplete and often not sent with youths when they are transferred to another DJJ facility. These predictable consequences of an overburdened medical staff are exacerbated by inadequate training and supervision of the medical personnel -- for most practical purposes, the facility nurse runs an autonomous health care program without any significant oversight or quality assurance from the State Medical Director's office or the contractor."

b.  "Our investigation identified a pattern of egregious conditions violating the federal rights of youths in the Georgia juvenile facilities we toured. These violations include the failure to

provide adequate mental health care to mentally disturbed youths throughout the system; overcrowded and unsafe conditions in the Regional Youth Detention Centers; abusive disciplinary practices, particularly in the boot camps, including physical abuse by staff and the abusive use of mechanical and chemical restraints on mentally ill youths; inadequate education and rehabilitative services; and inadequate medical care in certain areas. Because of these conditions, many youths have suffered grievous harm, such as being injured or hospitalized due to fights with other youths or physical abuse by staff; **mentally ill youths have degenerated in the State's care**; **youths have suffered needless pain and continued illness from undiagnosed or inadequately treated medical conditions**; and youths' educations have been damaged by grossly substandard DJJ educational programs."

c. "[O]ur review of State documents and interviews with State administrators indicate that many of the problems identified in the facilities we visited were caused in large part by lack of resources and other inadequacies that are prevalent throughout

the DJJ system and affect facilities beyond those toured by our

experts and investigators."

185. The DOJ Report placed all Defendants on notice of widespread

understaffing and inadequate medical treatment that occurred at DJJ

facilities such as the Dalton RYDC.

186. The Dalton RYDC was staffed with one nurse who was on-call but not

on site at night or on weekends. In other words, it was staffed exactly

the way that the DOJ Report took issue with in 2015 and found to be

dangerous and inadequate.

187. All Defendants knew that the Dalton RYDC was chronically

understaffed.

188. All Defendants knew that the Dalton RYDC was understaffed on the

night of Alexis Sluder's death, in accordance with the widespread

custom of understaffing the facility.

189. Alexis Sluder was sixteen at the time of her death.

190. Alexis Sluder's parents, Plaintiffs Melanie Hogan Sluder and Ricky

Shawn Curtis have experienced immense pain and suffering as a result

of the untimely death of their only daughter.

191. As a result of the Defendants' actions, Alexis Sluder experienced pain

and suffering, including but not limited to a very long and painful

death in which she convulsed, overheated, breathed heavily, writhed in pain, and begged for help.

192. Before her death, Alexis Sluder enjoyed playing softball.

193. Before her death, Alexis Sluder participated in beauty pageants, where she won an award for "Prettiest Smile."

194. Before her death, Alexis Sluder was a student at Gilmer High School in Elijay, Georgia.

195. Before her death, Alexis Sluder was expected to graduate from Gilmer High School on or about May 24, 2024.

196. On or about May 24, 2024, Gilmer High School held a graduation ceremony, during which a seat was reserved for Alexis Sluder and Gilmer High School posthumously graduated her.

## 42 U.S.C. Section 1983—Fourteenth Amendment
### *Plaintiffs v. Rebecka Phillips*

197. Plaintiff incorporates Paragraphs 1-196 as if stated in the section herein.

198. At all relevant times, including when she was booked into the RYDC and when she began to overdose, Alexis Sluder had an objectively serious medical need.

199.   At all relevant times, Officer Rebecka Phillips knew that Alexis Sluder
       had taken dangerous substances.

200.   Upon learning that Alexis Sluder had taken dangerous substances,
       Officer Rebecka Phillips knew that Alexis Sluder required medical
       treatment.

201.   Upon learning that Alexis Sluder had taken dangerous substances,
       Officer Rebecka Phillips knew that Alexis Sluder required heightened
       levels of monitoring.

202.   Officer Rebecka Phillips also knew that Alexis Sluder required
       heightened levels of monitoring due to her mental health risks, which
       included diagnoses of serious mental illnesses and recent suicide
       attempts.

203.   Upon learning that Alexis Sluder had taken dangerous substances,
       Officer Rebecka Phillips knew that Alexis Sluder had an objectively
       serious medical need.

204.   Upon learning that Alexis Sluder had taken dangerous substances,
       Officer Rebecka Phillips knew that Alexis Sluder was at risk of serious
       harm if not appropriately monitored.

205. Upon learning that Alexis Sluder had taken dangerous substances, Officer Rebecka Phillips knew that Alexis Sluder needed to be transported to a medical facility.

206. At all relevant times, Officer Rebecka Phillips remained in the room where Alexis Sluder experienced her medical emergency and the symptoms thereof.

207. At all relevant times, Officer Rebecka Phillips was monitoring or should have been monitoring Alexis's health, safety, and well-being.

208. Officer Rebecka Phillips became aware that Alexis Sluder was undergoing a medical emergency while Alexis Sluder was overdosing and began to exhibit physical symptoms thereof, including writhing on the ground, sweating profusely, breathing heavily, and crying out for help.

209. Despite her knowledge that Alexis Sluder was undergoing a medical emergency, Officer Rebecka Phillips did nothing to help her.

210. Defendant Rebecka Phillips witnessed Maveis Brooks depriving Alexis Sluder of medical care and had the opportunity to intervene.

211. Defendant Rebecka Phillips witnessed Russell Ballard depriving Alexis Sluder of medical care and had the opportunity to intervene.

212. Defendant Rebecka Phillips witnessed Monica Headrick depriving Alexis Sluder of medical care and had the opportunity to intervene.

213. Defendant Rebecka Phillips witnessed David Mckinney depriving Alexis Sluder of medical care and had the opportunity to intervene.

214. Officer Rebecka Phillips acted objectively unreasonably and with deliberate indifference towards the safety of Alexis Sluder in the following ways:

   a. Failing to transfer Alexis Sluder to a medical facility upon learning that she had taken dangerous substances;

   b. Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder had ingested dangerous substances;

   c. Failing to place Alexis Sluder on any withdrawal protocol upon learning that she had ingested dangerous substances;

   d. Failing to monitor Alexis Sluder despite knowledge that she had taken dangerous substances;

   e. Failing to monitor Alexis Sluder despite knowledge that she was experiencing a drug overdose;

   f. Failing to monitor Alexis Sluder despite knowledge that she was experiencing a medical emergency;

g.  Failing to notify medical staff upon learning that Alexis Sluder was undergoing a medical emergency;

h.  Failing to notify medical staff upon learning that Alexis Sluder was undergoing a drug overdose;

i.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a medical emergency;

j.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a medical emergency;

k.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a drug overdose;

l.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a drug overdose;

m.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was in extreme pain;

n.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was in extreme pain;

o.  Failing to transfer Alexis Sluder to a medical facility while physically observing her undergo a medical emergency;

37

p.   Failing to transfer Alexis Sluder to a medical facility while physically observing her undergo a drug overdose;

q.   Failing to transfer Alexis Sluder to a medical facility while physically observing her in extreme pain;

r.   Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder undergo a medical emergency;

s.   Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder undergo a drug overdose;

t.   Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder in extreme pain;

u.   Failing to take any other reasonable measures to provide Alexis Sluder access to necessary medical care;

v.   Failing to take any other reasonable measure upon learning that Alexis Sluder had ingested dangerous substances;

w.   Failing to take any other reasonable measures upon learning that Alexis Sluder needed medical treatment;

x.   Failing to take any other reasonable measures upon learning that Alexis Sluder needed heightened monitoring;

38

y.  Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a drug overdose;

z.  Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a medical emergency;

aa.  Failing to respond to Alexis Sluder's medical emergency in a timely manner;

bb.  Failing to intervene to stop Monica Headrick's objectively unreasonable and deliberately indifferent conduct;

cc.  Failing to intervene to stop Maveis Brooks' objectively unreasonable and deliberately indifferent conduct;

dd.  Failing to intervene to stop Russell Ballard's objectively unreasonable and deliberately indifferent conduct;

ee.  Failing to intervene to stop David McKinney's objectively unreasonable and deliberately indifferent conduct; and

ff.  Failing to take any other reasonable measures to ensure Alexis Sluder's safety.

215.  As a direct and proximate result of Officer Rebecka Phillips' objectively unreasonable conduct and deliberate indifference, Alexis Sluder did not receive necessary medical attention.

216.  As a direct and proximate result of Officer Rebecka Phillips' objectively unreasonable conduct and deliberate indifference, Alexis Sluder suffered a long, painful, drug overdose.

217.  As a direct and proximate result of Officer Rebecka Phillips' objectively unreasonable conduct and deliberate indifference, Alexis Sluder passed away.

Wherefore, Plaintiffs, personally and as individual administrators of the Estate of Alexis Sluder, seek to recover lost support and services, medical expenses, mental pain and suffering, loss of normal life, attorneys' fees, punitive damages, and any other appropriate compensatory damages.

## 42 U.S.C. Section 1983—Fourteenth Amendment
### *Plaintiffs v. Maveis Brooks*

218.  Plaintiff incorporates Paragraphs 1-196 as if stated in the section herein.

219.  At all relevant times, including when she was booked into the RYDC and when she began to overdose, Alexis Sluder had an objectively serious medical need.

220.  At all relevant times, Sergeant Maveis Brooks knew that Alexis Sluder had taken dangerous substances.

221.  Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Maveis Brooks knew that Alexis Sluder required medical treatment.

222.  Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Maveis Brooks knew that Alexis Sluder required heightened levels of monitoring.

223.  Sergeant Maveis Brooks also knew that Alexis Sluder required heightened levels of monitoring due to her mental health risks, which included diagnoses of serious mental illnesses and recent suicide attempts.

224.  Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Maveis Brooks knew that Alexis Sluder had an objectively serious medical need.

225.  Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Maveis Brooks knew that Alexis Sluder was at risk of serious harm if not appropriately monitored.

226.  Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Maveis Brooks knew that Alexis Sluder needed to be transported to a medical facility.

227. Throughout Alexis Sluder's medical emergency, Sergeant Maveis Brooks was present in the room where Alexis Sluder experienced her medical emergency and the symptoms thereof.

228. Throughout Alexis Sluder's medical emergency, Sergeant Maveis Brooks was monitoring or should have been monitoring Alexis's health, safety, and well-being.

229. Sergeant Maveis Brooks became aware that Alexis Sluder was undergoing a medical emergency while Alexis Sluder was overdosing and began to exhibit physical symptoms thereof, including writhing on the ground, sweating profusely, breathing heavily, and crying out for help.

230. Sergeant Maveis Brooks became aware that Alexis Sluder was undergoing a medical emergency while Alexis Sluder was overdosing.

231. Despite her knowledge that Alexis Sluder was undergoing a medical emergency, Sergeant Maveis Brooks did nothing to help her.

232. Defendant Maveis Brooks witnessed Rebecka Phillips depriving Alexis Sluder of medical care and had the opportunity to intervene.

233. Defendant Maveis Brooks witnessed Russell Ballard depriving Alexis Sluder of medical care and had the opportunity to intervene.

234. Defendant Maveis Brooks witnessed Monica Headrick depriving Alexis Sluder of medical care and had the opportunity to intervene.

235. Defendant Maveis Brooks witnessed David Mckinney depriving Alexis Sluder of medical care and had the opportunity to intervene.

236. Sergeant Maveis Brooks acted objectively unreasonably and with deliberate indifference towards the safety of Alexis Sluder in the following ways:

   a. Failing to transfer Alexis Sluder to a medical facility upon learning that she had taken dangerous substances;

   b. Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder had ingested dangerous substances;

   c. Failing to place Alexis Sluder on any withdrawal protocol upon learning that she had ingested dangerous substances;

   d. Failing to monitor Alexis Sluder despite knowledge that she had taken dangerous substances;

   e. Failing to monitor Alexis Sluder despite knowledge that she was experiencing a drug overdose;

   f. Failing to monitor Alexis Sluder despite knowledge that she was experiencing a medical emergency;

g.  Failing to notify medical staff upon learning that Alexis Sluder was undergoing a medical emergency;

h.  Failing to notify medical staff upon learning that Alexis Sluder was undergoing a drug overdose;

i.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a medical emergency;

j.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a medical emergency;

k.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a drug overdose;

l.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a drug overdose;

m.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was in extreme pain;

n.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was in extreme pain;

o.  Failing to transfer Alexis Sluder to a medical facility while physically observing her undergo a medical emergency;

44

p.  Failing to transfer Alexis Sluder to a medical facility while physically observing her undergo a drug overdose;

q.  Failing to transfer Alexis Sluder to a medical facility while physically observing her in extreme pain;

r.  Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder undergo a medical emergency;

s.  Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder undergo a drug overdose;

t.  Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder in extreme pain;

u.  Failing to take any other reasonable measures to provide Alexis Sluder access to necessary medical care;

v.  Failing to take any other reasonable measure upon learning that Alexis Sluder had ingested dangerous substances;

w.  Failing to take any other reasonable measures upon learning that Alexis Sluder needed medical treatment;

x.  Failing to take any other reasonable measures upon learning that Alexis Sluder needed heightened monitoring;

45

y.   Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a drug overdose;

z.   Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a medical emergency;

aa.  Failing to respond to Alexis Sluder's medical emergency in a timely manner;

bb.  Failing to intervene to stop Rebecka Phillips' objectively unreasonable and deliberately indifferent conduct;

cc.  Failing to intervene to stop Monica Headrick's objectively unreasonable and deliberately indifferent conduct;

dd.  Failing to intervene to stop Russell Ballard's objectively unreasonable and deliberately indifferent conduct;

ee.  Failing to intervene to stop David McKinney's objectively unreasonable and deliberately indifferent conduct; and

ff.  Failing to take any other reasonable measures to ensure Alexis Sluder's safety.

237. As a direct and proximate result of Sergeant Maveis Brooks' objectively unreasonable conduct and deliberate indifference, Alexis Sluder did not receive necessary medical attention.

238. As a direct and proximate result of Maveis Brooks' objectively unreasonable conduct and deliberate indifference, Alexis Sluder suffered a long, painful, drug overdose.

239. As a direct and proximate result of Maveis Brooks' objectively unreasonable conduct and deliberate indifference, Alexis Sluder passed away.

Wherefore, Plaintiffs, personally and as individual administrators of the Estate of Alexis Sluder, seek to recover lost support and services, medical expenses, mental pain and suffering, loss of normal life, attorneys' fees, punitive damages, and any other appropriate compensatory damages.

## 42 U.S.C. Section 1983—Fourteenth Amendment
### *Plaintiffs v. Russell Ballard*

240. Plaintiff incorporates Paragraphs 1-196 as if independently stated in the section herein.

241. At all relevant times, including when she was booked into the RYDC and when she began to overdose, Alexis Sluder had an objectively serious medical need.

242. Upon learning that Alexis Sluder had taken dangerous substances, Russell Ballard knew that Alexis Sluder required heightened levels of monitoring.

243. Upon learning that Alexis Sluder had been placed on Level III monitoring, Russell Ballard knew that Alexis Sluder required heightened levels of monitoring.

244. Upon learning that Alexis Sluder had taken dangerous substances, Russell Ballard knew that Alexis Sluder had an objectively serious medical need.

245. At all relevant times, Russell Ballard had access to a live feed broadcasting from the video camera in Alexis Sluder's cell.

246. At all relevant times, Russell Ballard was watching the live camera feed in Alexis Sluder's cell.

247. Russell Ballard became aware that Alexis Sluder was undergoing a medical emergency while Alexis Sluder was overdosing.

248. Upon witnessing Alexis Sluder writhe in pain, cry, state that she needed help because she had taken drugs, and other symptoms of her medical emergency, Russell Ballard was aware that Alexis Sluder had an objectively serious medical need.

249. Defendant Russell Ballard witnessed Rebecka Phillips depriving Alexis Sluder of medical care and had the opportunity to intervene.

250. Defendant Russell Ballard witnessed Maveis Brooks depriving Alexis Sluder of medical care and had the opportunity to intervene.

251. Defendant Russell Ballard witnessed Monica Headrick depriving Alexis Sluder of medical care and had the opportunity to intervene.

252. Defendant Russell Ballard witnessed David Mckinney depriving Alexis Sluder of medical care and had the opportunity to intervene.

253. Russell Ballard acted objectively unreasonably and with deliberate indifference towards the safety of Alexis Sluder in the following ways:

   a. Failing to transfer Alexis Sluder to a medical facility upon learning that she had taken dangerous substances;

   b. Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder had ingested dangerous substances;

   c. Failing to place Alexis Sluder on any withdrawal protocol upon learning that she had ingested dangerous substances;

   d. Failing to monitor Alexis Sluder despite knowledge that she had taken dangerous substances;

   e. Failing to monitor Alexis Sluder despite knowledge that she was experiencing a drug overdose;

   f. Failing to monitor Alexis Sluder despite knowledge that she was experiencing a medical emergency;

g.  Failing to notify medical staff upon learning that Alexis Sluder was undergoing a medical emergency;

h.  Failing to notify medical staff upon learning that Alexis Sluder was undergoing a drug overdose;

i.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a medical emergency;

j.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a medical emergency;

k.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a drug overdose;

l.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a drug overdose;

m.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was in extreme pain;

n.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was in extreme pain;

o.  Failing to transfer Alexis Sluder to a medical facility while physically observing her undergo a medical emergency;

50

p.  Failing to transfer Alexis Sluder to a medical facility while physically observing her undergo a drug overdose;

q.  Failing to transfer Alexis Sluder to a medical facility while physically observing her in extreme pain;

r.  Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder undergo a medical emergency;

s.  Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder undergo a drug overdose;

t.  Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder in extreme pain;

u.  Failing to take any other reasonable measures to provide Alexis Sluder access to necessary medical care;

v.  Failing to take any other reasonable measure upon learning that Alexis Sluder had ingested dangerous substances;

w.  Failing to take any other reasonable measures upon learning that Alexis Sluder needed medical treatment;

x.  Failing to take any other reasonable measures upon learning that Alexis Sluder needed heightened monitoring;

51

y.  Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a drug overdose;

z.  Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a medical emergency;

aa.  Failing to respond to Alexis Sluder's medical emergency in a timely manner;

bb.  Failing to intervene to stop Rebecka Phillips' objectively unreasonable and deliberately indifferent conduct;

cc.  Failing to intervene to stop Maveis Brooks' objectively unreasonable and deliberately indifferent conduct;

dd.  Failing to intervene to stop Monica Headrick's objectively unreasonable and deliberately indifferent conduct;

ee.  Failing to intervene to stop David McKinney's objectively unreasonable and deliberately indifferent conduct; and

ff.  Failing to take any other reasonable measures to ensure Alexis Sluder's safety.

254.  As a direct and proximate result of Russell Ballard's objectively unreasonable conduct and deliberate indifference, Alexis Sluder did not receive necessary medical attention.

255. As a direct and proximate result of Russell Ballard's objectively unreasonable conduct and deliberate indifference, Alexis Sluder suffered a long, painful, drug overdose.

256. As a direct and proximate result of Russell Ballard's objectively unreasonable conduct and deliberate indifference, Alexis Sluder passed away.

Wherefore, Plaintiffs, personally and as individual administrators of the Estate of Alexis Sluder, seek to recover lost support and services, medical expenses, mental pain and suffering, loss of normal life, attorneys' fees, punitive damages, and any other appropriate compensatory damages.

## 42 U.S.C. Section 1983—Fourteenth Amendment
*Plaintiffs v. David McKinney*

257. Plaintiff incorporates Paragraphs 1-196 as if independently stated in the section herein.

258. At all relevant times, including when she was booked into the RYDC and when she began to overdose, Alexis Sluder had an objectively serious medical need.

259. At all relevant times, Assistant Director David McKinney knew that Alexis Sluder had taken dangerous substances.

260. Upon learning that Alexis Sluder had taken dangerous substances, Assistant Director David McKinney knew that Alexis Sluder required medical treatment.

261. Upon learning that Alexis Sluder had taken dangerous substances, Assistant Director David McKinney knew that Alexis Sluder required heightened levels of monitoring.

262. Assistant Director David McKinney also knew that Alexis Sluder required heightened levels of monitoring due to her mental health risks, which included diagnoses of serious mental illnesses and recent suicide attempts.

263. Upon learning that Alexis Sluder had taken dangerous substances and had serious mental health risks, Assistant Director David McKinney knew that Alexis Sluder had an objectively serious medical need.

264. Upon learning that Alexis Sluder had taken dangerous substances, Assistant Director David McKinney knew that Alexis Sluder was at risk of serious harm if not appropriately monitored.

265. Upon learning that Alexis Sluder had taken dangerous substances, Assistant Director David McKinney knew that Alexis Sluder needed to be transported to a medical facility.

266. Defendant David Mckinney witnessed Rebecka Phillips depriving Alexis Sluder of medical care and had the opportunity to intervene.

267. Defendant David Mckinney witnessed Maveis Brooks depriving Alexis Sluder of medical care and had the opportunity to intervene.

268. Defendant David Mckinney witnessed Monica Headrick depriving Alexis Sluder of medical care and had the opportunity to intervene.

269. Defendant David Mckinney witnessed Russell Ballard depriving Alexis Sluder of medical care and had the opportunity to intervene.

270. Assistant Director David McKinney acted objectively unreasonably and with deliberate indifference towards the safety of Alexis Sluder in the following ways:

   a. Failing to transfer Alexis Sluder to a medical facility upon learning that she had taken dangerous substances;

   b. Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder had ingested dangerous substances;

   c. Failing to place Alexis Sluder on any withdrawal protocol upon learning that she had ingested dangerous substances;

   d. Failing to monitor Alexis Sluder despite knowledge that she had taken dangerous substances;

e.   Failing to monitor Alexis Sluder despite knowledge that she was experiencing a drug overdose;

f.   Failing to monitor Alexis Sluder despite knowledge that she was experiencing a medical emergency;

g.   Failing to notify medical staff upon learning that Alexis Sluder was undergoing a medical emergency;

h.   Failing to notify medical staff upon learning that Alexis Sluder was undergoing a drug overdose;

i.   Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a medical emergency;

j.   Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a medical emergency;

k.   Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a drug overdose;

l.   Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a drug overdose;

m.   Failing to transfer Alexis Sluder to a medical facility upon learning that she was in extreme pain;

n.   Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was in extreme pain;

o.   Failing to take any other reasonable measure upon learning that Alexis Sluder had ingested dangerous substances;

p.   Failing to take any other reasonable measures upon learning that Alexis Sluder needed medical treatment;

q.   Failing to take any other reasonable measures upon learning that Alexis Sluder had been placed on heightened monitoring;

r.   Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a drug overdose;

s.   Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a medical emergency;

t.   Failing to respond to Alexis Sluder's medical emergency in a timely manner;

u.   Failing to intervene to stop Rebecka Phillips' objectively unreasonable and deliberately indifferent conduct;

v.   Failing to intervene to stop Maveis Brooks' objectively unreasonable and deliberately indifferent conduct;

w.   Failing to intervene to stop Russell Ballard's objectively unreasonable and deliberately indifferent conduct;

    x.   Failing to intervene to stop Monica Headrick's objectively unreasonable and deliberately indifferent conduct;

    y.   Failing to physically go to the Elbert Shaw RYDC to evaluate Alexis Sluder when she knew of her condition;

    z.   Failing to take reasonable steps to address the known understaffing at the Elbert Shaw RYDC on the night of the incident.

    aa.  Making decisions on medical matters despite not being medical personnel; and

    bb.  Failing to take any other reasonable measures to ensure Alexis Sluder's safety.

271. As Facility Director, Defendant McKinney was also a supervising official of the Elbert Shaw Regional Detention Facility.

272. As a supervisor, Defendant McKinney maintained and enforced a policy in which subordinates could not transport juveniles in their care to a medical facility when they are experiencing medical emergencies.

273. As a supervisor, Defendant McKinney maintained and enforced a policy in which subordinates could not provide medical care to juveniles experiencing medical emergencies.

274. As a supervisor, Defendant McKinney maintained and enforced a policy in which subordinates could not contact emergency services and/or transportation for juveniles experiencing medical emergencies.

275. As a supervisor, Defendant McKinney directed Defendant Monica Headrick to deprive Alexis Sluder of medical care while she was experiencing a medical emergency and otherwise deprive her of constitutional rights.

276. As a supervisor, Defendant McKinney directed Defendant Maveis Brooks to deprive Alexis Sluder of medical care while she was experiencing a medical emergency and otherwise deprive her of constitutional rights.

277. Defendant McKinney directed Defendant Rebecka Phillips to deprive Alexis Sluder of medical care while she was experiencing a medical emergency and otherwise deprive her of constitutional rights.

278. Defendant McKinney directed Defendant Russell Ballard to deprive Alexis Sluder of medical care while she was experiencing a medical emergency and otherwise deprive her of constitutional rights.

279. Defendant McKinney knew Defendant Monica Headrick would deprive Alexis Sluder of medical care while she was experiencing a medical

emergency and otherwise deprive her of constitutional rights but failed to stop them from doing so.

280. Defendant McKinney knew Defendant Maveis Brooks to deprive Alexis Sluder of medical care while she was experiencing a medical emergency and otherwise deprive her of constitutional rights but failed to stop them from doing so.

281. Defendant McKinney knew Defendant Rebecka Phillips to deprive Alexis Sluder of medical care while she was experiencing a medical emergency and otherwise deprive her of constitutional rights but failed to stop them from doing so.

282. Defendant McKinney knew Defendant Russell Ballard to deprive Alexis Sluder of medical care while she was experiencing a medical emergency and otherwise deprive her of constitutional rights but failed to stop them from doing so.

283. Defendant McKinney was deliberately indifferent to a widespread practice in which juveniles were not provided with adequate medical care at the Dalton RYDC.

284. Defendant McKinney was deliberately indifferent to a widespread practice in which RYDCs lack sufficient medical staff to keep juveniles in custody safe.

285.  Defendant McKinney knew that DJJ RYDCs were chronically understaffed and took no measures to alleviate the dangers such understaffing posed to juveniles at the Dalton RYDC.

286.  Such chronic understaffing predictably led to failures in assessing, diagnosing, and treating juveniles in the Dalton RYDC, including Alexis Sluder.

287.  Defendant McKinney knew that there was a widespread practice at DJJ RYDCs, including the Dalton RYDC, or allowing youths to suffer needless pain and continued illness due to undiagnosed or inadequately treated medical conditions.

288.  Defendant McKinney was deliberately indifferent to the widespread practice of allowing youths to suffer needless pain and continued illness due to undiagnosed or inadequately treated medical conditions.

289.  The widespread practice of allowing youths to suffer needless pain and continued illness due to undiagnosed or inadequately treated medical conditions predictably

290.  Defendant McKinney knew the facility was understaffed on the night of the incident.

291.  Defendant McKinney did not take any steps to alleviate the understaffing problem on the night of the incident.

292.  Defendant McKinney knew that the understaffing problem posed a direct threat to the safety of the juveniles in custody at the Dalton RYDC, including Alexis Sluder.

293.  Defendant McKinney was deliberately indifferent to the risks posed by chronic understaffing at the Dalton RYDC.

294.  As a direct and proximate result of Assistant Director David McKinney's objectively unreasonable conduct and deliberate indifference, Alexis Sluder did not receive necessary medical attention.

295.  As a direct and proximate result of Assistant Director David McKinney's objectively unreasonable conduct and deliberate indifference, Alexis Sluder suffered a long, painful, drug overdose.

296.  As a direct and proximate result of Assistant Director David McKinney's objectively unreasonable conduct and deliberate indifference, Alexis Sluder passed away.

Wherefore, Plaintiffs, personally and as individual administrators of the Estate of Alexis Sluder, seek to recover lost support and services, medical expenses, mental pain and suffering, loss of normal life, attorneys' fees, punitive damages, and any other appropriate compensatory damages.

**42 U.S.C. Section 1983—Fourteenth Amendment**
*Plaintiffs v. Monica Headrick*

297.   Plaintiff incorporates Paragraphs 1-196 as if independently stated in the section herein.

298.   At all relevant times, including when she was booked into the RYDC and when she began to overdose, Alexis Sluder had an objectively serious medical need.

299.   At all relevant times, Monica Headrick knew that Alexis Sluder had taken dangerous substances.

300.   Upon learning that Alexis Sluder had taken dangerous substances, Monica Headrick knew that Alexis Sluder required medical treatment.

301.   Upon learning that Alexis Sluder had taken dangerous substances, Monica Headrick knew that Alexis Sluder required heightened levels of monitoring.

302.   Monica Headrick also knew that Alexis Sluder required heightened levels of monitoring due to her mental health risks, which included diagnoses of serious mental illnesses and recent suicide attempts.

303.   Upon learning that Alexis Sluder had taken dangerous substances, Monica Headrick knew that Alexis Sluder had an objectively serious medical need.

304. Upon learning that Alexis Sluder had taken dangerous substances, Monica Headrick knew that Alexis Sluder was at risk of serious harm if not appropriately monitored.

305. Upon learning that Alexis Sluder had taken dangerous substances, Monica Headrick knew that Alexis Sluder needed to be transported to a medical facility.

306. Monica Headrick became aware that Alexis Sluder was undergoing a medical emergency while Alexis Sluder was overdosing.

307. Despite her knowledge that Alexis Sluder was undergoing a medical emergency, Monica Headrick did nothing to help her.

308. Defendant Monica Headrick witnessed Rebecka Phillips depriving Alexis Sluder of medical care and had the opportunity to intervene.

309. Defendant Monica Headrick witnessed Maveis Brooks depriving Alexis Sluder of medical care and had the opportunity to intervene.

310. Defendant Monica Headrick witnessed David McKinney depriving Alexis Sluder of medical care and had the opportunity to intervene.

311. Defendant Monica Headrick witnessed Russell Ballard depriving Alexis Sluder of medical care and had the opportunity to intervene.

312. Monica Headrick acted objectively unreasonably and with deliberate indifference towards the safety of Alexis Sluder in the following ways:

a.  Failing to recommend transfer of Alexis Sluder to a medical facility upon learning that she had taken dangerous substances;

b.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder had ingested dangerous substances;

c.  Failing to place Alexis Sluder on any withdrawal protocol upon learning that she had ingested dangerous substances;

d.  Failing to monitor Alexis Sluder despite knowledge that she had taken dangerous substances;

e.  Failing to monitor Alexis Sluder despite knowledge that she was experiencing a drug overdose;

f.  Failing to monitor Alexis Sluder despite knowledge that she was experiencing a medical emergency;

g.  Failing to notify medical staff upon learning that Alexis Sluder was undergoing a medical emergency;

h.  Failing to notify medical staff upon learning that Alexis Sluder was undergoing a drug overdose;

i.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a medical emergency;

j.   Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a medical emergency;

k.   Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a drug overdose;

l.   Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a drug overdose;

m.   Failing to transfer Alexis Sluder to a medical facility upon learning that she was in extreme pain;

n.   Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was in extreme pain;

o.   Failing to take any other reasonable measure upon learning that Alexis Sluder had ingested dangerous substances;

p.   Failing to take any other reasonable measures upon learning that Alexis Sluder needed medical treatment;

q.   Failing to take any other reasonable measures upon learning that Alexis Sluder had been placed on heightened monitoring;

r.   Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a drug overdose;

s.   Failing to take any other reasonable measures upon learning that Alexis Sluder was undergoing a medical emergency;

t.   Failing to respond to Alexis Sluder's medical emergency in a timely manner;

u.   Failing to physically go to the Elbert Shaw RYDC to evaluate Alexis Sluder when she knew of her condition;

v.   Failing to physically go to the Elbert Shaw RYDC to evaluate Alexis Sluder when she knew no other medical staff was there to evaluate her in person;

w.   Failing to intervene to stop Rebecka Phillips' objectively unreasonable and deliberately indifferent conduct;

x.   Failing to intervene to stop Maveis Brooks' objectively unreasonable and deliberately indifferent conduct;

y.   Failing to intervene to stop Russell Ballard's objectively unreasonable and deliberately indifferent conduct;

z.   Failing to intervene to stop David McKinney's objectively unreasonable and deliberately indifferent conduct;

aa.  Failing to contact a Medical Director of Physician when making decisions regarding Ms. Sluder's condition and need for transportation; and

67

bb.  Failing to take any other reasonable measures to ensure Alexis
      Sluder's safety.

313.  As a direct and proximate result of Monica Headrick's objectively
      unreasonable conduct and deliberate indifference, Alexis Sluder did not
      receive necessary medical attention.

314.  As a direct and proximate result of Monica Headrick's objectively
      unreasonable conduct and deliberate indifference, Alexis Sluder
      suffered a long, painful, drug overdose.

315.  As a direct and proximate result of Monica Headrick's objectively
      unreasonable conduct and deliberate indifference, Alexis Sluder passed
      away.

Wherefore, Plaintiffs, personally and as individual administrators of the
Estate of Alexis Sluder, seek to recover lost support and services, medical
expenses, mental pain and suffering, loss of normal life, attorneys' fees,
punitive damages, and any other appropriate compensatory damages.

### 42 U.S.C. Section 1983—Fourteenth Amendment
*Plaintiffs v. Sharon Ellis*

316.  Plaintiff incorporates Paragraphs 1-196 as if independently stated in
      the section herein.

317. At all relevant times, including when she was booked into the RYDC and when she began to overdose, Alexis Sluder had an objectively serious medical need.

318. At all relevant times, Sergeant Sharon Ellis knew that Alexis Sluder had taken dangerous substances.

319. Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Sharon Ellis knew that Alexis Sluder required medical treatment.

320. Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Sharon Ellis knew that Alexis Sluder required heightened levels of monitoring.

321. Sergeant Sharon Ellis also knew that Alexis Sluder required heightened levels of monitoring due to her mental health risks, which included diagnoses of serious mental illnesses and recent suicide attempts.

322. Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Sharon Ellis knew that Alexis Sluder had an objectively serious medical need.

323.  Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Sharon Ellis knew that Alexis Sluder was at risk of serious harm if not appropriately monitored.

324.  Upon learning that Alexis Sluder had taken dangerous substances, Sergeant Sharon Ellis knew that Alexis Sluder needed to be transported to a medical facility.

325.  Sergeant Sharon Ellis acted objectively unreasonably and with deliberate indifference towards the safety of Alexis Sluder in the following ways:

    a.  Failing to transfer or transport Alexis Sluder to a medical facility upon learning that she had taken dangerous substances;

    b.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder had ingested dangerous substances;

    c.  Refusing to transport Alexis Sluder to a medical facility;

    d.  Failing to notify medical staff upon learning that Alexis Sluder had ingested dangerous substances;

    e.  Failing to write in the booking intake form that Alexis Sluder had methamphetamine on her person;

f.  Failing to take any other reasonable measure upon learning that Alexis Sluder had ingested dangerous substances;

g.  Failing to take any other reasonable measures upon learning that Alexis Sluder needed medical treatment;

h.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a medical emergency;

i.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a medical emergency;

j.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was undergoing a drug overdose;

k.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was undergoing a drug overdose;

l.  Failing to transfer Alexis Sluder to a medical facility upon learning that she was in extreme pain;

m.  Failing to contact 9-1-1 or any other emergency medical services upon learning that Alexis Sluder was in extreme pain;

n.  Failing to transfer Alexis Sluder to a medical facility while physically observing her undergo a medical emergency;

71

o.   Failing to transfer Alexis Sluder to a medical facility while physically observing her undergo a drug overdose;

p.   Failing to transfer Alexis Sluder to a medical facility while physically observing her in extreme pain;

q.   Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder undergo a medical emergency;

r.   Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder undergo a drug overdose;

s.   Failing to contact 9-1-1 or any other emergency medical services while physically observing Alexis Sluder in extreme pain;

t.   Failing to take any other reasonable measures to provide Alexis Sluder access to necessary medical care;

u.   Failing to take any other reasonable measures upon learning that Alexis Sluder needed heightened monitoring; and,

v.   Failing to take any other reasonable measures to ensure Alexis Sluder's safety.

326. As a direct and proximate result of Sergeant Sharon Ellis's objectively unreasonable conduct and deliberate indifference, Alexis Sluder did not receive necessary medical attention.

327. As a direct and proximate result of Sergeant Sharon Ellis's objectively unreasonable conduct and deliberate indifference, Alexis Sluder suffered a long, painful, drug overdose.

328. As a direct and proximate result of Sergeant Sharon Ellis's objectively unreasonable conduct and deliberate indifference, Alexis Sluder passed away.

Wherefore, Plaintiffs, personally and as individual administrators of the Estate of Alexis Sluder, seek to recover lost support and services, medical expenses, mental pain and suffering, loss of normal life, attorneys' fees, punitive damages, and any other appropriate compensatory damages.

## **Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs Melanie Hogan Sluder and Ricky Shawn Curtis, individually and as administrators of the estate of Alexis Marie Sluder, hereby demand a jury trial of all issues capable of being determined by a jury.

## **Prayer for Relief**

WHEREFORE, Plaintiffs Melanie Hogan Sluder and Ricky Shawn Curtis,

individually and as administrators of the estate of Alexis Marie Sluder, pray

for judgment against Defendants, damages, attorneys' fees, disbursement,

and any other and further relief as this Court deems just and equitable.

/s/ Sam Harton
*One of Plaintiff's Attorneys*

Romanucci and Blandin, LLC
Sam Harton
321 N. Clark St. Chicago, IL 60654
Tel: (312) 458-1000
Email: sharton@rblaw.net

Harold Boone, Jr.
The Boone Firm, P.C.
100 Hartsfield Center Parkway
Suite 100
Atlanta, GA 30354
(470) 765-6899 (phone)
(470) 745-6047 (fax)