EXHIBIT A

**Remote Video Conference Deposition of
Sharon Ellis taken on June 17, 2025**

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                        ROME DIVISION
3   MELANIE HOGAN SLUDER and        )
    RICKY SHAWN CURTIS, Individually )
4   and as Independent Administrators)
    of the Estate of Alexis Marie    )
5   Sluder, Deceased,                )
            Plaintiffs,              )
6                                    )  CASE NO.
        -vs-                         )
7                                    )  4:24-CV-00181
    REBECKA PHILLIPS, MAVEIS BROOKS, )
8   RUSSELL BALLARD, DAVID MCKINNEY, )
    MONICA HEADRICK, SHARON ELLIS,   )
9   GILMORE COUNTY (a municipal      )
    corporation),                    )
10           Defendants.             )
11
12
13       REMOTE VIDEOCONFERENCE DEPOSITION OF
14                    SHARON ELLIS
15
16          Taken on behalf the Plaintiffs
17
             Tuesday, June 17, 2025
18                12:06 p.m. EST
19
20       Laura B. Gildenberg, CCR No. B-1810
              Certified Court Reporter
21
22
23              LYON REPORTING, INC.
             Certified Court Reporters
24    P.O. Box 81124, Atlanta, Georgia 30366
           770/458-5500  800/767-2030
25             www.lyonreporting.com
                                              1
```

**Page 2**

```
1   REMOTE APPEARANCES OF COUNSEL:
2
    ON BEHALF OF THE PLAINTIFFS:
3
        SAM HARTON, ATTORNEY AT LAW
4       Romanucci & Blandin, LLC
        321 N. Clark Street
5       Suite 900
        Chicago, Illinois 60654
6       (312) 458-1000
        sharton@rblaw.net
7
8   HAROLD BOONE, JR., ATTORNEY AT LAW
        The Boone Firm, P.C.
9       100 Hartsfield Center Parkway
        Suite 100
10      Atlanta, Georgia 30354
        (470) 765-6899
11      hboonejr@boonefirm.com
12
    ON BEHALF OF DEFENDANT REBECKA PHILLIPS:
13
        CHARLES J. COLE, ATTORNEY AT LAW
14      McRae Bertschi & Cole, LLC
        1872 Independence Square
15      Suite D
        Dunwoody, Georgia 30338
16      (678) 999-1105
        cjc@mcraebertschi.com
17
18  ON BEHALF OF DEFENDANT MAVEIS BROOKS:
19      NOAH GREEN, ATTORNEY AT LAW
        Henefeld & Green, P.C.
20      3017 Bolling Way, N.E.
        Suite 129
21      Atlanta, Georgia 30305
        (404) 841-1275
22      ngreen@henefeldgreen.com
23
24
25  (continued)
                                              2
```

**Page 3**

```
1   ON BEHALF OF DEFENDANT RUSSELL BALLARD:
2       ANNARITA L. MCGOVERN, ATTORNEY AT LAW
        Annarita McGovern Law, LLC
3       125 Stonemist Court
        Roswell, Georgia 30076
4       (678) 488-6681
        annarita@amcgovernlaw.com
5
6   ON BEHALF OF DEFENDANT DAVID MCKINNEY:
7       GARRETT R. GREINER, ATTORNEY AT LAW
        Gannam Gnann & Steinmetz, LLC
8       Post Office Box 10085
        Savannah, Georgia 31412
9       (912) 232-1192
        ggreiner@ggsattorneys.com
10
11  ON BEHALF OF DEFENDANT MONICA HEADRICK:
12      WILLIAM R. DRIGGERS, ATTORNEY AT LAW
        Buckley Christopher & Hensel, PC
13      2970 Clairmont Road, N.E.
        Suite 650
14      Atlanta, Georgia 30329
        (404) 633-9230
15      wdriggers@bchlawpc.com
16
17  ON BEHALF OF DEFENDANTS SHARON ELLIS & GILMER COUNTY
18      RYAN L. RAY, ATTORNEY AT LAW*
        Womack, Rodham & Ray, PC
        P.O. Box 549
19      109 East Patton Street
        LaFayette, Georgia 30728
20      (706) 638-2234
        rray@wrrlawfirm.com
21
22  ALSO PRESENT REMOTELY:
23      David Clark, Attorney at Law (Gilmer County)*
24
25        (*Present with the witness)
                                              3
```

**Page 4**

```
1        I N D E X   T O   E X A M I N A T I O N
2   Examination by Ms. Harton. . . . . . . . . . .  7
3
4
5
6        I N D E X   T O   E X H I B I T S
7   Plaintiffs'                        Marked/First
    Exhibit No.   Description           Identified
8
9        5      8/26/2022 DJJ Special Incident
                Reporting Form . . . . . . . . .  134
10      12      8/26/2022 Sharon Ellis Statement . 133
11      15      8/26/2022 Alexis Sluder Statement. 126
12    18(c)     Photo: Located Suspected Meth. . . 169
13      21      Screenshots: Text Messages. . . .  165
14      28      Screenshots:  Ellis Call Records . 113
15      32      Video:  Gate A . . . . . . . . . . 139
16      33      Video:  Gate A . . . . . . . . . . 141
17      35      Video:  Front Gate B . . . . . . . 138
18      40      Juvenile Procedures. . . . . . . .  48
19      45      Ellis Timeline . . . . . . . . . . 115
20      46      Video:  Back Seat of Vehicle . . . 148
21      49      8/26/2022 Delivering Officer/Worker
                Courtesy Form. . . . . . . . . . .  83
22
        50      Special Incident Report. . . . . . 135
23
        51      Gilmer County Sheriff's Office
24              Miscellaneous Incident Report. . . 137
25
                                              4
```



1     (The following transcript may contain quoted
2     material, which is reproduced as read or spoken.)
3
4
5                         - - -
6
7
8               PUNCTUATION NOTE
9     -- = Sentence interrupted
10    ... = Sentence not completed though not interrupted
11
12
13                        - - -
14
15
16               DISCLOSURE
17    (Pursuant to O.C.G.A. Section 9-11-29(a) and (d)
      and Section 15-14-37(a), (b), and (c), the
18    court reporter disclosure statement is tendered
      at the end of the transcript.)
19
20
21
22                        - - -
23
24
25

                                                          5

1         P R O C E E D I N G S
2         MR. RAY:  If we could put on the
3     record that the witness will read and sign
4     the deposition transcript.
5         MS. HARTON:  Okay.
6         THE COURT REPORTER:  All right.
7     Counsel --
8         MR. RAY:  And, Sam --
9         Oh, go ahead.
10        THE COURT REPORTER:  No, that's okay.
11    Go ahead.  Still on the record.
12        MR. RAY:  Could we get a stipulation
13    on the record that we'll reserve all
14    objections except to the form of the
15    question and responsiveness of the answer
16    until use of the deposition or until
17    trial?
18        MS. HARTON:  That works.  I'll
19    stipulate to that.
20        MR. RAY:  Thank you.
21        We're ready to go.
22        THE COURT REPORTER:  All right.  And,
23    Counsel, before I swear in the witness:
24        Do you all agree that I can swear in
25    the witness remotely via Zoom today?  She

                                                          6

1     is located in Ellijay, Georgia.
2         MS. HARTON:  Sam Harton for the
3     plaintiff.  I agree.
4         MR. RAY:  Ryan Ray for Sharon Ellis.
5     I agree.
6         MR. COLE:  Chuck Cole for Rebecka
7     Phillips.  I agree.
8         MS. McGOVERN:  Annarita McGovern for
9     Russell Ballard.  I agree.
10        MS. HARTON:  Noah Green for Maveis
11    Brooks.  I agree.
12        THE COURT REPORTER:  And Mr. Greiner?
13        MR. GREINER:  Garrett Greiner on
14    behalf of David McKinney.  I agree.
15        THE COURT REPORTER:  And
16    Mr. Driggers?
17        MR. DRIGGERS:  Yeah, I agree.
18              SHARON ELLIS,
19        located in Ellijay, Georgia,
20        having been first remotely sworn,
21    was examined and testified as follows:
22              EXAMINATION
23    BY MS. HARTON:
24    Q.   All right.  Is it -- Is it Deputy Ellis?
25    A.   Yes.

                                                          7

1     Q.   Okay.  Not sergeant; correct?
2     A.   Correct.
3     Q.   Okay.  Deputy, have you ever given a
4     deposition before?
5     A.   One other time.
6     Q.   Okay.  Were you a defendant in that case?
7     A.   Yes.
8     Q.   Okay.  What was the nature of the case?
9     A.   I don't recall.
10    Q.   You were a defendant.
11        How many times have you been a defendant
12    in a lawsuit?
13    A.   It was one time.
14    Q.   One other time besides this time?
15    A.   I'm sorry?
16    Q.   It was one other time besides this time?
17    A.   Yes, ma'am.  Just the -- Just the
18    deposition.
19    Q.   Okay.  So -- So you understand you're a
20    defendant in this lawsuit; right?
21    A.   Yes.
22    Q.   And you've been a defendant in one other
23    lawsuit; right?
24    A.   Yes.
25    Q.   Okay.  What was that other lawsuit about?

                                                          8



1     A.   I don't recall.
2     Q.   Okay.  Did it have anything to do with
3  your duties as a -- as a sheriff's deputy?
4     A.   Can you repeat that -- Can you rephrase
5  that question.
6     Q.   Yeah.  You -- When you were sued as a
7  defendant in another case, did -- did the basis of
8  that lawsuit have anything to do with your job as a
9  sheriff's deputy?
10    A.   No.  It was about the facts of the event
11 of the -- of the events of the call.  It was just
12 a -- It was a deposition, but it didn't go any
13 further than that.  I don't know if that makes
14 sense.
15    Q.   Sure.
16         The facts of the call:  What facts?
17    A.   How I obtained the evidence, what I did
18 with the evidence, how I received the phone call.  I
19 mean not the phone call; the call.
20         I don't recall.  It's one of two cases
21 that come to mind; I just don't recall which one it
22 was.
23    Q.   Okay.  But it was something to do --
24 you -- you had investigated some sort of criminal
25 matter in that case; right?

9

1     A.   Correct.
2     Q.   And you were sued for some sort of conduct
3  that you were alleged to have performed as a
4  sheriff's deputy in that lawsuit; right?
5         MR. RAY:  Objection to form.
6     A.   I wasn't being sued.  It didn't go any
7  further than the depo.  So in other words, I had the
8  depo and I received a disposition that they were
9  charged on all -- on all of the -- that they were
10 found guilty of all the criminal charges.
11 BY MS. HARTON:
12    Q.   Okay.  So it was a criminal case against
13 someone else.
14    A.   Correct.
15    Q.   Okay.  Okay.  Well, I'm going to give you
16 some guidelines as to how a -- how a deposition
17 typically goes:
18         It's not like a normal conversation where
19 you kind of anticipate what other people say and you
20 might jump in or -- It's very important that we keep
21 this question-and-answer format.
22         I'm going to ask you my questions and I'm
23 going to do my best to let you finish your answer
24 before I ask my next question.  And I'm going to ask
25 that you do your best to let me finish the entire

10

1  question before you start giving your answer.  Is
2  that fair?
3     A.   Yes.
4     Q.   Okay.  Can you hear me okay in the room
5  that you're in?
6     A.   Yes.
7     Q.   Okay.  It sounds like there might be a
8  little bit of a delay, so we'll just have to be
9  really careful as far as talking over each other.
10         It's very important that you provide
11 verbal answers throughout this deposition -- so
12 yeses, nos, or whatever explanation you need to give
13 for the answer -- as opposed to huh-uhs (negatives),
14 uh-huhs (affirmatives), shaking the head, nodding
15 the head, because the court reporter won't be able
16 to take those things down.  Does that make sense?
17    A.   Yes.
18    Q.   Okay.  I've got an outline here that I've
19 prepared to ask you certain questions.  But like
20 most attorneys, I -- I tend to go pretty -- pretty
21 far off script as -- as we get into the deposition.
22 So that means that a lot of times I'm sort of asking
23 questions on the fly.  I'm trying to formulate my
24 questions on the fly, and so that means sometimes my
25 questions don't make a whole lot of sense.  And so

11

1  it's very important that if you do not understand
2  the question that I'm asking, you tell me because --
3  And I won't be offended.  I can always clarify or --
4  or rephrase.
5         But if you do go ahead and answer the
6  question, I'm going to go ahead and assume that you
7  understood it.  Is that fair?
8     A.   Yes.
9     Q.   Okay.  I'm not going to ask you to guess
10 or speculate.  I may ask you to approximate or
11 estimate.  But this is not a quiz, this is not a
12 test, so if the answer is I don't know, I don't
13 recall, I'm not sure, that answer is perfectly fine
14 as long as it's the truth.  Does that make sense?
15    A.   Yes.
16    Q.   Okay.  Sometimes your attorney or another
17 attorney on the call might object to a question that
18 I have.
19         Unless your attorney, though, instructs
20 you do not answer that question for some sort of
21 privilege, you are going to have to go ahead and
22 answer the question.  Does that make sense?
23    A.   Yes.
24    Q.   Okay.  You don't have any felonies in your
25 background, do you?

12



1    A.    No.
2    Q.    Okay.  Is there -- Is there any reason
3 sitting here today you won't be able to testify
4 truthfully and fully, something like you didn't get
5 enough sleep last night, you're ill, you're taking
6 some sort of new medication, anything like that?
7    A.    No.
8    Q.    Okay.  When did you get into law
9 enforcement?
10    A.    I -- I began my law enforcement career in
11 Florida.  Went into the basic law enforcement
12 academy there in '99, 1999, January of 1999.
13    Q.    And you -- you worked for the Orange
14 County Sheriff's Office while you were down there;
15 right?
16    A.    Yes.
17    Q.    Okay.  About -- Remind me how long you
18 were there.
19    A.    Approximately seven years.
20    Q.    So about 1999 to 2006?
21    A.    No.  I worked for a smaller agency prior
22 to that.
23    Q.    Okay.  Where did you work before that?
24    A.    The Edgewood Police Department.
25    Q.    Okay.  Is that in Orlando as well?

13

1    A.    It is.
2    Q.    Okay.  How many years did you work at
3 Edgewood?
4    A.    Approximately two years.
5    Q.    And then you went to Orange County?
6    A.    Yes.
7    Q.    And then after Orange County, did you come
8 up -- come up to Gilmer County?
9    A.    Yes.
10    Q.    So you've been in Gilmer County since
11 approximately 2008, 2009?
12    A.    2008, yes.
13    Q.    Have you ever been promoted to sergeant in
14 any of those positions?
15    A.    Yes.
16    Q.    Any of those departments?
17         Which one?
18    A.    Gilmer County.
19    Q.    Okay.  When were you promoted to sergeant?
20    A.    I don't recall.
21    Q.    Okay.  You're not (audio glitch)?
22         You're -- You're not a sergeant today?
23    A.    No.
24    Q.    A sergeant is a higher rank than a deputy;
25 correct?

14

1    A.    Yes.
2    Q.    So -- So did you get demoted to deputy?
3    A.    From sergeant?
4    Q.    Yes.
5    A.    No.
6    Q.    Okay.  Why are you a deputy now instead of
7 a sergeant?
8    A.    I accepted a promotion from sergeant to
9 lieutenant at the jail and I requested a voluntary
10 demotion.
11    Q.    Why did you do that?
12    A.    Because there was some conflict.
13    Q.    What kind of conflict?
14    A.    I didn't agree with some of the orders
15 that I was receiving.
16    Q.    You didn't agree with some of the orders
17 you were receiving from your captain at the jail?
18    A.    Not a captain.
19         Oh, from?
20    Q.    Yeah, from the captain.
21    A.    Correct.
22    Q.    Okay.  What kind of orders didn't you
23 agree with?
24    A.    Unlawful orders.
25    Q.    What kind of unlawful orders?

15

1    A.    For instance, he -- the policy stated that
2 we would not admit anybody with a .25 or higher if
3 they were intoxicated or if we suspected that
4 somebody was under the influence of drugs or
5 alcohol.  When I would refuse to accept until they
6 could be medically cleared, I was told that we don't
7 refuse anybody.  And I disagreed with that.
8    Q.    Okay.
9    A.    That is just an example.
10    Q.    Because under the policy, they were
11 supposed to go to some sort of medical facility
12 instead of the jail?
13    A.    Yes.
14    Q.    Okay.  And that -- And that was your
15 understanding as far -- You know, well, let me --
16 let me walk back a little bit.
17         You've been -- You've been in law
18 enforcement for over 20 years; right?
19    A.    Yes.
20    Q.    And about -- about what time -- what --
21 what time period was that happening where you were
22 being instructed to accept people into the jail that
23 the policy said the jail wouldn't accept?
24    A.    What year?
25    Q.    Yeah.

16

1      A.   I don't recall exactly.
2      Q.   Was it, like, in the last five years?
3      A.   Yes.
4      Q.   Okay.  Was it before or after the incident
5  with Alexis Sluder?
6      A.   It was after.
7      Q.   Okay.  And -- And you believed that, you
8  know, in your -- in your experience, twenty-- 25
9  years or so of law -- of law enforcement, that it
10  was -- it was not appropriate to admit someone who
11  had a .25 or higher alcohol intoxication?
12      A.   Yes.
13      Q.   Okay.  And why is that?
14      A.   Because, one, the person would need
15  medical attention.  That was with that and injuries.
16  Medical -- Medical attention first.  And then if
17  they were medically cleared, then they can return to
18  the jail and we would accept them.
19      Q.   So -- So you basically had to stand up to
20  a supervisor and say, I don't -- I don't agree
21  with -- with the orders you're giving me, while you
22  were there; right?
23      A.   Yes.
24      Q.   And that was because you believed having
25  those people who were intoxicated sent to a medical

17

1  facility as opposed to being accepted into the jail
2  was important to maintain the safety of the -- the
3  people that you were policing; fair?
4      A.   Yes.
5      Q.   Okay.  About how long did that go on where
6  you were being asked to -- to detain people in the
7  jail who -- where -- when you believed it was unsafe
8  to do so?
9      A.   I'm sorry?
10      MR. RAY:  Object -- Object to form.
11      A.   Can you repeat the question, please.
12  BY MS. HARTON:
13      Q.   Yeah.  So -- So you were kind of -- you
14  were kind of taking the position that -- that it was
15  unsafe to -- to detain these -- these people who
16  were intoxicated that were coming into the jail;
17  right?
18      A.   Yes.
19      Q.   Okay.  And did that happen multiple times?
20  Was it, like, an ongoing thing or was it just kind
21  of one isolated incident?
22      A.   Multiple times.  But when it -- when it
23  was addressed, it was one incident, if that makes
24  sense.
25          I was training a sergeant and I was

18

1  allowing him to make the call.  I knew what the
2  decision was, but I was giving him the ability to
3  run his shift and make -- make a decision.
4      Q.   What decision?  What do you mean?
5      A.   One of the city officers brought in a
6  female who was clearly under the influence of
7  something, and I allowed him -- instead of me making
8  the decision as to what to be done, I wanted to see
9  if he would be confident enough to make the correct
10  decision, so I allowed him.
11          When he expressed to me that she should be
12  refused and receive medical attention, I told him,
13  good job, and to let the officer know that she was
14  not going to be accepted.
15      Q.   And then what happened?
16      A.   The sergeant expressed it to the officer.
17  I don't know what that conversation entailed other
18  than the -- than the obvious, that he was letting
19  the officer know we were not going to accept him
20  until she -- she was medically cleared.
21          The officer was -- expressed -- came over
22  to me, he expressed that he was getting off duty
23  and, since it was a ticketable offense, he was going
24  to write her a ticket and release her.  And I told
25  him that was his arrest and his decision but we

19

1  could not accept her until she was medically
2  cleared.
3      Q.   Okay.
4      MR. RAY:  Sam, could we go off the
5      record, take a quick break for just a
6      minute?
7      MS. HARTON:  I mean, yeah.
8      MR. RAY:  Thank you.
9      THE COURT REPORTER:  Off the record.
10      (A recess was taken from 12:23 p.m. EST
11      until 12:25 p.m. EST.)
12      THE COURT REPORTER:  All right.  Back
13      on the record.
14      MS. HARTON:  Okay.
15  BY MS. HARTON:
16      Q.   So after this -- this incident happened
17  where you refused -- you -- you and the sergeant
18  expressed to the officer that you were refusing to
19  accept this intoxicated detainee, what did you do
20  next?
21      A.   I don't understand that question.
22      Q.   Did you -- Did you talk to your -- your
23  captain or your supervisor about the -- about the
24  detainee that you refused to take because she was
25  intoxicated?

20



1    A.    No.
2    Q.    Okay.  So you told the officer that it
3  was -- it was basically their decision whether, you
4  know, to release the person but you would not be
5  taking her; right?
6    A.    I'm sorry.  Repeat that --
7    Q.    Yeah.
8    A.    -- question, please.
9    Q.    Yeah.  Okay.  Let's --
10        So there was -- there was this -- this
11  girl who was brought to the -- your lieutenant who
12  was clearly intoxicated; right?  That we --
13    A.    Yeah.
14    Q.    -- we discussed before the break.
15    A.    I'm sorry.  I didn't hear the last part.
16    Q.    That we were just discussing before the
17  break.
18    A.    Yes.
19    Q.    Okay.  And you and the sergeant instructed
20  the officer that they could make a decision to
21  release her but you weren't going to accept her
22  because she needed to be medically cleared; right?
23    A.    No.
24    Q.    Okay.  Can you clarify it for me.
25        What am I missing?

21

1    A.    I didn't tell the officer that it was his
2  decision.  When he made the decision -- when I --
3  when I explained to him that we were not going to
4  accept her until she was medically cleared, he told
5  me that he was getting off duty and that it was a
6  ticketable offense, so he was just going to -- He
7  still had custody of her.  He was going to take her,
8  give her the citations, and then release her.
9        And at that point I told him that -- that
10  it's his arrest and he can do whatever he chooses to
11  do with her but that we would not accept her into
12  the adult detention center until she was medically
13  cleared.
14    Q.    Okay.  And -- And did you report that
15  incident to a supervisor or anything like that?
16    A.    No.
17    Q.    Okay.  Now, but earlier you said that you
18  had accepted this voluntary demotion because of
19  something going on at the jail involving them
20  accepting people who were intoxicated when they
21  shouldn't be.  Is that fair?
22    A.    One of -- That's one example.
23    Q.    Okay.  What were some other examples?
24    A.    Well, I was also being falsely accused of
25  doing things I wasn't doing and not doing things

22

1  that I was doing.
2    Q.    Like what?
3    A.    I was accused of staying in my office all
4  night.  I worked on the night shift.
5        And just for clarification:  I believe I
6  was just act -- I was acting lieutenant because I
7  had to take the promotional process.  But
8  nonetheless...
9        I was accused of remaining in my office
10  all night and, on the other hand, that I was accused
11  of micromanaging.  And I -- my response to that was,
12  well, I couldn't have been doing both.
13        My -- I was also accused of having a
14  sergeant in my office too much.  The purpose of that
15  was to train him.
16        When I first -- when I first arrived at
17  the jail, I was told that this particular sergeant
18  was not confident, he was afraid of making
19  decisions.  And I was trying to train him and
20  support him and allow him to make -- allow him to
21  make decisions.
22        I was being accused of doing things rather
23  than being asked why I did or didn't do something.
24    Q.    Who was accusing you?
25    A.    The captain.

23

1    Q.    Who is the captain?
2    A.    Captain Misty Williams.
3    Q.    And she was the captain of the jail?
4    A.    Yes.
5    Q.    Okay.  And now you are a deputy on -- on
6  patrol; is that fair?
7    A.    No.
8    Q.    Okay.  So what -- where -- what department
9  are you in now?
10    A.    I am assigned to the Court Services
11  Division.
12    Q.    Oh, right, right, right.
13        Were there -- Were there any other --
14        Besides the -- the one incident that you
15  described about the -- the girl that came in, were
16  there any other incidents while you were the -- that
17  you were a lieutenant at the jail where you were
18  asked to accept a intoxicated detainee who you
19  believed need to be medically cleared?
20    A.    I'm sorry.  I'm sorry to keep asking you
21  to repeat, but I'm going to ask you to repeat that
22  question again, please.
23        MS. HARTON:  Laura, could you read
24      the question back for me.
25        THE COURT REPORTER:  One moment.

24

1        All right.  The last question:
2        Were there -- Were there any other --
3        Besides the -- the one incident that
4   you described about the -- the girl that
5   came in, were there any other incidents
6   while you were the -- that you were a
7   lieutenant at the jail where you were
8   asked to accept a intoxicated detainee who
9   you believed need to be medically cleared?
10  A.   Yes.
11  BY MS. HARTON:
12  Q.   Okay.  How -- About how many times --
13       If you could approximate or estimate,
14  about how many times did that happen?
15  A.   I don't recall.  It was that -- The -- The
16  jail receives a lot of -- I can give you another
17  incident.  But the jail receives prisoners that come
18  in intoxicated, whether it's drugs or alcohol.  And
19  those incidents I don't know the number.  But
20  apparently there were officers that were reporting
21  back incorrect information to the captain, and I was
22  approached -- I was told by the captain that we are
23  not going to refuse anybody.  So there were a number
24  of times where prisoners that came in were refused
25  on my watch that required medical clearance.

25

1        And that kind of brought it to -- I guess
2   kind of brought it to a head and she told me that we
3   will not refuse anybody.  I reminded her of the
4   policy when I -- and she repeated herself.
5   Q.   And so after she repeated the policy to
6   you and -- you took that to indicate that she was
7   going to require you to violate the policy; fair?
8   A.   Fair.
9   Q.   You believed that the captain was going to
10  require you to accept people who needed to be
11  medically cleared because they were intoxicated and
12  at risk of some sort of illness; fair?
13  A.   It wasn't something I believed; it was a
14  direct order.
15  Q.   Okay.  It was that she directly ordered
16  you that you have to accept these people even when
17  you believed that there's a danger to their safety
18  based on their intoxication.
19  A.   Yes.
20  Q.   Okay.  And you, as a lieutenant, were not
21  willing to sacrifice the -- the safety and security
22  of -- of the people in Gilmer County by accepting
23  them when they needed to be medically cleared; fair?
24  A.   When you say "people," who are you
25  referring to?

26

1   Q.   The -- The -- The people that are coming
2   into the jail who have been arrested.
3   A.   Sure.
4   Q.   Okay.  Why -- why was that --
5        I mean, you -- you essentially had to be
6   demoted because of that decision; right?
7   A.   I wasn't demoted.
8   Q.   You took a voluntary demotion as a result
9   of that; right?
10  A.   Yes, it was voluntary.
11  Q.   Yeah.
12       Probably not necessarily the outcome you
13  wanted out of your career; right?
14  A.   Based on the circumstances, I was okay
15  with that.  That's why I took it.
16  Q.   Yeah.  Because you -- you can -- you can
17  sleep at night now knowing that -- that you did what
18  you needed to do to -- to protect the safety and
19  security of the people coming into the jail; right?
20  A.   Excuse me for pausing.
21       It's not that -- It's not that I can sleep
22  well at night; it's -- you know, it's -- it's our
23  responsibility, it's the policy, and I did what I
24  had to do.
25  Q.   Yeah.

27

1        And can you just tell me about why that
2   was so important for you to -- to stand your ground
3   on that particular policy.
4        MR. RAY:  Object to form.
5   A.   It's why I do this job.  It's -- It's our
6   responsibility for everybody's safety and security.
7   BY MS. HARTON:
8   Q.   Okay.  So as a -- a -- a deputy -- I want to
9   talk about your -- your job in -- in August of 2022.
10       You were a deputy -- You were a court
11  services deputy for Gilmer County; right?
12  A.   Yes.
13  Q.   Okay.  And as a court services deputy, you
14  have a variety of responsibilities including keeping
15  people safe; right?
16  A.   Yes.
17  Q.   Okay.  So that's sort of -- sort of the
18  main responsibility as a -- as a deputy for Gilmer
19  County is -- is to interact with the public when
20  there's a problem and make sure that they're safe to
21  the best of your ability; right?
22  A.   Yes.
23  Q.   Okay.  As a deputy, you have to detain
24  people; right?
25  A.   Yes.

28

1     Q.   And you have to transport people from
2  crime scenes and detainments to correctional
3  facilities; right?
4     A.   Not in court services.  Not from crime
5  scenes to -- unless I'm requested by a road -- a
6  road unit through my supervisors.  But trans- -- Our
7  transports are solely from -- from the court, from
8  the courthouse.
9     Q.   Okay.
10    A.   Or the jail.  I'm sorry.  Or the jail.
11  Jail or courthouse.
12    Q.   Okay.  But that --
13         I mean, you weren't transporting Alexis
14  Sluder on August 26th, 2022, from the courthouse,
15  were you?
16    A.   I'm sorry.  Can you repeat that.
17    Q.   You transported Alexis Sluder from the
18  county line to the Department of Juvenile Justice
19  RYDC on August 26th, 2022; right?
20    A.   Correct.
21    Q.   Okay.  So why don't -- why don't -- It
22  might be better just to have you put this stuff
23  in -- in your words.
24         I mean, as far as transporting detainees
25  and -- and people in the community as a court

29

1  services deputy, describe for me your
2  responsibilities as far as transportation goes.
3     A.   Are you speaking about the -- the process
4  or the procedure with the transporting in general?
5     Q.   Yeah, sure.  In August of 2022.
6     A.   So you want me to explain the events of
7  that day.
8     Q.   No.  No.  I want you to talk about your --
9  your responsibilities as a -- as a deputy.  I'm
10  trying -- I'm just trying to get a sense of your
11  day-to -- of your day-to-day -- you know.
12         You're transporting people; right?
13    A.   Yes.
14    Q.   Okay.  That is one of your
15  responsibilities as a deputy; right?
16    A.   Yes.
17    Q.   Okay.  And sometimes you are transporting
18  them to correctional facilities; right?
19    A.   Yes.
20    Q.   Okay.  And most of the people that you are
21  transporting are people who have been either accused
22  or convicted of some sort of crime; right?
23    A.   Yes.
24    Q.   Okay.  Now, when you trans- -- like, when
25  you transport people, it's important that you search

30

1  them for contraband; right?
2     A.   Not necessarily.
3     Q.   Okay.  Well, the people that you detain:
4  You don't -- You don't search them to make sure they
5  don't have any weapons on them?
6     A.   It depends on clothing, what they're
7  wearing; where we are; whether it's an adult, a
8  juvenile.
9     Q.   Okay.  So it's your testimony that it's
10  sort of at your discretion as an officer to
11  determine whether or not to search someone for
12  contraband; fair?
13    A.   If we can justify why, we do not.
14    Q.   Okay.  And how would you justify -- what
15  are some of the ways that you would justify not
16  searching someone?
17    A.   May I use this -- May I use the juvenile
18  involved in this case as a -- as an example?
19    Q.   Well, I -- I really -- I -- I know where
20  you're going with this and it's kind of a -- I know
21  it's kind of weird to not talk about the incident.
22         I need to kind of get a lay of the land
23  for how you were trained and how you understand the
24  Gilmer policies to work.  Okay?  So I'd really like
25  you to talk about maybe when you joined Gilmer

31

1  County and you were trained on how to transport
2  people.
3         Were you trained to search people?
4     A.   Yes.
5     Q.   Okay.  And were you trained that you have
6  discretion when to search people or were you trained
7  that it is mandatory that you -- that you search
8  everyone for contraband?
9     A.   Again, I don't recall if it was
10  specifically -- if I was specifically trained not
11  to.  But short of a strip search, anywhere, whether
12  it be juvenile or adult -- and, again, depending
13  upon -- depending on their attire and their -- the
14  place, the location, it would be a pat-down search;
15  it would not be a physical search.
16    Q.   And when you say "physical search," are
17  you referring to a strip search?
18    A.   Correct.
19    Q.   And when you refer to a strip search, can
20  you kind of explain that for the record.
21    A.   Yes.  I worked in the jail.  And when we
22  would receive and accept an inmate -- for instance,
23  we'll use a female; it works the same thing for a
24  male -- we take them into a room in booking
25  specifically designated for them to shower and

32

1  perform -- perform a strip search.
2        The strip search is visual, it's never
3  physical.  We would give the inmate instructions to
4  remove one piece, an article of clothing, at a time
5  and we would search it before we lay it down.  When
6  the inmate is -- has no more clothing on, we then
7  give them instructions so that we can --
8        Okay.  For instance, for a female, we
9  would instruct them to lift -- if they had big
10 breasts, to lift their breasts so we can see
11 underneath their breasts.  Lift their arms so we can
12 see under their armpits.  We would have them support
13 themselves with one hand against the -- face the
14 wall; use one hand to support themselves against the
15 wall; using their other hand to separate their
16 buttocks, squat, and cough.
17       While they're doing that, we're making a
18 physi- -- a visual observation to see if maybe
19 they're -- they are hiding something in their
20 vaginal or buttock area.
21    Q.   Okay.  And -- And a pat --
22       What is a pat-down search that you
23 described earlier?
24    A.   A pat-down is never inside the clothing;
25 it's simply just a pat outside of the -- outside of

33

1  the -- the clothing.
2     Q.   Okay.  And were you trained to perform
3  pat-down searches on anyone that you were
4  transporting?
5     A.   Yes.
6     Q.   Okay.  Were you -- Were you trained to
7  perform pat-down searches on -- that you were
8  required to perform pat-down searches on each person
9  that you transport?
10    A.   I'm sorry.  Can you repeat that.
11    Q.   Sure.  See, these are the questions that I
12 have to come up with and --
13       So were you trained to perform a pat-down
14 search on every person that you transport?
15    A.   Yes.
16    Q.   Okay.
17    A.   Both -- A -- A pat-down search doesn't
18 differ between adult and juvenile; a pat-down search
19 is a pat-down search.
20    Q.   Okay.  And you're -- you're required to
21 perform those on every person that you are
22 transporting?
23    A.   Again, it -- it depends on the clothing
24 and the location.
25    Q.   Okay.  So your -- your training has taught

34

1  you that you do not have to perform a -- a pat-down
2  search on people that you are transporting if there
3  are certain factors indicating to you that a
4  pat-down search isn't necessary; is that fair?
5     A.   I don't -- I don't recall if I was
6  specifically trained --
7     Q.   Okay.
8     A.   -- whether to perform a pat-down search or
9  not.
10       It is -- Yes, it is required.  However,
11 when somebody -- man -- well, adult or juvenile --
12 is wearing clothing so tight that it's sufficient
13 for a -- for visual observation, again, that's short
14 of performing a strip search.  I would -- Yes, it's
15 a discretionary call that I would make at the time
16 when I'm transporting.
17    Q.   All right.  And when did you -- how did
18 you come to understand that it was appropriate for
19 you to -- to make that discretionary call not to
20 perform a pat-down if the clothes were tight enough?
21    A.   Can you rephrase that.
22    Q.   Yeah.  You just -- You just said that if
23 the clothes are tight enough on a person, you can
24 sort of make the discretionary call not to perform a
25 pat-down; right?

35

1     A.   Yes.
2     Q.   Okay.  Where did you learn that that's --
3  that's appropriate?
4     A.   Where did I learn that that's appropriate?
5     Q.   Where did you --
6     A.   I don't...
7     Q.   Sorry.  Go ahead.
8     A.   I don't -- I don't recall.
9        When we do a pat-down search, we're --
10 especially getting into a vehicle, we are looking
11 for weapons and drugs.
12       I -- That is a discretionary call that I
13 make based on what the individual is wearing.  If I
14 don't see -- If it's -- If the clothing is so tight
15 I don't feel -- I mean I don't see -- excuse me -- I
16 don't see bulges or anything that would -- that
17 would give me cause to suspect that the individual
18 has something on them --
19       And, again, in -- in juvenile cases,
20 the -- the -- I'm sorry.  I'm just -- I'm just
21 trying to...
22       We just have to be more cautious because,
23 again, when you -- when you put hands on somebody --
24 And I have done this with adults; it's not just
25 juveniles.  If I can look at a person and their

36



1    clothes are so tight that it doesn't raise a
2    suspicion if they have any drugs or weapons on them,
3    again, and short of doing a strip search, it's
4    not -- it's just a call.  It's a discretionary
5    call -- a discretionary call that I made.
6        Q.   But you --
7        A.   Or I make.
8        Q.   As you sit here today, you cannot identify
9    any training or policy that you received from Gilmer
10   County explaining that you have that discretion to
11   make the call not to perform a pat-down; right?
12            MR. RAY:  Object to form.  She
13        doesn't work for Gilmer County.
14        A.   I don't recall.
15   BY MS. HARTON:
16       Q.   Okay.  As you sit here today, you cannot
17   identify any training or policy you received from
18   the Gilmer County Sheriff's office that gives you
19   that discretion to decide not to perform a pat-down;
20   right?
21       A.   I don't recall.
22       Q.   You have to transport people who are
23   either on drugs or have a history of -- of drug
24   addiction or drug use; right?
25       A.   Yes.

37

1        Q.   And one of your responsibilities as a
2    deputy in transporting people who are on drugs or
3    have a history of drug use is to take reasonable
4    measures to keep them safe; right?
5        A.   Yes.
6        Q.   That includes taking them to the hospital
7    when they appear at risk of a -- of a drug-related
8    emergency or illness; right?
9        A.   Under what circumstances?  Can you -- Can
10   you clarify that.
11       Q.   Well, are -- are you trained to identify
12   whether or not someone is having a -- a -- an
13   emergency related to their drug use?
14       A.   I don't recall if I was specifically
15   trained in that.  But based on observations, yes.
16       Q.   Okay.  You as a -- as a deputy with
17   25 years of law enforcement experience know how to
18   observe someone and look for signs if they're
19   experiencing symptoms of a drug-related emergency;
20   right?
21       A.   Yes.
22       Q.   Okay.  What -- What are some of the
23   symptoms that you're trained to look for?
24       A.   If the person is coherent, slurring words.
25   Could be physical -- physically observing.  Maybe

38

1    they have their eyes are red or watery.  Their
2    behavior can be erratic or subdued.  They --
3    Sometimes a person may act violently.  Can't assist
4    themselves, fall down, need assistance.  Things of
5    that nature.
6        Q.   As a law enforcement officer, 25 years of
7    experience, you know how to observe someone for
8    signs that they are actively high on drugs; right?
9        A.   For the most part, yes.
10       Q.   Okay.  And what -- what's your
11   understanding of what you should be looking for in
12   order to determine whether someone is -- is actively
13   on drugs?
14            MR. RAY:  Object to form.
15       A.   Basically what I just described.  However,
16   sometimes it is hard to detect.  Sometimes you have
17   functioning alcoholics out there or drug users out
18   there who can function in society and you -- it
19   would be difficult to detect whether or not that
20   person is currently on drugs or has done drugs or
21   alcohol for that matter.  So it's -- So sometimes
22   the signs are obvious and sometimes they're not.
23   BY MS. HARTON:
24       Q.   Okay.  It's important as a -- as a deputy,
25   for the safety of the people that you're detaining,

39

1    to make sure that they don't have any drugs on their
2    person; fair?
3        A.   Can you clarify, please.
4            MS. HARTON:  Laura, could you read
5        back my question.
6            THE COURT REPORTER:  One moment.
7            The last question:  Okay.  It's
8        important as a -- as a deputy, for the
9        safety of the people that you're
10       detaining, to make sure that they don't
11       have any drugs on their person; fair?
12       A.   Drugs or weapons.
13   BY MS. HARTON:
14       Q.   I want to specifically speak about drugs.
15   It's -- When you're -- It's important to make
16   sure -- Strike that.
17            It's important for the safety and security
18   of the people that you're transporting to make sure
19   they don't have access to drugs while they are in
20   your custody; right?
21       A.   As far as a visual or physical pat-down
22   search would allow me.
23       Q.   Okay.  Is there any -- Besides a visual
24   search or a pat-down, is there any other way for you
25   to determine whether or not someone has drugs on

40

1  them short of a strip search?
2      A.  If they admit it.
3      Q.  Okay.  So -- So directly asking them if
4  they have drugs on them; right?
5      A.  Depending on why I'm transporting.
6      Q.  Okay.  So if -- if you know that you are
7  transporting someone for a -- a drug-related
8  offense, you might -- you would ask them if they
9  have drugs on them?
10     A.  Yes, prior to me patting them down.
11     Q.  Okay.  If you were -- If you were
12  detaining someone who you knew had a history of drug
13  use or drug addiction, would you ask them if they
14  have drugs on them?
15     A.  Maybe I would, maybe I wouldn't.  Again,
16  it depends on location.
17     Q.  What do you mean "it depends on location"?
18     A.  So if I came in contact with somebody on
19  the street, yes, I would ask them.
20          If I'm transporting somebody directly
21  that -- that -- that was remanded by a judge, I
22  probably would not.  If they come through a
23  courthouse, they're coming through security, so,
24  again, I may or I may not ask them if they do.  Most
25  likely, if they're remanded into custody in the

41

1  courtroom, probably not.
2      Q.  Are there any other situations where you
3  would not ask someone who you know to have a history
4  of drug use whether they have drugs on them?
5      A.  As of this moment, I can't think of one.
6      Q.  Okay.  Because asking whether an
7  individual who has a history of drug use has drugs
8  on them or not is one way to increase their safety
9  and security by ensuring they don't have dangerous
10  substances on them; right?
11     A.  Repeat that question for me, please.
12     Q.  I can -- I can take it a step back.
13          It is your responsibility as a deputy to
14  take all reasonable measures to make sure the people
15  you are transporting do not have dangerous
16  substances on their person; right?
17     A.  The best of my ability.
18     Q.  In the best of your ability.
19          And one of the things that is within your
20  ability is to ask the person if they have drugs on
21  them; right?
22     A.  Again, it depends on the situation.
23     Q.  But it's one thing that you can do to
24  increase the chances that this person does not have
25  dangerous substances on them; right?

42

1      A.  I can.
2      Q.  Okay.  And another thing that you can do
3  to help ensure that this person does not have
4  dangerous substances on them is pat them down;
5  right?
6      A.  Again, that depends.
7      Q.  It's one thing that you can do; right?
8      A.  No.  It depends.  I -- As I explained, if
9  they're wearing clothing that doesn't require for me
10  to go hands on and just a visual observation is
11  sufficient...
12     Q.  I understand -- I understand it's your
13  position that it -- it's not always required and you
14  have discretion.
15          But it is something and it is within your
16  toolbox to use to make -- to -- to help ensure that
17  this person does not have dangerous substances on
18  them -- right? -- a pat-down?
19     A.  Again, I'm going to -- I'm -- I'll say it
20  again:  It depends.  A visual observation or a
21  physical pat-down.
22     Q.  Okay.  You -- You have a camera in your
23  transport vehicle; right?
24     A.  Yes.
25     Q.  Okay.  And the camera:  There's -- There's

43

1  one camera that sort of faces the road and one
2  camera that faces into the back of the vehicle;
3  right?
4      A.  Yes.
5      Q.  While you are --
6          And -- And the camera that faces the back
7  of the vehicle gives you a visual of any individual
8  that you're transporting in that back seat of the
9  car; right?
10     A.  Yes.
11     Q.  Okay.  And while you're driving, do you
12  have a monitor that displays the image on -- on the
13  back seat of the vehicle or are you only seeing the
14  person in the back seat of the vehicle by looking in
15  your rearview mirror?
16     A.  Monitor as well.
17     Q.  Okay.  So you can -- you can maintain a
18  visual on people in the back seat of your vehicle by
19  watching a monitor from the camera of the back seat
20  and by looking at your rearview mirror; right?
21     A.  Yes.
22     Q.  Okay.  Is there any other way that you
23  maintain a visual of the people in the -- in the
24  back seat of your vehicle that you're transporting?
25     A.  If they were sitting -- How do I say it?

44



1      If I can safely turn around, physically
2  turn around.  But if the person is sitting directly
3  behind me, that's -- can't do that.  If the person
4  is sitting behind the passenger's seat, I can
5  physically turn around and look.
6      Q.   Okay.  And just to get this out of the
7  way:
8           On August 26th, twenty-twenty-twenty- --
9  sorry -- August 26th, 2022, when you were
10 transporting Alexis Sluder, she was sitting behind
11 the passenger's seat; correct?
12     A.   I believe she was sitting behind the
13 driver's seat.
14     Q.   Okay.  Is there any other way that you can
15 monitor the person that you're transporting besides
16 the camera, the rearview mirror, and if you are able
17 to -- able to safely turn around and see them?
18     A.   To observe them?  To observe them?
19     Q.   Yes.
20     A.   Engaging in conversation.
21     Q.   Okay.  Listening to what they're saying;
22 right?
23     A.   Yes.
24     Q.   Okay.  Anything else?
25     A.   Not that I can think of.

45

1      Q.   Okay.  And it's -- it's important to
2  monitor the people that are -- that you're
3  transporting in the back seat of your vehicle in
4  those ways that you just described to the best of
5  your ability because that enhances their safety and
6  security; right?
7      A.   Yes.
8      Q.   Okay.  Being able to see and hear the
9  people in -- that you are transporting in the back
10 of your vehicle helps you keep them more safe; fair?
11          MR. RAY:  Object to form.
12     A.   When you say "helps to keep them more
13 safe" -- "safe," what do you mean?
14 BY MS. HARTON:
15     Q.   Well, when I asked you, it's one of your
16 responsibilities as a deputy to keep people safe and
17 secure, you -- you said correct; right?
18     A.   Correct.
19     Q.   Okay.  And when you are transporting
20 people in the back of your vehicle, it is one of
21 your responsibilities as you are transporting them
22 to keep them safe and secure; right?
23     A.   Yes.
24     Q.   Okay.  And one of -- some of the things
25 that help you do that while you're transporting

46

1  people is to keep a visual on them and be able to --
2  to hear them speak; right?
3           MR. RAY:  Object to form.
4      A.   Yes.
5  BY MS. HARTON:
6      Q.   Okay.  I'm going to show you a document.
7           MR. RAY:  While you're pulling that
8      up, can we take, like, a two-minute break?
9           MS. HARTON:  Yeah.  I just realized
10     that I -- I have a few more questions on
11     this just real quick, and then we can take
12     a break.
13          MR. RAY:  That's okay.
14 BY MS. HARTON:
15     Q.   Is there anything else that you can think
16 of that you, as a deputy, are supposed to do while
17 transporting someone to keep them safe and secure
18 that we haven't covered yet?
19     A.   No.
20     Q.   Okay.  Is there -- Besides drugs and
21 weapons, is there anything else that you're supposed
22 to search or screen them for prior to transporting
23 them?
24     A.   No.
25     Q.   Okay.

47

1           MS. HARTON:  Okay.  We can take a
2      break.
3           THE COURT REPORTER:  Off the record.
4      (A recess was taken from 1:09 p.m. EST
5      until 1:21 p.m. EST.)
6           THE COURT REPORTER:  Back on the
7      record.
8  BY MS. HARTON:
9      Q.   I am going to show you Exhibit 40.
10     (Plaintiffs' Exhibit Number 40 was
11     identified for the record.)
12 BY MS. HARTON:
13     Q.   Can you see my screen here?
14     A.   Yes.
15     Q.   Okay.  And I can make things bigger for
16 you as we go through it if you're having trouble
17 reading.
18          Did you recognize this, this document?
19     A.   Yes.
20     Q.   Okay.  What is this?
21     A.   The juvenile -- juvenile procedures.
22     Q.   For the Gilmer County Sheriff's Office?
23     A.   Yes.
24     Q.   Okay.  You understood these procedures to
25 be applicable to you to follow as a Gilmer County

48

1  sheriff's deputy; right?
2      A.  Yes.
3      Q.  Okay.  And you -- you reviewed these
4  juvenile procedures at some point prior to
5  transporting Alexis Sluder on August 26th, 2022;
6  right?
7      A.  Yes.
8      Q.  Okay.  And you understand that these
9  procedures are mandatory; right?  You can't decide
10  whether or not to follow them; you have to follow
11  them; right?
12     A.  Yes.
13     Q.  Okay.  And it's important to follow these
14  procedures because they help you keep people safe;
15  right?
16     A.  Well, it's a policy of the Gilmer County
17  Sheriff's Office.
18     Q.  Right.
19         And you understand that following the
20  policies of the Gilmer County Sheriff's Office helps
21  you keep people safe; right?
22     A.  Yes.
23     Q.  Okay.  I want to go to Page 9.  Hold on.
24         MR. RAY:  Do you care if she
25     approaches the screen in case she can't

49

1      read it --
2          MS. HARTON:  Not at all, no.  And
3      I -- I can also zoom in.  We won't be on
4      this document for very long.
5  BY MS. HARTON:
6      Q.  Okay.  You under-- So first of all, I'll
7  go up here.  Well, why don't I just ask you; it
8  might be quicker that way.
9          Do you understand what a delinquent child
10  is within the meaning of this policy?
11     A.  Not specifically.
12     Q.  Okay.  Well, I will show you...
13         Okay.  So here we are at 10.3, the
14  Definitions section.  Do you see that?
15     A.  Yes.
16     Q.  Okay.  And I'm just going to scroll down
17  to G.  Or F.  It says:  Delinquent Child.  A child
18  who has committed a delinquent act and is in need of
19  treatment or rehabilitation.
20         Do you see that?
21     A.  Yes.
22     Q.  On August 26th, 2022, it's fair to say
23  that Alexis Sluder was a delinquent child; right?
24     A.  Yes.
25     Q.  Okay.  So okay.  So now I'm going to go to

50

1  Page 9.  Okay.  And this is Section 10.6, Intake of
2  Delinquent Offenders.
3          Do you see that?
4      A.  I do.
5      Q.  Okay.  And I am going to go to the next
6  page.  And it says:  Pursuant to O.C.G.A. 15-11-502,
7  the person taking an alleged delinquent child into
8  custody with all reasonable speed and without first
9  taking the child elsewhere shall --
10         And then it gives three options.
11         Do you see that?
12     A.  I do.
13     Q.  Okay.  You understand that this section
14  would have applied to your custody and transport of
15  Ms. Sluder on August 26th, 2022?
16     A.  Would you mind if I take a moment to just
17  read it?
18     Q.  Of course.  Of course.  And I can zoom in
19  and let you read it.
20     A.  Thank you.
21         No.
22     Q.  Okay.  Why not?
23     A.  I was transporting her on an ungovernable
24  child, a runaway order.
25     Q.  Okay.  So because there was a prior order

51

1  regarding her runaway status, you did not have to
2  follow -- it was your understanding you did not have
3  to follow this section via the policy?
4      A.  Correct.
5      Q.  Okay.
6      A.  Not only that, I didn't -- there was no
7  reason -- there was nothing that she was -- that I
8  observed that required (unintelligible).
9          THE COURT REPORTER:  That required
10     what?  I'm sorry.
11         THE WITNESS:  That required medical
12     attention.
13         THE COURT REPORTER:  Thank you.
14  BY MS. HARTON:
15     Q.  Okay.  Well, medical attention is only
16  the -- the sort of second option -- second option
17  here; right?
18     A.  Yes.
19     Q.  Okay.  What I -- What I'd like to ask you
20  about is this Section 3 here, where it says:  Bring
21  the child --
22         This is the third option that it gives for
23  delinquent child in custody:  Bring the child
24  immediately to the juvenile court or promptly
25  contact the juvenile court intake officer or other

52

1  intake officer designated by the juvenile court
2  judge.
3          Do you see that?
4      A.  I do see that.
5      Q.  What -- What is a juvenile court intake
6  officer?
7      A.  I'm just going to read -- read what it
8  says.  It says:  ...contact the juvenile court
9  intake officer or other intake officer designated by
10 the juvenile court judge for the purposes of
11 determining if the child will be released or
12 detained and, if detained, the appropriate place of
13 detention.
14     Q.  Okay.  So I don't -- I don't work for the
15 Gilmer County Sheriff's Office and so I'm really
16 just trying to find -- get information from you
17 about what this policy means or what you understand
18 it to mean.
19         So -- So what's your understanding of --
20 of what a juvenile court intake officer is?
21     A.  Probably the probation officer --
22     Q.  Okay.
23     A.  -- that's assigned to the case.
24     Q.  Okay.  So you understand that this -- this
25 third option to mean to instruct officers in this

53

1  particular situation to call the juvenile's
2  probation officer; is that fair?
3      A.  Yes.
4      Q.  Okay.  And -- And -- And Lexi's --
5  sorry -- Alexis Sluder's probation officer was
6  Marilyn Ortiz; right?
7      A.  Yes.
8      Q.  Okay.  Okay.  And then Section E says:
9  The designated juvenile court intake officers are on
10 call 24 hours a day and no juvenile will be accepted
11 at the Regional Youth Detention Center or other
12 secure or nonsecure residential facility without a
13 referral from an intake officer.
14         Do you see that?
15     A.  Yes, I do.
16     Q.  Okay.  Did you receive a referral from the
17 intake officer in -- in Alexis Sluder's situation on
18 August 26th, 2022?
19     A.  Not physically.  I spoke with Ms. Ortiz
20 because I wanted -- I didn't have any paperwork in
21 hand and I wanted to make sure that the receiving
22 facility received it.
23     Q.  Okay.  You wanted to make sure that the
24 receiving facility essentially had this referral; is
25 that fair?

54

1      A.  Yes.
2      Q.  Okay.  Okay.  I can stop sharing now.
3          Did you contact --
4          MR. RAY:  Was that -- Sorry, Sam.
5          Was that marked as an exhibit?
6          MS. HARTON:  Yes.  That's Exhibit 40,
7      4-0.  I just -- I pre-marked them all for
8      the whole case so that I don't get them
9      confused.  So I'm not showing 40 exhibits
10     today, I promise.
11 BY MS. HARTON:
12     Q.  Okay.  So I want to kind of shift gears a
13 little bit.
14         And we talked a little bit about your
15 responsibilities as a deputy and we talked about how
16 you're supposed to keep people safe and you're
17 supposed to transport people in certain situations;
18 fair?  Right?
19     A.  Yes.
20     Q.  Okay.  Another sort of responsibility and
21 thing that you encounter as a deputy is that you
22 have to deal with people who have drug issues,
23 history of drug addiction, are on drugs or
24 experiencing drug-related emergencies; fair?
25     A.  Yes.

55

1      Q.  Okay.  And you understand that some drugs
2  can pose serious safety risks to people; right?
3      A.  Yes.
4      Q.  People can overdose on drugs or experience
5  toxic effects from drugs; right?
6      A.  Yes.
7      Q.  Okay.  And those, you know, the toxic
8  effects and the overdoses are -- Or strike that.
9          Drugs are especially dangerous when you're
10 dealing with juveniles; is that fair?
11         MR. RAY:  Object to form.
12     A.  I'm sorry.  It kind of glitched.
13         Can you just repeat that, please.  Please.
14 BY MS. HARTON:
15     Q.  Sure.  Sure.
16         Drugs are especially dangerous to
17 juveniles; right?
18         MR. RAY:  Object to form.
19     A.  I don't -- I don't think drugs are kind of
20 prejudiced.  I think it's equally dangerous to
21 adults and juveniles.
22 BY MS. HARTON:
23     Q.  Okay.  One of the -- You understand
24 that --
25         You know what methamphetamine is; right?

56



1    A.    Yes.
2    Q.    Methamphetamine is a -- is a -- is a
3 dangerous, toxic substance; right?
4    A.    Yes.
5    Q.    Are you familiar with the symptoms of
6 someone who is on methamphetamine?
7         MR. RAY:  Object to form.
8    A.    Technically, no.  If I saw somebody
9 displaying symptoms, I would know it was symptoms of
10 some -- of some kind of a drug.
11 BY MS. HARTON:
12    Q.    Okay.  Are -- Are you -- In your 25 years
13 of law enforcement experience, have you come to
14 understand how to -- some -- some character--
15 physical attributes or characteristics that can be
16 used to identify someone who is addicted to
17 methamphetamine?
18    A.    Addicted, no.  Maybe using, yes.
19    Q.    Okay.  So what are some of the attributes
20 or characteristics that you've learned and
21 understand to be indicative of methamphetamine use?
22    A.    Their physical appearance would
23 drastically change.  They -- Maybe sores, sores on
24 their body.  Underweight.  Maybe while speaking to
25 somebody, not really make a whole lot of sense.

57

1         And, again, it also depends on, you know,
2 the severity of it.  Like if somebody was, like --
3 like recently took drugs, they would, you know,
4 maybe geek or shake or, like, display physical
5 behaviors that are not normal.
6    Q.    You said that their physical appearance
7 might drastically change.
8         What -- What specific attributes about
9 their physical appearance do you understand could
10 change if they are actively using methamphetamine?
11    A.    Very unhealthy.  Weight, underweight.
12 Skinny to the eye.  And, again, as -- also, you
13 know, like -- like if there are sores or picking,
14 things -- things like that.
15    Q.    You understand that with methamphetamine,
16 people can -- it is possible to take so much
17 methamphetamine, ingest or otherwise consume
18 methamphetamine at such a high amount that it --
19 it's fatally toxic to the body; right?
20    A.    Sure.  Yes.
21    Q.    Have you -- In your 25 years of law
22 enforcement experience, have you come to understand
23 how to identify when someone is experiencing that
24 sort of methamphetamine toxicity?
25    A.    No.

58

1    Q.    Okay.  Do you know anything about what
2 medical treatment is appropriate for someone
3 undergoing medical -- or methamphetamine toxicity?
4    A.    No.
5    Q.    Okay.  As a -- As a Gilmer County deputy
6 who has worked there for over a decade, it's safe to
7 say that you commonly interact with people that
8 you've -- in the community who you've interacted
9 with before in the context of your duties as a
10 sheriff's deputy; is that fair?
11    A.    Yes.
12    Q.    Okay.  You're commonly transporting or
13 detaining the same people in Gilmer County; right?
14    A.    Yes.
15    Q.    Okay.  And when you are transporting or
16 detaining someone who you've interacted before,
17 you -- it's important to sort of use knowledge that
18 you have from past interactions with them to inform
19 sort of the best way to handle them; is that fair?
20         MR. RAY:  Object to form.
21    A.    Yes.
22 BY MS. HARTON:
23    Q.    Okay.  Sorry.  You froze for a minute.  I
24 was worried.
25         MS. HARTON:  Laura, did you get that

59

1    answer?
2         THE COURT REPORTER:  Yes, I did.
3    Thank you.
4         MS. HARTON:  Okay.  I think it might
5    have just been me.
6 BY MS. HARTON:
7    Q.    Information that you've received in past
8 interactions with people can be helpful in
9 determining, for example, whether or not they have a
10 drug problem; right?
11    A.    Could.
12    Q.    Okay.  Can -- It can be helpful to
13 determine whether or not there are changes in their
14 physical appearance like you just described with
15 the -- the methamphetamine; right?
16    A.    Yes.
17    Q.    Okay.  Whether they're more likely to
18 carry contraband on them like drugs or weapons;
19 right?
20    A.    Perhaps.
21    Q.    Okay.  And it can -- you know, things that
22 you learn about a person in a prior interaction can
23 help you determine whether or not they may have
24 mental health issues or -- or be a danger to
25 themselves; right?

60

1      A.   Perhaps.
2      Q.   Okay.  And with Alexis, you had interacted
3  with her before as a juvenile; right?
4      A.   Yes.
5      Q.   About how many times prior to August 26th,
6  2022, had you interacted with Lexi?
7      A.   I can't recall.
8      Q.   Okay.  More than five?
9      A.   I can't recall.
10     Q.   You can't recall whether you had
11  interacted with Lexi more than five times prior to
12  her death?
13     A.   Interaction with her?
14     Q.   Yes.
15     A.   Not transport?
16     Q.   Correct.
17     A.   Just interaction?
18     Q.   Correct.
19     A.   Oh.  Yes.  Multiple times.  There were...
20     Q.   More than 10 times you -- you've
21  interacted with her?
22     A.   I can't be specific on that.  I don't
23  know.
24     Q.   Okay.  So you can definitely say more than
25  five but not sure if more than 10.

61

1      A.   I think that's safe to say.
2      Q.   Okay.  And safe to say you knew on
3  August 26th, 2022, that she had a history of drug
4  use; right?
5      A.   Yes.
6      Q.   Okay.  You had -- You knew she had a
7  history of using serious drugs like methamphetamine;
8  right?
9      A.   Yes.
10     Q.   Okay.  You know that she had been through
11  certain programs for juveniles to help with drug
12  addiction and drug use, things like that; right?
13     A.   Yes.
14     Q.   Okay.  Did you know that she had a history
15  of mental illness?
16     A.   I did not.
17     Q.   Okay.  You had sort of a -- a
18  semi-personal connection with her -- right? -- where
19  she knew -- where she was cousins of your -- your
20  formerly adopted daughter; is that fair?
21     A.   Correct, yes.
22     Q.   Okay.  And -- And that formerly adopted
23  daughter is an adult now and her name is Amber;
24  right?
25     A.   Yes.

62

1      Q.   Okay.  So did -- did you ever interact
2  with -- with Alexis outside the scope of your
3  professional duties in -- in a more personal
4  capacity?
5      A.   No.
6      Q.   Okay.  The nature of -- of her being
7  cousins of this -- the adopted daughter did not
8  cause you to interact with her outside of -- of your
9  policing duties; fair?
10     A.   Yes.
11     Q.   Okay.  One of your responsibilities --
12  Strike that.
13          As a -- As a deputy for Gilmer County, I'm
14  sure you frequently detain or transport people who
15  are suffering from mental health issues or mental
16  illness.  Is that fair?
17     A.   Yes.
18     Q.   Okay.  And -- And you, as a deputy, have
19  to sort of take into account any known or visible
20  signs of mental distress or mental illness when
21  you're detaining them; right?
22          MR. RAY:  Object to form.
23     A.   That's not something that crosses my mind
24  unless I am specifically aware if I'm transporting
25  them to, like, a mental health facility or if they

63

1  disclose that to me.
2  BY MS. HARTON:
3      Q.   Okay.  So -- So you're --
4          Are you -- Are you trained to identify
5  whether or not someone is a risk of suicide?
6      A.   Can you clarify that for me, please.
7      Q.   Sure.
8          You understand that suicide is a
9  serious -- a -- poses a substantial risk of harm
10  to -- Well, let me strike that.  Let me just try to
11  clarify this as best that I can so we can get on the
12  same page.
13          You've had people in your custody who have
14  expressed suicidal ideation before; right?
15     A.   Are we speaking about something that would
16  be imminent or something that was some -- that was
17  in their life in a prior -- at a prior time?
18     Q.   Yeah.  What do you -- What do you mean by
19  "imminent"?
20     A.   So if -- if somebody was in my custody and
21  expressed I'm suicidal, well, then sure, they would
22  need some kind of medical clearance.
23     Q.   Okay.
24     A.   In some type --
25          Okay.  Sorry.

64

1    Q.    That's okay.
2         So it's your understanding as a Gilmer
3  County sheriff that if someone provides express
4  suicidal ideation, they need some sort of medical
5  clearance.
6    A.    Yes.
7    Q.    Okay.  Can you explain to me how that
8  process works.
9    A.    If somebody expressed --
10        Now, this would be during a transport;
11  correct?
12   Q.    Yes.
13   A.    During transport.  I -- I would notify my
14  supervisor and let them know that they are
15  expressing -- whether it be suicidal thoughts or
16  sometimes even making passing statements like I'll
17  kill myself and receive direction from my
18  supervisor.
19   Q.    Why is that important that you notify your
20  supervisor of those sorts of statements?
21        MR. RAY:  Object to form.
22   A.    That would be my next chain of command to
23  receive my next order.
24  BY MS. HARTON:
25   Q.    Okay.  But I guess my question is:

65

1         Why can't you as a -- as a deputy make the
2  call as -- as to what to do next when you -- when
3  you hear those sorts of suicidal statements?
4    A.    It's not that I can't make the call.  I
5  would know what to do, but I'd need to pass that
6  information on to my supervisor and I -- I --
7         As to where -- a facility, an intake, I'm
8  sure there's procedures with that with, you know,
9  acceptance or take them to an emergency --
10        It -- It's something that I would have to
11  clear that through my supervisor and let my
12  supervisor make the necessary arrangements for --
13  for where I would transport that individual.
14   Q.    Okay.  Because that's a -- that's a
15  serious occurrence that signals problems with the
16  safety and security of the person you're
17  transporting if they -- if they make a suicidal
18  statement; fair?
19   A.    Yes.
20   Q.    So it's really, really important for their
21  safety and security to communicate that information
22  to your supervisor so that the next step in dealing
23  with that person in your custody is kept safe and
24  secure; fair?
25   A.    Yes.

66

1    Q.    Okay.  When you --
2         I want to talk about the -- the moment you
3  first saw Lexi on August 26th, 2022.  Okay?
4    A.    Yes.
5    Q.    Okay.  When -- When was the first time you
6  saw her?
7    A.    On that day was when I met with the Union
8  County deputy at the Fannin-Gilmer County line.
9         Oh, are you talking about that --
10        On that day, yes.
11   Q.    Yes.  Yes.
12        You -- You met her at the county line
13  because --
14        I believe it was Vicky Stuart, another
15  deputy of another county, met you and -- and
16  transferred her to your custody.  Right?
17   A.    Yes.
18   Q.    Okay.  Did you talk to Vicky at all about
19  Lexi when you sort of transferred custody?
20   A.    Did we talk about her?
21   Q.    Yes.
22   A.    I mean, there were passing comments.
23  There were statements.
24   Q.    Like what?
25   A.    I believe Deputy Stuart informed me that

67

1  she was a runner.
2    Q.    Did she give you any other information
3  about Lexi?
4    A.    No.
5    Q.    You -- The reason you had gone to the
6  Fannin-Gilmer County line was because you were
7  dispatched there to pick Lexi up; right?
8    A.    I was called, yes.
9    Q.    Okay.  Who called you?
10   A.    I believe it was dispatch.
11   Q.    Okay.  And you often spoke with dispatch
12  on your personal cell phone as opposed to on the --
13  the radio; right?
14   A.    Work cell phone.
15   Q.    Work cell phone --
16   A.    I was on...
17   Q.    Sorry?
18   A.    I'm sorry.  I should have waited.
19        I was on a call that day.
20   Q.    And when you communicate with dispatch
21  over the radio, it's recorded on, you know, some --
22  some sort of log; right?
23   A.    Radio or a phone.  Their line is recorded,
24  so -- I believe, yes, radio or -- or landline.
25   Q.    So you primarily that night spoke with

68

1  dispatch via your work cell phone; right?
2      A.  I believe when I received the phone
3  call -- I mean the -- the initial call.  But I
4  believe that everything -- Or maybe I spoke to them
5  one other time.  But everything was pretty much
6  communicated via radio.
7      Q.  Okay.  What -- What do you remember
8  dispatch telling you about the situation with Lexi
9  that night before you went to the Fannin County
10 line?
11         MR. RAY:  Object to form.
12     A.  That -- What I recall?  That there was
13 another county -- I -- I don't know specifically if
14 they told me who, but another county had picked up a
15 juvenile in regards to a runaway order and to meet
16 with the deputy at the -- at the county line.
17 BY MS. HARTON:
18     Q.  And so when go pick up Alexis at the
19 county line, you -- you see Alexis; right?
20     A.  I'm sorry.  I didn't catch that.
21     Q.  You -- You see Alexis sitting in Ms. --
22 Officer Stuart's vehicle; right?
23     A.  Oh.  Yes.
24     Q.  And is she handcuffed at that point?
25     A.  Yes.

69

1      Q.  Okay.  And someone had informed you that
2  Alexis had not been patted down at that point;
3  right?
4      A.  Yes.  If I remember correctly, yes.
5      Q.  Okay.  And when you saw what Alexis looked
6  like, she looked like she was on methamphetamine,
7  didn't she?
8      A.  She appeared so.  Not on it.  Not on it,
9  but she was possibly using.
10     Q.  She looked like she was using
11 methamphetamine?
12     A.  Yeah.  Not at that time.  I mean I
13 couldn't determine -- She was acting normal but
14 that, yeah, that she was -- she was involved in it.
15     Q.  Okay.  And you knew she had just run away
16 from home a few days prior; right?
17     A.  I don't know when she ran away from home.
18 I was just -- I was just responding regarding the
19 order.
20     Q.  But you knew she was a runaway when you
21 picked her up; right?
22     A.  Yes, that's correct.
23     Q.  And you -- when you saw her, you believed
24 that she looked worse than she had -- than you had
25 ever seen her; right?

70

1      A.  Yes.
2      Q.  She looked -- She had sores on her face;
3  right?
4      A.  She did.
5      Q.  She was extremely skinny; right?
6      A.  She was.
7      Q.  She looked very unhealthy; right?
8      A.  Yes.
9      Q.  Her -- Was her face really sunken in?
10     A.  I don't recall if that was something that
11 came to mind.  But her being very underweight did.
12     Q.  Okay.  Her being underweight and having
13 sores on her face and just appearing as unhealthy as
14 she did all signaled to you that she was using
15 methamphetamine; fair?
16     A.  Yes.
17     Q.  And in fact --
18         So eventually Alexis is transferred from
19 Vicky to your vehicle; right?
20     A.  Yes.
21     Q.  Do you take her out of Vicky's handcuffs
22 and put her into your handcuffs?
23     A.  Before attempting to remove Vicky's
24 handcuffs, I secured her with mine.
25     Q.  Okay.  Got it.

71

1          And I assume you're trained on how to put
2  handcuffs on someone.  Right?
3      A.  Yes.
4      Q.  Okay.  And you're trained, I assume, to
5  make sure that the handcuffs are neither too loose
6  or too tight by placing your finger into the
7  handcuffs to make sure there's enough room for them;
8  right?
9      A.  Yes.  And double-locking them.
10     Q.  Okay.  And double-locking them.
11         Is there anything that you're trained to
12 do as far as handcuffs go to make sure that they
13 aren't able to maneuver to potentially access
14 contraband that they have on their person?
15     A.  I'm sorry.  I'll have to ask you to repeat
16 that.
17     Q.  Yeah.
18     A.  I'm so sorry.
19     Q.  So when you're -- you're placed in
20 handcuffs, they're -- obviously it restricts your
21 movements, but you're still able to -- to maneuver
22 your hands to sort of access things on your person;
23 right?
24     A.  Yes.
25     Q.  Okay.

72

1    A.   Yes.
2    Q.   Okay.  So before Alexis gets into your
3 vehicle, you did not pat her down; correct?
4    A.   I checked her shoes, but I did not pat her
5 down.
6    Q.   Okay.  You did not pat her down.
7         You had her take her shoes off and you
8 looked inside of her shoes to make sure there was no
9 contraband; right?
10    A.   Yes.
11    Q.   And that was important to do because you
12 wanted to make sure she wasn't able to access any,
13 for example, drugs she might have hidden in those
14 shoes while she's in the back of your car; right?
15    A.   Yes.  That was reasonable.  It was able to
16 be removed.  I was able to look inside of them.
17    Q.   Because even though she's handcuffed in
18 the back of your vehicle, she is still able -- she
19 is -- she would still be able to reach into her shoe
20 and get any contraband that she may be hiding in
21 there; right?
22    A.   Yes.
23    Q.   So it's important for you to -- in order
24 to maintain her safety and security while she's in
25 the back of your vehicle, to make sure she's not

73

1 hiding any contraband in her shoe; fair?
2    A.   Yes.
3    Q.   Okay.  What --
4         You said you did not perform a pat-down on
5 her because she was wearing clothes that you felt
6 like you could see enough whether or not she was
7 hiding any contraband; is that fair?
8    A.   Yes.
9    Q.   You felt like a pat-down wasn't necessary
10 because you could tell just by looking at her
11 whether she had drugs or weapons on her; fair?
12    A.   Yes.
13    Q.   Did you look at her -- at her pupils when
14 you were -- Sorry.  Well, strike that.
15         I assume when you did a -- a -- a visual
16 observation of her, you were looking for contraband
17 but you were also looking for signs of -- of any
18 medical condition that needed clearance.  Is that
19 fair?
20    A.   Not specifically.
21    Q.   Okay.  Well, you -- you looked at her to
22 make sure she wasn't suffering any sort of medical
23 emergency; right?
24    A.   Not specifically.  So, yes, I observed
25 her.  There was nothing that raised any concern.

74

1    Q.   Right.
2         Did you -- Did you look at her pupils to
3 see if there was anything unusual?
4    A.   No, not specifically.
5    Q.   Okay.  Did you detect any odor about her?
6    A.   I did not.
7    Q.   Did you observe whether or not she
8 appeared to be sweating or anything like that?
9    A.   No.  Not that I noticed.
10    Q.   Okay.  Is there anything that you visually
11 inspected specifically about her person that we
12 haven't covered prior to transporting --
13    A.   Just --
14         Oh, I'm sorry.  I thought you were done.
15    Q.   -- prior to transporting her?
16         Go ahead.
17    A.   Well, I -- I -- I performed a visual
18 observation of the -- of the -- of her person.  I
19 mean of the -- you know, between the legs.  And she
20 was wearing shorts, so -- and a -- and a
21 tight-fitting top.  So yeah, I looked at the breast
22 area, I looked at the waist area, you know, her
23 private area, and there was nothing that raised
24 concern to me.
25    Q.   Could you tell if she was wearing a bra?

75

1    A.   I -- I don't think I was able to tell.  I
2 can't remember.
3    Q.   Okay.
4    A.   I don't recall.
5    Q.   You understand that contraband can be --
6 be hidden inside of the -- the lining of -- of a
7 bra; correct?
8    A.   Yes.
9    Q.   And that's not something that you -- you
10 checked before transporting Lexi?
11    A.   I didn't perform a pat-down search.  But
12 if I did, I would just scoop underneath her breasts
13 and possibly the -- the center of her breasts.
14    Q.   Would you have checked sort of the lining
15 of her bra to make sure there was nothing tucked in
16 there?
17         MR. RAY:  Object to form.
18    A.   Again, it wouldn't be a pat-down.  It
19 wouldn't -- I wouldn't pull anything out or
20 anything; I would just do a -- basically a sweep.
21 BY MS. HARTON:
22    Q.   Okay.  So check if there's anything
23 protruding from any -- any lining of any clothing,
24 including a bra, such as -- as a bag with drugs in
25 it or a weapon or something like that; right?

76

1    A.   That's correct.  That's why I believe that
2  a -- a visual observation was sufficient because,
3  aside from going hands on, it would have -- if she
4  was hiding anything that would -- that was obvious
5  whether I felt it or I could see it.
6    Q.   So eventually you get Lexi into your
7  vehicle and begin to transport her to the Elbert
8  Shaw RYDC; right?
9    A.   Yes.
10    Q.   Okay.  And do you -- do you frequently
11  transfer people -- or transport people for admission
12  into the RYDC?
13    A.   Yes.
14    Q.   Okay.  What are your responsibilities as a
15  deputy when you arrive at -- at an RYDC?
16         And I'm sorry.  I -- I don't think I've
17  said the acronym.
18         You understand I mean the regional youth
19  detention centers; right?
20    A.   I'm sorry.  What was the first part?
21    Q.   You understand when I say RYDC I'm talking
22  about regional youth detention centers; right?
23    A.   Yes.  Correct.
24    Q.   Okay.  And when I say the Elbert Shaw
25  Regional RYDC, I'm talking about the regional youth

77

1  detention center in Dalton where Lexi was brought on
2  the night of her death; right?
3    A.   Yes.
4    Q.   Okay.  Tell me a little bit about your
5  responsibilities as a -- as a Gilmer County deputy
6  when you're -- when you're dropping off a juvenile
7  at the RYDC.
8    A.   Sure.  When we -- When we arrive, I would
9  press the call box.  An officer would meet us
10  outside.  They would open up --
11         So the -- the compound is secured, not the
12  front parking lot but where the actual -- Where the
13  juvenile actually enters, they'll -- there's a gate
14  that that compound is secured.  They'll -- They will
15  open up the gate.  I will drive through, turn
16  around, park, secure my weapons, and then I would
17  assist the juvenile out of the back seat and an
18  officer would escort us inside.
19    Q.   Okay.  And it's -- And then you go inside
20  and you are responsible for filling out some sort of
21  form about -- that has information about the
22  juvenile that you've just transported; is that fair?
23    A.   Yes.
24    Q.   Okay.  And it's your responsibility as the
25  transporting officer to communicate anything

78

1  pertinent that you know about the juvenile that
2  might affect their safety and security within the
3  RYDC; is that fair?
4    A.   That's fair.
5    Q.   Okay.  One of those things would be any
6  concerns you have about them being on drugs; fair?
7    A.   When you say "on drugs":  At -- At what
8  point?
9    Q.   Yeah, let me -- I can -- I can clarify
10  that for you.
11         One of -- One of the things that you
12  should -- that's important for you to communicate to
13  the employees at the RYDC are anything about --
14  anything that you've noticed that might indicate
15  that they have recently usen dangerous substances
16  like methamphetamine; is that fair?
17    A.   I don't know if she had used recently.
18  All I know is what I observed.
19    Q.   Okay.
20    A.   And I completed the intake form and I
21  asked the officer if they were familiar with her
22  because Alexis had -- she had been incarcerated
23  there multiple times, and she informed me --
24  informed me that she was -- that they're aware of --
25  of Alexis.

79

1    Q.   Okay.  But -- And so at that point you --
2  you sort of thought you didn't need to communicate
3  any information about Alexis's drug use because you
4  assumed that they already knew; is that fair?
5    A.   Not that they assume -- Not that they
6  would assume they already know.  I didn't even know.
7  All I -- All I was going by -- All I knew is that I
8  looked at her, knew she was a user, not knowing if
9  she was using at the time.  And it was -- it was
10  obvious.  And, yes, it -- being that they interacted
11  with her on multiple occasions, it was -- it was
12  pretty obvious.
13    Q.   Okay.  And you didn't think it was
14  important to communicate the specific observations
15  that you made about Alexis, about her sores and --
16  and how much weight she seemed to have lost, all
17  that indicated to you that she was -- was -- was
18  using?
19         MR. RAY:  Object to form.
20    A.   Of course it would be important.  It's --
21  I didn't withhold any information.  It wasn't -- It
22  wasn't necessary at the time.  I was bringing her in
23  on a runaway order, not a drug charge or anything.
24         And yes, she was certainly known and has
25  been in juvenile -- had been in juvenile court for

80

1  using.  But, you know, there were times she used,
2  sometimes she didn't and then she would use.
3          So it wasn't something that came to mind
4  where I withheld -- deliberately withheld
5  information.  It -- It -- That didn't even -- It
6  didn't even come to mind.  Her behavior was more
7  what came to mind than -- than her drug use because
8  her behavior was typical that night.  There was
9  nothing that -- that suggested otherwise to me.
10  BY MS. HARTON:
11     Q.  Well, you agree that she looked worse than
12  she ever had that day; right?
13     A.  Sure.
14     Q.  And you didn't feel that was something
15  important to communicate to the RYDC employees?
16          MR. RAY:  Object to form.
17     A.  No.
18  BY MS. HARTON:
19     Q.  Why not?
20     A.  It's not something that -- It was --
21  Again, it was -- it was obvious to the -- to
22  anybody's naked eye.  It's not something that I --
23  that came to mind to -- whether or not I should say
24  something.  It just didn't come to mind.  Her
25  behavior was more typical.  And that's why I asked

81

1  them if they were familiar with Alexis, and she
2  said, yeah, we are familiar with them -- with her.
3     Q.  You didn't --
4          You would agree it would be important to
5  inform them of any concerns you had about her mental
6  health or imminent risk of suicide; is that fair?
7     A.  If -- If that's what I -- If that's what I
8  had knowledge of.  I didn't have knowledge of any
9  mental health --
10     Q.  You would agree -- You would agree --
11     A.  -- with her.
12     Q.  -- it would be -- you'd be --
13     A.  For sure.
14     Q.  You agree it would be important to
15  communicate that to the RYDC; fair?
16     A.  Yes.
17     Q.  And you did not communicate anything about
18  Alexis making any sort of suicidal statement; is
19  that fair?
20          MR. RAY:  Object to form.
21     A.  She didn't express any suicidal tendencies
22  to me.
23  BY MS. HARTON:
24     Q.  Okay.  So at some point -- I understand
25  it's sort of your position at some point you

82

1  transfer custody of Lexi to the RYDC.  Is that fair?
2     A.  Yes.
3     Q.  And explain to me what that means in terms
4  of what is the moment that you are no longer in
5  custody of Alexis.
6     A.  When they tell me I'm free to go.
7     Q.  Okay.  So when the RYDC employees tell you
8  you're free to go, you are no longer in custody
9  of -- of a juvenile; fair?
10     A.  Fair.
11     Q.  Who told you you were -- Was it -- Was it
12  Maveis Brooks that told you that you were free to go
13  on the night of Alexis Sluder's death?
14     A.  I believe so.
15     Q.  Okay.  And was that after you had filled
16  out -- Well, hold on.  Strike that.
17          Okay.  I'm pulling up Exhibit 49.
18          (Plaintiffs' Exhibit Number 49 was
19          identified for the record.)
20  BY MS. HARTON:
21     Q.  Okay.  Do you see this document?
22     A.  I do.
23     Q.  Okay.  At the bottom of this --
24          Well, why don't you tell me what this
25  document is.  This is Exhibit 49.

83

1     A.  That is their intake form, the RYDC intake
2  form.
3     Q.  So whenever you drop off a juvenile to
4  RYDC, do you fill out one of these forms?
5     A.  Yes.
6     Q.  Okay.  And this is the one that you filled
7  out for Lexi on August 26th, 2022; right?
8     A.  Yes.
9     Q.  And there's a -- there's a series of
10  questions here that asks about sort of the condition
11  of the child and maybe some things that they may
12  have done in your -- that you may have witnessed
13  about them that would cause for concern; is that
14  fair?
15     A.  Yes.
16     Q.  And you answered no to all of those
17  questions.
18     A.  Correct.
19     Q.  That includes the question do you have any
20  reason to think this youth may try to harm
21  themselves?  Is that fair?
22     A.  Correct.
23     Q.  Nothing -- You didn't indicate anything --
24  Well, strike that.
25          Did you fill out this form prior to

84

1  Sergeant Brooks telling you you were free to go?
2      A.   Yes.  They -- They require you to fill
3  that out immediately upon arrival when you -- you
4  enter the --
5      Q.   Okay.  Did you have any --
6      A.   -- (indiscernible crosstalk.)
7      Q.   I'm sorry.  Go ahead.
8      A.   I'm sorry.
9           Yes.  When you -- When -- When you enter
10  with a juvenile into their receiving area where
11  they -- where they perform their -- their search --
12      Q.   Okay.
13      A.   -- while they're doing that -- And it --
14  it all depends; it could be before or after or
15  during.  But that's -- that's one -- that's the --
16  that's the first requirement that they ask of the --
17  of the officer or deputy.
18      Q.   Okay.  Before you filled out this form,
19  you had -- you had brought Lexi physically inside of
20  the Elbert Shaw RYDC; right?
21      A.   I'm sorry.  Can you repeat that --
22      Q.   Yes.  Prior to filling --
23      A.   -- question.
24      Q.   Prior to filling out this form, you had
25  come -- you had walked physically into the RYDC with

85

1  Alexis Sluder; right?
2      A.   Correct.
3      Q.   And between walking into the RYDC and
4  filling out this form, did you have any
5  conversations with anyone about Alexis?
6      A.   No.
7      Q.   Okay.  Did you have any --
8      A.   Not that I recall.
9      Q.   Okay.  So it's sort of your process that
10  as soon as you walk into the RYDC, you immediately
11  fill out this form.
12      A.   Correct.
13      Q.   Okay.  Did you talk to Alexis while you
14  were in the RYDC?
15      A.   Not that I recall.
16      Q.   Okay.  Now, after this -- between filling
17  out this form and Sergeant Brooks telling you that
18  you're free to go, did you speak with anyone in the
19  RYDC?
20      A.   No.
21      Q.   So when Sergeant --
22           Well, tell me about your first
23  conversation with Sergeant Brooks that night.
24      A.   My first conversation?  Like once -- once
25  custody was relinquished, after that, or --

86

1      Q.   No.
2      A.   During?
3      Q.   So was the first thing that
4  Sergeant Brooks said to you you're free to go
5  essentially?
6      A.   Correct.  Because if I remember correctly,
7  she thought I was leaving.  And I was just walking
8  over to the hand sanitizer to sanitize my hands and
9  my -- and my handcuffs.  Because she --
10  Sergeant Brooks unsecured Alexis and I don't recall
11  if she was at the time searching her at that time
12  or -- or was going to search her at that time, but I
13  started to walk.
14           There's a couple of security doors you
15  have to get through anyway.  But she thought I was
16  leaving and she asked -- and she told me not to
17  leave yet.  And I told her I wasn't; I was just
18  going to the hand sanitizer.
19      Q.   Okay.  And this was after you filled out
20  the intake form?
21      A.   Yes.
22      Q.   Okay.  So then you get -- you go and get
23  your hanitizer -- hand sanitizer, and do you walk
24  back to where Sergeant Brooks is?
25      A.   The general area.

87

1      Q.   Okay.
2      A.   Or maybe I just stood -- It's very -- It's
3  close proximity.
4      Q.   Okay.  And eventually you have a
5  conversation when she tells you that you're free to
6  go; right?
7      A.   After her search, she told me I was free
8  to go.
9      Q.   Okay.  Did she say anything else to you
10  about Alexis in -- at that time?
11      A.   Not that I recall.
12      Q.   Okay.  Did you talk to anyone else besides
13  Sergeant Brooks when you were in the RYDC?
14      A.   Amanda Smith I think her name is.
15      Q.   Okay.
16      A.   Amanda Stewart-Smith or Smith.  Yeah,
17  Stewart-Smith I think her name is.
18      Q.   And what did you talk to her about?
19      A.   She's the one that -- that -- that was
20  working inside the office that -- that provided me
21  with the form to fill out.  And I asked her -- I
22  believe I asked her if she received the paperwork
23  and I think -- I believe I asked her for a copy of
24  the paperwork.
25      Q.   Meaning the intake form?

88

1      A.   The order.  The -- The paperwork that I
2   didn't have.  The paperwork that they would receive
3   regarding the -- the arrest.
4      Q.   Okay.
5      A.   The detention.
6      Q.   Okay.  Other than asking for the
7   paperwork, did you talk to Amanda Stewart-Smith
8   about anything else?
9      A.   Just if -- if -- if they were familiar
10  with Alexis.  And she said yes.  That -- That's what
11  I recall that -- that took place.
12     Q.   Okay.  Okay.  Besides Amanda Stewart-Smith
13  and Sergeant Brooks, did you talk to anyone else in
14  the RYDC?
15     A.   No.
16     Q.   Okay.  You didn't talk to Russell Ballard;
17  correct?
18     A.   No.
19     Q.   And you didn't talk to Rebecka Phillips;
20  fair?
21     A.   No.
22     Q.   Okay.
23     A.   Yeah, fair.
24     Q.   Okay.  Sorry.  Good catch.
25          So then Sergeant Brooks tells you that

89

1   you're free to go and you walk out of the building;
2   right?
3      A.   Yes.  They have to unsecure one, two doors
4   and a gate, a walk-in gate.
5      Q.   Okay.  And then you walk out to your car
6   and you begin inspecting the vehicle pretty soon
7   after you leave the building; right?
8      A.   Once they released me from the secured
9   compound, once I pulled out of that, I did.
10     Q.   Okay.  Is -- Is that typical for you, to
11  inspect a vehicle after you've transported someone?
12     A.   Yes.
13     Q.   Okay.  That's something that you're
14  trained to do by the Gilmer County Sheriff's Office?
15     A.   Yes.
16     Q.   Okay.  And when you inspect the vehicle,
17  you find a crystal subs- -- what looks like a
18  crystallized substance, crystallized white
19  substance, in the back of your car; right?
20     A.   I didn't identify it right away.  I didn't
21  know what it was.  I knew that there was nothing on
22  her seat and then there was something on her seat.
23     Q.   Okay.  And so then what did you do when
24  you -- when you saw that there was something on her
25  seat?

90

1      A.   I retrieved my flashlight and I began to
2   inspect it.
3      Q.   And what did you find when you inspected
4   it?
5      A.   One of the pieces, the way I could
6   describe it is it sparkled, and then I knew
7   immediately that I had crystal meth in my car.
8      Q.   Okay.  How did you know that?
9      A.   It was just obvious to me.
10     Q.   Okay.
11     A.   It was -- It was not something -- It -- It
12  was unusual.  I knew I had -- I knew I had something
13  in my vehicle.  I identified it as crystal meth by
14  the way that it -- it reacted to the light on my
15  flashlight.  And that's how -- that's how I --
16  that's how I knew.  That's how I identified it.  I
17  suspected it was.  I didn't -- It wasn't confirmed
18  yet, but I suspected it was.
19     Q.   And in that moment, you became concerned
20  that Alexis had crystal meth on her while she was in
21  your transport vehicle; right?
22     A.   Yes.
23     Q.   Okay.  And you became concerned that she
24  had either taken the methamphetamine or still had it
25  on her person when she entered the RYDC; right?

91

1      A.   Yes.
2      Q.   Okay.  And either situation would present
3   a significant risk to her safety and security;
4   right?
5      A.   Yes.
6      Q.   Okay.  So after you discover the crystal
7   meth or what you believe to be the crystal meth in
8   the back of your car, what do you do next?
9      A.   I immediately called inside and I informed
10  them that I just found what I suspected to be
11  crystal meth in my vehicle.
12     Q.   And you -- you immediately called the
13  RYDC?
14     A.   RYDC, yes.
15     Q.   Okay.  And you call the RYDC.
16          Who do you speak with?
17     A.   I believe it was Sergeant Brooks.
18     Q.   Okay.  And what did you tell her?
19     A.   I told her that I found what I believed
20  was crystal meth in my vehicle.  And I believe she
21  asked me to hold on.
22     Q.   Meaning, like, she was -- what you -- you
23  took to understand that she was sort of going to
24  talk to someone else?
25     A.   Yes, to -- to hold, yes, because I was

92

1 speaking with her on the phone.
2    Q.   Okay.  And then did you -- That -- That --
3 Let me -- Let me strike that.
4         That conversation that you had with
5 Sergeant Brooks when she said, hold on, did she --
6 did she physically put you on hold?
7    A.   I don't know what she -- I don't know if
8 she put me on hold or if she put the phone down.  I
9 don't know.  I just --
10    Q.   Okay.  Did you hear her speaking with
11 anyone in the background while you were on the
12 phone?
13    A.   No.
14    Q.   Okay.  And then when -- she eventually
15 came -- came back on the line and sort of talked
16 with you again; right?
17    A.   Yes.
18    Q.   And what did you -- what did she say?
19    A.   Forgive me if I have the -- the -- the
20 sequence of events.
21         She did tell me -- I don't remember if it
22 was the first time that she said that Alexis was
23 with I think Ms. Stewart, Ms. Smith, Amanda Smith,
24 at the time, if that was during the first -- before
25 she told me to hold or after.  But I believe the --
93

1 when she came back on the phone, that's when she
2 told me that Alexis admitted to eating meth in the
3 other cop car.
4    Q.   Okay.  So -- So -- So the first kind of
5 conversation that you had with Sergeant Brooks about
6 what you believed to be methamphetamine in your car,
7 she told you that Alexis had actually eaten the meth
8 in the cop car before you had taken custody of
9 Alexis?
10    A.   Yeah.  I don't know what cop car, but she
11 said, the other cop car.
12    Q.   Okay.  So every -- every time that she
13 talked about Alexis having taken the
14 methamphetamine, she communicated that it was not in
15 your cop car; right?
16    A.   That was what seemed to be insinuated,
17 that -- so my response to her was, but I found it in
18 my car.
19    Q.   What do you mean she was insinuating it?
20    A.   No, no.  When -- By -- So she was -- She
21 was repeating what she told me that Alexis said,
22 that I ate it in the other cop car, to let me know
23 that Alexis had eaten meth in somebody else's cop
24 car.  Because, again, you know, the custody was
25 transferred into my custody.  I don't know what that
94

1 meant.  But I told her, but I found the meth in my
2 car.
3    Q.   Okay.
4    A.   Letting her know that there was more
5 than -- if she ate it in the other cop cars, it was
6 still -- it was found in my car.
7    Q.   Okay.  Did she say that multiple times to
8 you, that Alexis had claimed to have eaten the --
9 the meth in -- in someone else's car?
10    A.   Yes.
11    Q.   Sergeant Brooks said that to you multiple
12 times?
13    A.   Yes.
14    Q.   Okay.  Did you -- Did you get a sense
15 or -- or did you have any inclination as to why she
16 was emphasizing that so much to you?
17    A.   I don't -- I don't know.  I can't speak
18 for her.
19    Q.   Okay.  Did you think it was strange?
20    A.   I did.  I did.
21    Q.   Why?
22    A.   That she was emphasizing it that much?
23 Because I was trying to get her to understand the
24 seriousness of the situation because the meth was
25 found in my car, so whether she had taken it in
95

1 another car was -- it was serious because it --
2         Whether she took it in the other car --
3 car or not, my point was that I found it in my car,
4 for -- for action to be taken.  That -- That was --
5 That was my point in relaying that message,
6 obviously knowing that she either had it on her,
7 could have ingested it.
8         I don't know where that came from.  I
9 don't know what Alexis did with it.  But all I knew
10 was that when I did my contraband check, I found a
11 substance that I suspected to be crystal
12 methamphetamine and I relayed that message to
13 Sergeant Brooks.
14    Q.   Okay.  And you emphasized to her how
15 serious the situation was?
16    A.   I didn't say that.  I just kept repeating,
17 but I found it in my car.
18    Q.   Okay.  Did you say -- say specifically
19 anything about being concerned about Alexis's safety
20 or security?
21    A.   Those words, no.
22    Q.   Well, just anything implying that or -- or
23 expressing that you were concerned about her safety
24 and security?
25    A.   My emphasis on finding the drugs was
96



1    concern enough.
2        Q.   Okay.  Because you were concerned that
3    Alexis would -- would -- would take them or had
4    taken them; right?
5        A.   Correct.
6        Q.   Okay.
7        A.   And now she's in their custody, so I'm
8    letting them know that I found the substance,
9    suspected substance, in my vehicle and I'm letting
10   them know.  And when they asked her, she admitted
11   it, admitted to it.
12       So, yes, there wasn't -- At that point,
13   whether I expressed my concern or not, once Alexis
14   admitted to eating it in the other cop car, that in
15   itself is serious enough.
16       Q.   Okay.  Did you tell Sergeant Brooks
17   anything that she should do in -- in light of the
18   situation?
19       A.   In regards to what?
20       MR. RAY:  Object to form.
21   BY MS. HARTON:
22       Q.   In regards to Alexis's safety.
23       A.   No.
24       Are you -- Are you referring to me telling
25   her how to do her job or...

97

1        And the longer that it -- the longer that
2    I was there, the more I realized there was some
3    complacency there.  I wanted some -- I wanted
4    Alexis -- I wanted her statement specifically.
5        Plus the fact that I found it in my car,
6    so I don't -- Again, I don't know if Alexis just had
7    it on her, if it was something that came off her
8    clothes.  I don't know if she ate it.  I don't know
9    where that came from, so of course I wanted
10   something that Alexis specifically stated to them
11   saying that she ate it in the other cop cars.
12   Sure --
13       Q.   Okay.
14       A.   -- that's important.
15       Q.   I want to focus on two things.  First, you
16   said you sensed there was some complacency.
17       Can you explain what you meant by that.
18       A.   Yes.  Once I made the phone call inside
19   and expressed that I found a -- a suspected drug,
20   crystal meth, and Alexis admitted to ingesting --
21   Regardless where she admitted to ingesting it, she
22   admitted to ingesting it.  And we were still -- I
23   don't know how far you want to get ahead, but we
24   were still engaged in a conversation.  When I --
25       Do you want me to tell you a part of the

99

1        Q.   Well, I'm just trying to get a sense for
2    what you talked about.  And let's -- And we can
3    focus on that sort of first phone call that you make
4    to her about the meth that you found in the car.
5        Did you tell her that -- Did you tell her
6    that she should do anything, give her any advice,
7    anything like that?
8        A.   No.
9        Q.   Okay.  You expected that she should know
10   what to do when a juvenile is suspected -- is
11   suspected to have ingested drugs or have drugs on
12   them; right?
13       A.   Sure.  They had -- RYDCs, they have their
14   own standard of operation, their policies, their
15   procedures.  I don't -- I don't know what those are.
16       Q.   Okay.  Now, at some point while you're on
17   the phone with Sergeant Brooks, you tell her that
18   you need a statement from Alexis; right?
19       A.   Yes.
20       Q.   Okay.  Why did you tell her that?
21       A.   That's something that I do.  If somebody
22   admits to doing something, I do obtain a
23   statement -- or I try to obtain a statement --
24   with -- with that statement that was made from the
25   individual.

98

1    conversation that -- that took place when she
2    brought a state- -- the statement out to me?
3        Q.   No.  Let's -- Let's focus on the -- the
4    first -- Let's focus on the first -- when --
5        The timeline that we're at right now is
6    that first phone call you make outside your car.
7    Okay?  That's where we're at.
8        A.   Okay.
9        Q.   Fair?
10       A.   At some point she was requesting that I
11   trans- -- that I -- that I transport her.
12       Q.   Was that during the first phone call?
13       A.   Honestly, I don't remember what part,
14   where that -- I don't know -- remember if that was
15   on the phone -- if that was a phone call or in
16   person.  I don't remember.
17       Q.   Okay.  I just -- I still am not -- I -- I
18   don't -- And I know there's a lot to this story and
19   so -- and I know that the timeline, it's been a few
20   years, but I just want to make sure I -- I get an
21   answer to my original question, which is you said
22   something about you were sensing complacency amongst
23   the -- the people at the RYDC.
24       Can you explain what you specifically
25   meant by that.

100



1    A.   Sure.  When -- Okay.  Honestly, once
2  Alexis admitted to taking crystal meth, we shouldn't
3  have been engaged in any conversation; they should
4  have been, at minimum, calling for a medical unit.
5    Q.   And why -- why do you say that?
6    A.   Because she admitted to ingesting
7  something.
8    Q.   And that's a serious -- as far as you
9  understand it, a serious risk to her safety and
10 security; right?
11   A.   Sure.  It's not edible.  We don't eat
12 drugs.
13   Q.   Right.  At least not methamphetamine;
14 right?
15   A.   Right.
16   Q.   Right?
17   A.   Right.  Not including prescriptions but,
18 yeah, any illegal drug.
19   Q.   Right.
20        And so what was Sergeant Brooks saying to
21 you on the phone that led you to believe that they
22 were being complacent?  Was it just the fact that
23 they weren't calling medical?
24   A.   That night -- I believe -- and, again, I
25 don't remember at what point -- but she was asking

101

1  me if I can transport Alexis.
2    Q.   Okay.  Okay.  And we'll get to that in a
3  moment.
4        At the point that you -- that you were
5  told that Alexis had admitted to ingesting the
6  methamphetamine, you believed that she had a serious
7  medical need that required a medical professional;
8  is that fair?
9    A.   Yes.
10   Q.   And -- And when Sergeant Brooks -- At some
11 point Sergeant Brooks -- after you discovered the
12 methamphetamine or what you believed to be
13 methamphetamine, Sergeant Brooks asked you to
14 transport Alexis to the hospital for them; right?
15   A.   Yes.
16   Q.   Okay.  And you responded something about
17 don't you have your own local law enforcement;
18 right?
19   A.   Yes.
20   Q.   Okay.  And -- And she said no; right?
21   A.   Correct.
22   Q.   And did she explain what she meant by
23 that?
24   A.   No.  I was actually a little bit
25 surprised.

102

1        She explained something; I couldn't make
2  sense of what she was explaining to me.  And the
3  only thing I kind of caught was we just can't
4  release her to an adult or something to that effect.
5    Q.   Because she was a --
6    A.   Didn't make sense.
7    Q.   Because she was a juvenile?
8    A.   Sure.  Sure.
9    Q.   Okay.  You weren't familiar with any RYDC
10 policy that prohibited them from calling 911 or some
11 other emergency medical service, were you?
12   A.   No.
13   Q.   Okay.  How long had you been transporting
14 juveniles to the RYDC at that point?
15   A.   A few years.
16   Q.   A few years.
17        You had never run into that issue where --
18 where they said that they can't call 911 or
19 emergency medical services to transport someone who
20 had an emergency; right?
21   A.   No.  They didn't -- And they didn't
22 express to me that they couldn't --
23   Q.   Right.
24   A.   -- call.
25   Q.   Right.

103

1        Sergeant Brooks also expressed to you that
2  they were pretty understaffed that night; right?
3    A.   Yes.
4    Q.   Okay.  And -- And so you understood during
5  your conversations with Sergeant Brooks that they --
6  they were not going to transport Alexis to the
7  hospital themselves; right?
8    A.   Right.
9    Q.   Okay.
10        MR. RAY:  (Unintelligible.)
11        THE COURT REPORTER:  I'm sorry.
12        Did I hear an objection there?
13        MR. RAY:  (Unintelligible.)
14        THE COURT REPORTER:  Sir?
15        MR. RAY:  Yes.
16        THE COURT REPORTER:  Yes?
17        Thank you.
18 BY MS. HARTON:
19   Q.   And -- And Sergeant Brooks also indicated
20 to you that they would not be calling 911 or any
21 other emergency medical service or law enforcement
22 to transport her; right?
23   A.   No.  She never expressed that to me.
24   Q.   Oh, she never expressed that to you.
25   A.   She didn't tell me that they weren't going

104

1  to call or they couldn't call or they couldn't --
2  The only thing that -- that she was asking me to do
3  was the transport because they were understaffed.
4  But she didn't explain any reason why or that they
5  didn't have the ability to.
6     Q.   Okay.
7     A.   That they...
8     Q.   But she expressed to you that they -- they
9  would not be transporting her; right?
10    A.   No, she didn't express that, that -- Yeah,
11 yeah.
12         I -- And, quite honestly, again, I'm not
13 familiar, I don't know anything about their policies
14 and procedures.  I don't know anything about their
15 standard operating procedures.  All I can go by is
16 just experience.
17         And I understand it's a juvenile facility,
18 not an adult facility, but that's something you call
19 rescue for, not -- not an officer or a deputy, not
20 even a road deputy to transport.  That -- That would
21 be medical services.
22    Q.   What's "rescue"?
23    A.   "Rescue"?
24    Q.   Yes.
25    A.   Medical, be it a EMT or the fire
                                                    105

1  department or -- somebody medically qualified to --
2  that would go to the facility and, you know, take
3  vitals and -- you know, and -- and -- and check the
4  person out.
5     Q.   Okay.  And so when Sergeant Brooks asked
6  you to transport Alexis for them, you -- you told
7  them you couldn't; right?
8     A.   Correct.
9     Q.   Okay.  Are you -- Are you aware of some
10 sort of policy that directs that you -- you can't
11 transfer a juvenile after you release them to the
12 RYDC?
13    A.   I don't know a policy specifically.  There
14 may be.  But I was out of my jurisdiction.
15    Q.   Okay.  What does that mean?
16    A.   That means I was at -- I had no
17 jurisdiction.  I don't operate in Whitfield County
18 or Dalton County.  My jurisdiction -- And I work for
19 the Gilmer County Sheriff's Office, so when I
20 relin- -- when I relinquished custody to RYDC, now
21 that is their jurisdiction.  They have their local
22 law enforcement.  They have their -- their -- their
23 procedures there.
24         My responsibility is to the Gilmer County
25 Sheriff's Office if somebody's in my custody and
                                                    106

1  what happens in Gilmer County.
2     Q.   Okay.  But, I mean, you did transport
3  Alexis to the RYDC in Whitfield County; right?
4     A.   Correct.  Based on a Gilmer County order.
5     Q.   Right.  Right.
6          And so you were not out of your
7  jurisdiction when you were transporting her there;
8  correct?
9     A.   What do you mean not out of my
10 jurisdiction?
11    Q.   Well, you're the one who used the term
12 "out of your jurisdiction," and I --
13    A.   Sure.
14    Q.   Frankly, I don't understand what that
15 means, so I need you to explain to me --
16         I mean, do you have some -- do you know --
17 can you identify some sort of policy that explains
18 the boundaries of your jurisdiction as a Gilmer
19 County sheriff's deputy?
20    A.   Yes.  I work in Gilmer County.  I
21 transported Alexis from Gilmer County to Dalton,
22 Dalton County.  She's my responsibility as long as
23 she's in my custody.  Once I turned her over to
24 RYDC, they accepted custody, they -- they admitted
25 her, they released me.  She's no longer in my
                                                    107

1  custody or in the custody of the Gilmer County
2  Sheriff's Office.
3     Q.   Okay.  And is there -- is there any sort
4  of formal document that -- that reflects Alexis's
5  transfer of custody between the Gilmer County
6  Sheriff's Office and the State of Georgia?
7     A.   What do you mean a formal document for
8  the...
9     Q.   I mean is there any --
10         The only formal document that I have
11 that -- that you sort of engaged with at the RYDC is
12 that intake form.  Right?
13    A.   Right.
14    Q.   And there's nothing on that document
15 talking about jurisdiction or -- or custody of
16 Alexis; right?
17    A.   No.  On their intake form, no.
18    Q.   And you didn't sign anything that says,
19 Alexis is no longer in my jurisdiction or custody;
20 right?
21    A.   No.
22    Q.   Okay.  And so why --
23         I mean, you understand that
24 Sergeant Brooks is -- is an agent of the State of
25 Georgia; right?
                                                    108



1    A.   Yes.
2    Q.   And -- And she specifically asked you for
3  a courtesy ride or a courtesy transfer of Alexis due
4  to a potential medical emergency; right?
5        MR. RAY:  Object to form.
6    A.   Negative.  There was no -- There was no
7  emergency -- emer- -- imminent emergency at that
8  moment.
9  BY MS. HARTON:
10   Q.   Okay.  But you -- you all understood that
11 there was potential that Alexis --
12        Well, you said -- said earlier that you
13 believed that -- that medical needed to be contacted
14 at that time; right?
15   A.   Correct.
16   Q.   Right.
17        And Sergeant Brooks specifically, as an
18 agent of the State of Georgia, asked you to transfer
19 Ms. Sluder from the RYDC to a medical facility, did
20 she not?
21        MR. RAY:  Object to form.  She
22        doesn't work for the State of Georgia.
23 BY MS. HARTON:
24   Q.   Go ahead.
25   A.   So it was a request.  It was a request

109

1  being made because they were short- -- they were
2  shorthanded.  However, she was not in my custody.
3  For her to be back into my custody, they would have
4  to go through their release -- their booking
5  release, however that is done, to release her from
6  their custody into my custody back into the Gilmer
7  County Sheriff's office.  But I was out of my
8  jurisdiction; I was in Dalton.
9    Q.   Okay.
10   A.   So, no, I -- Custody was relinquished; she
11 was no longer my responsibility.  Didn't mean that I
12 didn't care.  It didn't mean that I wasn't concerned
13 for her well-being.  I certainly was.  That's why I
14 went to the extent that I did.
15   Q.   And what extent did you go to?
16   A.   Well, I -- my first one was my immediate
17 phone call inside into RYDC.  My next -- My next
18 step was to process my vehicle.  I also contacted
19 her probation officer to let her know what I
20 discovered in my vehicle.
21   Q.   Okay.
22   A.   And I'm not going to get ahead of you, but
23 there's more to come with that.
24   Q.   Yeah.  And then you -- you contacted your
25 supervisor; correct?

110

1    A.   My supervisor?
2    Q.   Uh-huh (affirmative).
3    A.   Yes.
4    Q.   I'm sorry.  I don't -- I forgot to write
5  his name in this -- this outline.
6        It was your lieutenant; right?
7    A.   Yes.  Lieutenant Knight.
8    Q.   Thank you.
9        And about how long was that conversation
10 with Lieutenant Knight?
11   A.   It was not -- It was brief.
12   Q.   And -- And what -- what did you say to him
13 during that conversation?
14   A.   I -- Like, I -- I told him that they were
15 requesting that I -- that -- I told him they were
16 requesting for me to transport her to the hospital.
17 He asked me if she was in their custody.  I said
18 yes.  He said no.
19   Q.   Okay.  Did you ask any follow-up
20 questions?
21   A.   No.
22   Q.   Okay.  Did you tell him that Alexis had
23 admitted to ingesting methamphetamine?
24   A.   Yeah, I believe I did tell him that.
25   Q.   Okay.  Did you tell him that Alexis made

111

1  any suicidal statements in your car?
2        MR. RAY:  Object to form.
3    A.   She didn't ever express suicidal -- She
4  never made any suicidal statements, that I heard
5  anyway.  I mean, yeah, I -- I haven't heard.  She
6  didn't express that to me and I didn't hear any.
7  BY MS. HARTON:
8    Q.   You didn't tell him -- Strike that.
9        Okay.  So then after your supervisor tells
10 you that you can't transport Alexis because she's
11 out of your custody, you call the RYDC back; right?
12   A.   I don't -- I don't recall.  If I'm -- If
13 I'm not mistaken, I thought Sergeant Brooks was with
14 me at the time.  I thought we were standing inside.
15 I could be wrong.  I will have to reflect in my report
16 for it.  But if -- if I had to call, I made the
17 phone call.  If she was standing there, I expressed
18 it to her.
19   Q.   Okay.  That's fine.
20        I -- I want to be fair to you, so I want
21 to -- this might be a little bit easier if I just
22 pull up some -- some records for you.
23        This is going to be Exhibit 28.  I'll
24 share my screen.
25 / / / (continued)

112

1    (Plaintiffs' Exhibit Number 28 was
2    identified for the record.)
3 BY MS. HARTON:
4    Q.   Okay.  I'm going to scroll really quickly
5 through this.
6         This is a series of pictures of a cell
7 phone and -- and some screenshots of -- of calls
8 that were made and received by this phone; right?
9    A.   Okay.
10   Q.   And do you recognize this as -- as the
11 phone that you had on the night of Alexis's death?
12   A.   Yes.
13   Q.   Okay.  And -- And you recall allowing a
14 GBI investigator to take pictures of these -- of
15 your phone with these records on them?
16   A.   I don't -- I don't recall.
17   Q.   Okay.  You have no reason to dispute that
18 these are screenshots of the phone calls that you
19 made that night?
20   A.   No dispute.
21   Q.   No dispute.  Okay.  Thank you.
22        And so let's start with the first one.
23 That is a -- a call.  It says, Dispatch.
24        That's the -- That's the Gilmer County
25 Sheriff's Office dispatch; right?

113

1    A.   It is.
2    Q.   Okay.  And it looks like at 7:43 you
3 received a -- a call from the dispatch; right?
4    A.   Yes.
5    Q.   Okay.  And this is August 26th, 2022, the
6 night of Alexis's death; fair?
7    A.   Fair.
8    Q.   Okay.  And then -- so 7:43, incoming call
9 from dispatch.
10        Is that when you first received
11 communication from dispatch about Alexis Sluder?
12   A.   About the -- yes, the runaway.  I was on a
13 call.  They were calling to let me know that there
14 was a pickup.
15   Q.   Okay.  The next call that you make is at
16 7:50 p.m. to the RYDC, and that is when you informed
17 them that you've picked Alexis up and are now
18 transporting her; fair?
19   A.   May I make a statement?
20   Q.   Sure.
21   A.   That's really difficult for me to tell you
22 what was -- what was said just looking at that.  I
23 laid everything out in my -- in my report, the date
24 and time and what -- what would -- what had occurred
25 in each conversation.  It's really difficult for me

114

1 to -- to recall looking at the screenshot or the...
2    Q.   (Displaying document on the screen.)
3    A.   Yeah.  Thank you.
4    Q.   Okay.  So this is Exhibit 45.
5        (Plaintiffs' Exhibit Number 45 was
6        identified for the record.)
7 BY MS. HARTON:
8    Q.   And this is a document that you made;
9 correct?
10   A.   Yes.
11   Q.   And this is -- this is sort of a timeline
12 that you laid out of the events with all of your
13 reports and supplemental reports about what you did
14 and what was said to you on the night of the
15 incident; right?
16   A.   Yes.
17   Q.   And I -- I forgot to ask you this
18 actually:
19        Did you review any documents in
20 preparation for your deposition?
21   A.   For the -- For the depo today?
22   Q.   Yes.
23   A.   My report.
24   Q.   This report that we're looking at,
25 Exhibit 45?

115

1    A.   Yes.
2    Q.   Okay.  So you -- So you reviewed this.
3        Did you review any videos?
4    A.   No.
5    Q.   Okay.  Is this the only document that you
6 reviewed in preparation for this deposition today?
7    A.   That particular -- I -- I --
8        MR. RAY:  (Unintelligible.)
9        THE COURT REPORTER:  Excuse me?
10   A.   Oh, the -- yeah.
11   Q.   Is that -- Okay.  Is that my -- Are
12 those -- What is that?  Is that my incident report?
13 BY MS. HARTON:
14   Q.   This is what appears to be a timeline
15 where you --
16        The first one you say:  On Friday,
17 August 26th, 2022, at approximately 1850 hours, I,
18 Court Services Division Sergeant Sharon Ellis 535,
19 received a call on my agency work cell phone...
20        And then you -- And then you go on.
21        And you wrote this document; correct?
22   A.   I did.  However, I don't -- I don't know
23 if that was my layout for the -- so that I didn't
24 mess up time.  I don't know if that was -- like, if
25 those were my notes that I -- that was added or if I

116

1  added to the case to use for my actual incident
2  report.
3       Q.  Okay.
4       A.  Does that make sense?
5           I don't know if I prepared that so that I
6  can -- I can write my report in -- in the sequence
7  of events.
8       Q.  You're not --
9           So looking at this document:  Have you
10 ever seen this document in this format before?
11      A.  Yeah.  Those -- Those could have very well
12 been my notes.
13      Q.  Okay.  But you're not sure?
14      A.  No.  I'm sure that that's my -- that could
15 be my notes.  I'm asking for my actual incident
16 report.
17      Q.  All right.
18      A.  The one that was -- that -- that -- The
19 one that's actually in the system.
20      Q.  Okay.  Okay.  I guess I -- I kind of got
21 the sense based on -- on your interviews with the
22 GBI that -- that you had inputted a bunch of notes
23 into the system but then you had made this timeline
24 separately for the GBI just to sort of lay out in
25 one place all the events.
                                                117

1           That -- You're telling me that's not quite
2  accurate; is that fair?
3       A.  No, ma'am.  I -- I didn't do that for the
4  GBI.
5       Q.  Okay.
6       A.  I did that -- I don't know how to explain
7  it.  I did that for myself.
8       Q.  Okay.
9       A.  However, if -- if -- if I can compare that
10 to my actual incident report, because there are
11 things -- I could have laid that out as my reference
12 material.
13          So I got everything in order.  I used all
14 the documents, the timeline, text messages, calls
15 in, calls out, as my -- my layout.  Then I would use
16 that because it -- I could use that so that I didn't
17 get confused in my -- when I actually -- when I did
18 the actual report, I wouldn't confuse myself, that
19 it would be laid out for me there.
20      Q.  Okay.  And this, Exhibit 45, is sort of
21 what you did for yourself as -- as a reference; is
22 that fair?
23      A.  I'm sorry.  Repeat that one more time.
24      Q.  This -- This, Exhibit 45, is just sort of
25 what you did for yourself as a reference for the
                                                118

1  actual report?
2       A.  Yeah.  Very well.
3       Q.  Okay.  Okay.  And I can pull up your --
4  your report in -- in a little bit.  But since we're
5  here, let's just do this:  So I want to go to --
6           So here it says 8:45 you arrived at RYDC
7  in Dalton; right?
8       A.  That's (audio glitch).
9       Q.  Correct?
10      A.  Yes.  I'm sorry.
11      Q.  And that's -- that's accurate; right?
12 That's -- That's the time that you arrived at the
13 RYDC?
14      A.  It sounds accurate.
15      Q.  Okay.  Okay.  And then here at 9:14 it
16 says:  RYDC Requests a Courtesy Transport to the
17 Hospital.
18          Do you see that?
19      A.  Where?  I'm sorry.  Where are you?
20          Oh, yes, I see it.
21      Q.  Okay.  I'll zoom in a little bit here for
22 you so that you can -- I can be fair to you.
23          If you want to review this, then I can --
24 This is on Page 9.  It says:  RYDC Requests a
25 Courtesy Transport to the Hospital.
                                                119

1           If you -- If you'd like to, kind of skim
2  that and let me know when you're ready to -- for me
3  to ask you questions about it.
4       A.  I'm ready.
5       Q.  Okay.  So this 9:14 entry that you have
6  here:  This is that first phone call that you had
7  with Sergeant Brooks; correct?
8       A.  My first phone call.  No, that's not my
9  first phone call.
10      Q.  Okay.  This is the first phone call that
11 you make to Sergeant Brooks about the
12 methamphetamine in the car?
13      A.  Yes.  My first phone call was to let her
14 know that I found suspected crystal meth in my car.
15 Or crystal meth.
16      Q.  Okay.  Sorry.
17          So going back up to 9:10, you immediately
18 called the RYDC and this is after -- at 9:10 p.m.,
19 this is right after you found the -- the
20 methamphetamine in the vehicle; right?
21      A.  Yes.
22      Q.  Okay.  And that's -- that's when she
23 informs you that Alexis admitted to eating all of it
24 and -- and she told you that -- she asked you for a
25 transport and explained that they were
                                                120



1    short-staffed; right?
2        A.   Yes.
3        Q.   Okay.  So then later, at -- just a few
4    minutes later, you called the RYDC again -- fair? --
5    based on this?
6        A.   Okay.
7        Q.   Okay.  And I want you to -- I know you
8    read through this first paragraph, but I want you to
9    read it, let me know when you're ready to go to the
10   next page.
11       A.   Okay.  I'm ready.
12       Q.   Okay.  The next page.
13       A.   Okay.  I'm ready.
14       Q.   Okay.  So that was a -- that was a sort of
15   entry that you made to describe this call you had
16   with Sergeant Brooks at 9:14 p.m.; right?
17       A.   Yes.
18       Q.   Okay.  Anything you read in there that was
19   inaccurate that -- that you'd like to change?
20       A.   Again, these are my notes.
21       Q.   Yes.
22       A.   I would much rather prefer to use my
23   actual incident report --
24       Q.   Okay.
25       A.   -- because it's very possible I could have
121

1    remembered something --
2        Q.   Okay.
3        A.   -- and it went into -- These -- This was
4    my outline.
5        Q.   Okay.  Okay.  I can -- When we take a
6    break, I can -- I can pull up your -- your actual
7    report.  But I was just trying to orient our --
8    some -- kind of the timing and -- and now I got a
9    little lost.
10            So after that call with -- with
11   Sergeant Brooks, you -- you call your Lieutenant
12   Knight and he tells you that you cannot transport
13   Alexis because you do not have custody of her;
14   right?
15       A.   Well, in -- in a short way, he just said
16   no and I -- He asked if she was in their custody.  I
17   said yes.  He said no.
18       Q.   Okay.  And then what do you do after that
19   conversation with your lieutenant?
20       A.   Well, I informed Sergeant Brooks.  I don't
21   remember, again, if she -- if it was on -- if it's
22   on the phone or standing beside me.
23       Q.   Okay.  And how did she respond --
24            And -- And I'm assuming when you told her
25   that -- when -- when you did communicate with her
122

1    after your call with the lieutenant, you told her
2    that you could not transport Ms. Sluder for them.
3    Right?
4        A.   Yes.
5        Q.   Okay.  And how did she respond?
6        A.   I don't recall.
7        Q.   Okay.  You don't recall her saying
8    anything?
9        A.   Offhand, without looking at my report, I
10   don't -- I don't recall.
11       Q.   Okay.  After you inform Sergeant Brooks
12   that you will not be transporting Ms. Sluder, what
13   do you do next?
14       A.   I don't -- I don't -- I can't -- I -- I
15   can't tell you -- I don't recall that situation,
16   like, off the top of my head.  Again, it's something
17   that I'd have to review my report on.  But I'm sure
18   I went back to processing my vehicle.
19       Q.   Okay.  At some point you communicate to
20   Sergeant Brooks that you won't be transporting
21   Ms. Sluder and you go back to processing your
22   vehicle; is that fair?
23       A.   Yes.
24       Q.   Okay.  And how -- what do you mean by
25   processing your vehicle?
123

1        A.   I collected the -- drug, placed it in
2    evidence -- Well, I put gloves on, again, to -- I
3    took pictures before and after, before collecting
4    the substance off my -- off the seat and after.  I
5    placed it into an evidence bag.
6            Just to make sure I didn't miss anything,
7    I took the glove that I was using to -- once I
8    collected the pieces that I could collect by my
9    fingers to place in the evidence bag, I took the
10   glove that I was using in the event that -- I didn't
11   want to miss anything and I actually rubbed my hand
12   over the seat to see if I -- to -- to collect any
13   residue onto my glove and I placed the glove inside
14   another -- another evidence bag.
15       Q.   Okay.  And -- And you didn't have any
16   field -- field test kits on you for methamphetamine;
17   right?
18       A.   Correct.
19       Q.   Was that because you -- you didn't
20   typically carry them or just you were out because
21   you had used all the ones that you had on you?
22       A.   I work for court services.  We -- We -- We
23   don't -- We're not provided that and I didn't have
24   any on me.
25       Q.   Okay.
124



1    A.  And so that's why I had to seek a test kit
2  from -- from patrol.
3    Q.  Okay.  And then when you're done
4  processing your vehicle, collecting the
5  methamphetamine, you put all the methamphetamine
6  into -- into an evidence bag; right?
7    A.  Yes.
8    Q.  Okay.  But you don't test it because you
9  don't have a -- a field test kit; right?
10    A.  Correct.
11    Q.  Okay.  So -- So where do you put it?
12    A.  Well, knowing that I was going to have to
13  test it, I clipped them together and I put them
14  into -- if I remember correctly, it's not -- it -- I
15  had an organizer on my front seat and I laid it
16  inside there because that was the safest place where
17  it wouldn't get disturbed, it couldn't be shifted
18  around.  So I placed it in there for -- for
19  safekeeping really.
20    Q.  Okay.  And then after you kind of secured
21  the evidence, the methamphetamine, what you believed
22  to be the methamphetamine, what did you do next?
23    A.  I waited -- Again, there were conver- --
24  there might have been conversations that took place
25  between that; I don't recall.  But I was waiting

125

1    Q.  Okay.  Is this the document that
2  Sergeant Brooks brought out to you while you were
3  processing your vehicle?
4    A.  It looks like it.
5    Q.  Okay.  And this -- it says:  When 12
6  caught my friends shoplifting at Walmart, he talked
7  to me and I got scared and ate the meth I had.
8        Right?
9    A.  Right.
10    Q.  Okay.  Now, when you received this, you
11  were not completely satisfied as far as what you
12  needed for your records; right?
13    A.  I wanted clarity.  Yes.
14    Q.  Okay.  What kind of clarity did you want?
15    A.  I wanted her direct statement.  I wanted
16  her direct statement, verbal statement that she made
17  to the officers in RYDC that I ate it all in the
18  other cop car.
19    Q.  Okay.  What do you mean a "verbal
20  statement"?  Like you wanted to talk to her?
21    A.  No.  The verbal statement she made to them
22  that she ate it all in the other cop car.
23    Q.  And so you --
24    A.  I wanted --
25    Q.  Sorry.  Go ahead.

127

1  on --
2        Okay.  At some point I was waiting for a
3  statement for Sergeant Brooks to bring me with
4  Alexis admitting to eating it in the other cop car.
5    Q.  Okay.  And at some point Sergeant Brooks
6  did come out and give you a piece of paper; right?
7    A.  Yes.  And that was during my processing.
8  I didn't finish processing just yet.
9    Q.  Okay.  Right.
10        And what -- And you had a conversation
11  when she brought out those papers to you; right?
12    A.  Yes.
13    Q.  And I'll show you --
14        And -- And that paper that she showed you
15  had a statement by Ms. Sluder; right?  Or what you
16  understood to be a statement by Ms. Sluder?
17    A.  Yes.
18    Q.  Okay.  Let me just -- This is Exhibit 15.
19        (Plaintiffs' Exhibit Number 15 was
20        identified for the record.)
21  BY MS. HARTON:
22    Q.  Okay.  I'm showing you --
23        Do you see my -- this document on the
24  screen?
25    A.  Yes.

126

1    A.  Well -- I'm sorry.  I wanted -- I
2  wanted -- I wanted it quoted in her statement.  That
3  was what she said; I didn't want something, like,
4  generalized.  She said -- I wanted something that
5  would -- that when they asked her about the meth --
6        I don't know what they asked her.  I don't
7  know what they said to her.  Other than me telling
8  them that I found meth in my car and then
9  Sergeant Brooks told me that she said she ate it all
10  in the other cop car, but she didn't know what she
11  meant by "all," so I wanted a statement that
12  quoted -- I wanted -- I just wanted Alexis to just
13  put in the statement exactly what she quoted to
14  the -- to the officers is all.
15    Q.  Did you want kind of clarity on how much
16  she had taken?
17    A.  I didn't ask.  "All" was -- "All" to me is
18  all, whether it's a little bit or a lot.  I don't
19  know what "all" is.  But I wanted that -- When --
20  when -- when I was told that --
21        Are you still there?
22    Q.  Yeah.  I -- I'm just putting the document
23  back up for you.
24    A.  Okay.  Oh, thank you.
25        So to me, that was kind of generalized.  I

128

1 wanted -- I just wanted in a statement that I ate it
2 all in the other cop cars.
3        Now, that could have been sufficient.
4 It -- I'm -- I'm just saying what I preferred was a
5 direct statement.
6    Q.   Okay.  And this statement was not
7 sufficient to you because it didn't clarify that she
8 had eaten it all and that it was in the other cop
9 car; is that fair?
10   A.   Yeah.  I -- I don't know what that -- I
11 got scared and I ate the meth I had:  I -- I
12 don't -- That's not clear to me.  I mean, it's
13 obvious --
14   Q.   Okay.
15   A.   I'm sorry.
16   Q.   Yeah.  And I -- I apologize if -- if some
17 of these questions seem silly or obvious.  I just --
18 I'm trying to get things for the record and I -- and
19 I'm not -- I'm not a cop, so I -- I've got to get
20 information from you.
21        So why -- what were -- what were you
22 concerned about as far as clarity goes?  Were you
23 con-- -- Were you concerned about just like your --
24 your records being clear as far as because you
25 wanted to charge Alexis or because you wanted to
                                                    129

1 know how much she had taken?  I just -- I'm not
2 clear on why those particular elements of the report
3 were so important to you.
4    A.   For the entirety of the case really.  It
5 was for -- because she admitted to -- to taking
6 something, a sub-- -- a substance that I suspected
7 was in my vehicle.  All of this time is going by.  I
8 don't know what they were doing in RYDC, but there
9 didn't seem to be any urgency about it, so I
10 wanted --
11        When I do a report, if I have the ability
12 to complete it, I'm going to complete it.  So when I
13 asked for a very specific quote or statement in a --
14 in a -- in a statement form from -- whether it's a
15 victim or a suspect or a witness, if they quote
16 something --
17        She had the pen and paper.  I expected to
18 see exactly what she told them:  I ate it all in the
19 other cop car.
20        It's just something -- It's -- It's --
21 whether this kind of case or any other kind of case,
22 if I have the ability to collect a statement, I'm
23 going to collect a statement.
24   Q.   And so --
25   A.   A written statement.
                                                    130

1    Q.   Sorry.  Go ahead.  So sorry.
2    A.   A written statement.
3    Q.   And so -- but Brooks, Sergeant Brooks,
4 never -- besides that Exhibit 15 that we looked at,
5 Sergeant Brooks did not ever bring you a more clear
6 statement from Alexis, did she?
7    A.   No.
8    Q.   Okay.  Did any RYDC employee bring you a
9 clearer statement?
10   A.   Yes.  I requested that somebody give me a
11 statement, whoever she made that state-- -- whoever
12 Alexis made that statement to, that I asked them for
13 a statement that this is what she said.
14   Q.   Okay.  And did you get that?
15   A.   Yes.
16   Q.   Okay.  Was -- Was it a statement by
17 Sergeant Brooks?
18   A.   No.  I believe that was Ms. Smith.
19   Q.   Okay.  Ms. Stewart-Smith?
20   A.   (No audible response.)
21   Q.   Amanda Stewart-Smith; correct?
22   A.   Oh.  Yes.
23   Q.   Okay.  And she handed you a statement made
24 by herself about Alexis eating all the meth in the
25 cop car?
                                                    131

1    A.   Yes.  That was prior to me leaving.  There
2 was a couple things that took place before.
3    Q.   At some point Ms. Stewart-Smith comes out
4 of the RYDC and -- and starts talking to you while
5 you're in your vehicle; correct?
6    A.   Yes.
7    Q.   Okay.  And what do you guys talk about in
8 that conversation?
9    A.   I think it was just general.  I think she
10 was asking me -- She was asking me about another
11 deputy that she knew.  If I remember, it was just
12 general conversation.  And she did ask -- I -- I
13 don't recall if it was -- I don't think it was
14 Ms. Smith directly, maybe it was Ms. -- the message
15 was related to Sergeant Brooks, but that they also
16 wanted a statement from me.
17   Q.   Okay.  And did you give them one?
18   A.   Yes.
19   Q.   Okay.  In what form did you give them a
20 statement?
21   A.   I took a -- a Gilmer County Court Services
22 Division form and I wrote it -- handwrote it on the
23 back.
24   Q.   This is Exhibit 12.
25 / / / (continued)
                                                    132



1          (Plaintiffs' Exhibit Number 12 was
2          identified for the record.)
3   BY MS. HARTON:
4          Q.   Do you see this document on the screen?
5          A.   Yes.
6          Q.   All right.  Is this the -- the document
7   that you're referring to that you gave to either
8   Ms. Smith or Sergeant Brooks?
9          A.   Yes.  I gave that to Ms. Smith directly.
10  We -- We exchanged statement forms.
11         Q.   Okay.  She gave you her statement about
12  Alexis eating all the meth and you gave her this,
13  Exhibit 12?
14         A.   Yes.
15         Q.   Okay.  Now, I think here you say:  I
16  arrived at about 1945 hours.
17              That was a -- a mistake; right?  You meant
18  2045 hours; correct?
19         A.   I believe so.  And I believe that I
20  corrected that in my actual report.
21         Q.   Right.  Right.
22         A.   I -- I believe that was my arrival time.
23  Oh, not my arrival time.  My -- Maybe my dispatch
24  time.
25         Q.   Okay.

                                                    133

1          A.   I don't remember.  But I -- I made the
2   correction in my -- in my actual incident report.
3          Q.   All right.  All right.  I'm going to share
4   this document with you.  This is Exhibit 5.
5               (Plaintiffs' Exhibit Number 5 was
6               identified for the record.)
7   BY MS. HARTON:
8          Q.   Do you see this document?
9          A.   Yes.
10         Q.   All right.  It's two pages and it's got
11  the summary at the top of the second page.
12              Do you see that?
13         A.   I see it.
14         Q.   And it's signed Amanda Stewart-Smith,
15  8/26/2022.
16              Do you see that?
17         A.   I see it.
18         Q.   Okay.  10:00 p.m.; right?
19         A.   I see that.
20         Q.   Is this the statement that she -- that she
21  gave you?
22         A.   I don't recall if that's the statement or
23  not.
24         Q.   Is this what it looked like?
25         A.   Honestly, I don't recall.

                                                    134

1          Q.   Okay.
2          A.   I know I attached it to my report, but I
3   don't recall what it looked like.
4          Q.   Okay.  Okay.  Do you recall about what
5   time you left the RYDC?
6          A.   I don't.  10:00-ish, I guess.
7          Q.   Okay.
8          A.   Thereabouts.
9               MS. HARTON:  Guys, I'm getting pretty
10         close to done.  I just want to show her
11         some videos.  So if we could just take a
12         five-minute break so I can cross things
13         off my outline, it'll probably go quicker.
14              MR. RAY:  Sounds good, Sam.  Thank
15         you.
16              THE COURT REPORTER:  Off the record.
17              (A recess was taken from 3:16 p.m. EST
18              until 3:30 p.m. EST.)
19  BY MS. HARTON:
20         Q.   I'm going to show you -- Before I show you
21  videos, I'm going to show you another record.
22              where do I see records?
23              Okay.  I'm going to show you Exhibit 50.
24              (Plaintiffs' Exhibit Number 50 was
25              identified for the record.)

                                                    135

1   BY MS. HARTON:
2          Q.   Do you see this?
3          A.   I see it.
4          Q.   Okay.  And this says at the top Special
5   Incident Report; correct?
6          A.   It does.
7          Q.   Okay.  And then if I zoom in, there is
8   this narrative that has a big cross-out there.
9               Do you see that?
10         A.   Yes.
11         Q.   Okay.  Is this the record that you
12  received from Amanda Stewart-Smith?
13         A.   That's -- That looks correct.
14         Q.   Okay.  And you -- you asked her when you
15  spoke about why this particular part was crossed
16  out, didn't you?
17         A.   I did.
18         Q.   Did she -- What -- What information did
19  she give you?
20         A.   Verbatim, I don't remember, but it was
21  something in reference that it wasn't -- it wasn't
22  part of the -- this, I guess, incident or -- I don't
23  want to call it incident yet because -- Anyway, it
24  wasn't part of what we were working on.  What I was
25  working on.

                                                    136

1    Q.   Okay.  And I know there was confusion
2  about what the appropriate report is, so I'm going
3  to show you Exhibit 50.
4        That was Exhibit 50 that I just showed
5  you.  This is Exhibit 51.
6        (Plaintiffs' Exhibit Number 51 was
7        identified for the record.)
8  BY MS. HARTON:
9    Q.   Okay.  Do you see this document?
10   A.   I do.
11   Q.   Okay.  This is a nine-page document.  It
12  says, Gilmer County Sheriff's Office Miscellaneous
13  Incident Report at the top.  And there -- It says --
14  There's a narrative and then 12 supplements, many of
15  which at the bottom say, Reporting Officer, Sharon
16  Ellis.
17        Do you see that?
18   A.   I do.
19   Q.   Okay.  Is this the report that you
20  reviewed in advance of this deposition?
21   A.   I didn't review the whole thing.  I didn't
22  concern myself with the other -- the supplements or
23  the other -- the initial runaway report.  I just
24  focused on mine.
25   Q.   Okay.  The supplements at -- at the bottom
                                                    137

1  say, Reporting Officer, Sharon Ellis?
2    A.   Those are the ones that I -- yeah, my
3  report.  I didn't concern myself with anybody
4  else's.
5    Q.   Okay.  Okay.  And as far as your reports
6  go and these -- and these supplements, is there
7  anything that -- that you believe is inaccurate?
8    A.   No.
9    Q.   Okay.  And you wrote these -- these
10  reports during and shortly after the incident
11  occurred; right?
12   A.   Yes.
13   Q.   And so it's fair to say that when you --
14  when you wrote these narratives, you had -- you had
15  a better memory of what had occurred than you have
16  today; right?
17   A.   Sure.
18   Q.   Okay.
19   A.   Yes.
20   Q.   Okay.  This is Exhibit 35.
21        (Plaintiffs' Exhibit Number 35 was
22        identified for the record.)
23  BY MS. HARTON:
24   Q.   And we're not going to watch the whole
25  video.  I'm playing it right now from the beginning,
                                                    138

1  and it says at the bottom 9:00 p.m.
2        And this looks like the -- vehicle
3  gate at the RYDC; right?
4    A.   Yes.
5    Q.   Okay.  And -- And there's a -- this patch
6  of grass on the right and then this metal thing in
7  that patch of grass --
8        Oh, I did not mean to do that like that.
9        -- is the call button that you -- that you
10  press when you -- you want to get the attention of
11  someone at RYDC to let you in; right?
12   A.   Yes.
13   Q.   Okay.  We'll skip ahead.
14        (Playing video on the screen.)
15  BY MS. HARTON:
16   Q.   Sorry.  I actually need to show you
17  Exhibit 32.
18        (Plaintiffs' Exhibit Number 32 was
19        identified for the record.)
20  BY MS. HARTON:
21   Q.   Yeah.  Okay.  This is Exhibit 32 and it's
22  the same view that we were just looking at.
23        This is the -- front of the RYDC, the
24  vehicle gate; right?
25   A.   Yes.
                                                    139

1    Q.   Okay.  And it says at the bottom 8:45,
2  August 26th, 2022.
3        And there's your vehicle right here that
4  says 1321; right?
5    A.   Yes.
6    Q.   And so this is about when you arrived at
7  the RYDC with Alexis Sluder; right?
8    A.   Yes.
9    Q.   Okay.
10   A.   I'll have to look at my report.  I don't
11  know if -- what's -- what's accurate, what I wrote
12  or -- or what's on their video, but okay.
13   Q.   Okay.  This is -- This is a fair and
14  accurate representation of the space before the
15  vehicle gate at the RYDC on the night of Alexis
16  Sluder's death; right?
17   A.   Yes.
18   Q.   Okay.  So I'm going to jump ahead to 8:46.
19        Do you see this -- this man walking
20  towards your car, your vehicle?
21   A.   Yes.
22   Q.   Okay.  At 8:46:54 he kind of gets near
23  your vehicle.
24        Do you know who that is?
25   A.   No.
                                                    140



1    Q.   Okay.  You don't remember --
2    A.   I mean I don't -- I'm sorry.
3    Q.   That's okay.
4         You don't remember his name?
5    A.   I don't.
6    Q.   Okay.
7    A.   I don't -- I don't -- I didn't even -- I
8  didn't ask him.  I didn't interact with him other
9  than the initial -- the initial interaction right
10  there.
11   Q.   Okay.  Now, if I zoom in here, it looks
12  like you're writing on a -- on a notepad.
13        Do you see that?
14   A.   Yes.
15   Q.   What are you writing on?
16   A.   I'm probably just note- -- notating what
17  time I arrived.  And at some point I'm sure I called
18  dispatch on my phone to advise them that I was -- I
19  was on the scene.
20   Q.   Okay.  I want to go back to Exhibit 33.
21        (Plaintiffs' Exhibit Number 33 was
22        identified for the record.)
23  BY MS. HARTON:
24   Q.   I'm going to skip ahead to 9:06.
25        Okay.  So that's -- that's you leaving the
                                                          141

1  RYDC -- right? -- at around 9:06?  Or at least the
2  vehicle gate; right?
3    A.   Yes.
4    Q.   And at this point you have dropped off
5  Alexis at the RYDC; correct?
6    A.   Yes.
7    Q.   And this is the point where you start to
8  inspect your vehicle for contraband; right?
9    A.   Yes.
10   Q.   Okay.  And then we've -- we've already
11  talked about most of what was on this video, so I'm
12  going to skip ahead a little bit.
13        Skip ahead to 9:50.
14        Okay.  And that's at 9:49:36.
15        Do you see that time stamp at the bottom?
16   A.   Oh, I do.
17   Q.   Okay.  And it looks like you're still
18  inspecting your vehicle; correct?
19   A.   Well, where am I?  If I'm in the front --
20        Oh, I -- I mean, I am, but I don't -- I
21  don't know what I'm doing at that moment right
22  there.
23   Q.   Okay.
24   A.   Am I...
25   Q.   I'm going to just put it on two times for
                                                          142

1  a little bit just so we can keep this moving if
2  anyone -- unless anyone has an objection.
3         Okay.  Now, on the left side of the
4  screen, you see this -- the person in a blue shirt
5  kind of coming into view.
6         Do you see that?
7    A.   I do.
8    Q.   Okay.  And that's you that just stepped
9  out of the car at 9:50:53 -- right? -- around then?
10   A.   Yes.
11   Q.   Okay.  Do you know who the other person
12  is?
13   A.   I -- I -- I don't recall and I can't make
14  out...
15   Q.   It looks like you're -- you're looking at
16  some papers.
17        Do you see that?
18   A.   Yes.
19   Q.   Okay.  Now, having watched it for a little
20  bit more, do you recognize who that is?
21   A.   It -- It looks like Sergeant --
22  Sergeant Brooks, but...
23   Q.   Okay.
24   A.   On the -- It looks like it.  I don't
25  recall that, that part right there.
                                                          143

1    Q.   Okay.  Now, watching this conversation
2  between -- between the two of you, do you -- do you
3  recall having this conversation with
4  Sergeant Brooks?
5    A.   I don't.
6    Q.   Okay.  Let's skip ahead to --
7    A.   And may I ask a question?
8    Q.   Yes.
9    A.   So I know because you -- you
10  fast-forwarded -- you skipped a little bit.  I can't
11  tell if that was before or after my contraband check
12  on the back seat from my side.  I saw the door was
13  open, but I -- I -- I didn't --
14        Okay.  That's me.  Okay.  Now I see I'm
15  doing the check in the back seat.  Okay.
16   Q.   Yeah.  Okay.
17        So -- So here at 9:13 --
18        I can -- I can go back to 9- -- I think
19  it's 9:06.  It's when you pull out.  And I'm putting
20  it on two times just so we can get through this
21  part.
22        So you park your car around 9:06 outside
23  of the vehicle gate and you begin to open the doors.
24        Okay.  So this is -- this is about when
25  you start.  This is -- We're about 9:07:06.
                                                          144

1    This is about when you start your -- your
2  inspection of the vehicle; fair?
3    A.   Yes.
4    Q.   Okay.  So where I -- where I skipped ahead
5  to was 9:50, when Sergeant Brooks comes out and
6  begins speaking with you and you have that paper in
7  your hand; right?
8    A.   Is that after I did the -- the -- the
9  other side?  I'm assuming it is because I see the
10 door open.
11   Q.   Yes.
12   A.   Okay.
13   Q.   Right.  Because we -- yeah.
14        Right.  So we're -- we're looking at this
15 as time-stamped 9:50.  What we were looking at
16 earlier was your inspection that began around 9:06,
17 9:07.
18        Having that being represented to you, this
19 is -- this is that conversation we were discussing
20 earlier where you and Ms. Brooks were talking about
21 the -- the papers -- or Alexis's statement that you
22 weren't satisfied with; right?
23   A.   Yes.  That's what I wanted to clarify, if
24 that was after my -- my check.  Yes.
25   Q.   And then the last thing I want to show
                                                      145

1  you, Exhibit 35.
2        Okay.  This is the -- front gate at
3  the RYDC; right?
4    A.   Yes.  It looks like that.
5    Q.   Okay.  And after you complete your
6  inspection of your vehicle, you -- you bring your
7  vehicle around to this front gate; right?
8    A.   Yes.
9    Q.   That's -- That's you pulling up right
10 there around -- around 10:00 o'clock; right?
11   A.   Yes.
12   Q.   And you actually park your vehicle there
13 for -- for a while; right?  And you're waiting for
14 Sergeant Brooks to update you on what's going on
15 with Alexis; right?
16   A.   No.  I was -- From what I recall, I was
17 waiting there for the statement from Amanda Smith.
18   Q.   Okay.  You were -- You were waiting there
19 to get the rest of your paperwork so that you could
20 leave; right?
21   A.   Right.
22   Q.   So just skipping ahead, I'm going to go to
23 10:33 on here.  Okay.
24        Okay.  So at 10:33:51 about, this woman
25 comes up to speak to you in your vehicle.
                                                      146

1    Is that Amanda Stewart-Smith?
2    A.   Yes.
3    Q.   Okay.  Now, while she's doing that,
4  another woman also walks out of the front gate past
5  your vehicle.
6        Do you see that?
7    A.   Yes.
8    Q.   Okay.  That's Sergeant Brooks; correct?
9    A.   It looks like her.
10   Q.   Okay.  And it looks like she's walking to
11 a white vehicle; right?
12   A.   Yes.
13   Q.   All right.  Do you -- Do you know if
14 that's her vehicle or not?
15   A.   I don't know.  I don't even think I even
16 knew that she went out there until --
17   Q.   Okay.
18   A.   -- looking at this video.
19   Q.   You have no idea what she was -- what she
20 was doing or anything like that; right?
21   A.   No.  I was interacting with Ms. Smith over
22 the -- the -- the statement forms.
23   Q.   Okay.
24   A.   The statements.
25   Q.   Yeah.  And you were -- that's the general
                                                      147

1  conversation you had and where she showed you the
2  document with the strike-out; right?
3    A.   Correct.
4    Q.   Okay.  I'm going to show -- This is
5  Exhibit 46.
6        (Plaintiffs' Exhibit Number 46 was
7        identified for the record.)
8  BY MS. HARTON:
9    Q.   Do you recognize this video?
10   A.   Recognize it?  I didn't look at any
11 videos, so I'm going from my perspective from
12 monitor -- oh, sorry -- from my -- from the
13 monitor -- monitor and mirrors.  It looks like -- It
14 looks like -- Obviously it looks like Alexis.
15   Q.   Okay.  This looks like Alexis on the -- in
16 the -- in the back of your seat on the night that
17 you transported her to RYDC; right?
18   A.   Yes.
19   Q.   Okay.  And it says at the bottom, Start
20 2022-8-26, 18:43:55, which is consistent with the --
21 around the time that you picked her up; right?
22   A.   Yes.
23   Q.   Okay.
24        (Playing video on the screen.)
25        MS. HARTON:  Can you guys hear the
                                                      148

audio?
THE WITNESS: No. I don't hear anything.
MR. RAY: No. I don't hear anything.
MS. HARTON: There's like a little bit of -- It's --
Here, let me fast-forward to a part where she's actually talking.
THE COURT REPORTER: Okay. And to remind you, Counsel: I'm just noting for the record that you're playing the video --
MS. HARTON: Okay.
THE COURT REPORTER: -- since I won't be able to get the audio.
MS. HARTON: Thank you.
(Playing video on the screen.)
MS. HARTON: Did you hear audio there?
MR. RAY: No.
(Playing video on the screen.)
MS. HARTON: Is there any audio there at all?
MR. RAY: No.
I mean, can we confirm if anyone else could hear the audio of --

149

MS. HARTON: Yeah.
MR. RAY: -- any other --
MS. HARTON: Chuck, can you hear the audio?
MR. COLE: I can't hear anything.
MS. HARTON: So it's me. Okay. Not good.
BY MS. HARTON:
Q. Well, Sergeant -- or Deputy Ellis, have you -- have you ever watched this video since the incident occurred?
A. I'm sorry. Can you repeat that.
Q. Have you -- Have you watched this video since the incident occurred?
A. No.
Q. Okay. So I know y'all don't have any audio, which is fine.
But as I'm -- as I'm scrolling through here -- and I'm at time stamp 8:50:33 -- that looks like how Alexis was dressed on the day of the incident; right?
A. Yes.
Q. Okay. And she was wearing that -- those -- those necklaces on her -- on her person; right?

150

A. Yes.
Q. Okay. Now, looking at this, it looks to me like she sat behind the passenger's seat. Is that correct?
A. It does look like that. I don't -- From my recollection, I thought she was behind me. I don't know if that's because the camera reverses it --
Q. Right.
A. -- or she's -- the -- the way that the camera is set, if it reverses it or if she's actually behind the passenger's seat.
Q. Okay. So -- All right. I'm just trying to figure out the audio here, guys. Sorry.
Still nothing?
A. Nothing.
Q. Okay.
MS. HARTON: Why don't we take a break for a minute and let me figure out what I want to do.
MR. RAY: Off the record.
THE COURT REPORTER: Off the record.
(A recess was taken from 3:54 p.m. EST until 4:06 p.m. EST.)
THE COURT REPORTER: All right. Back

151

on the record.
BY MS. HARTON:
Q. Okay. Deputy, I'm back at Exhibit 46.
Do you see this?
A. Yes.
Q. Okay. And I'm playing it.
And you can hear audio on it now; right?
A. Yes.
Q. Okay.
THE COURT REPORTER: And audio won't be transcribed from the video.
MS. HARTON: Right.
BY MS. HARTON:
Q. So I want to skip ahead to -- I'll go to 19. Hang on.
(Video playing on the screen.)
BY MS. HARTON:
Q. Okay. That's -- That's your voice kind of coming from the -- the front of the vehicle; right?
A. Yes.
Q. And you're telling -- you're -- you're asking Alexis if -- if she had taken her seatbelt off; right?
A. Yes.
Q. Okay.

152

1          (Video playing on the screen.)
2   BY MS. HARTON:
3       Q.   Okay.  So there at about 8- -- it looks
4   like around 19:14:39 you say to Alexis that you hope
5   she gets off the drugs one day; right?
6       A.   Yes.
7       Q.   Oh, okay.  Sorry.  I -- I didn't hear an
8   answer.
9       A.   Yes.
10      Q.   But you said yes?
11      A.   Yes.
12      Q.   Okay.  Why did you say that to her?
13      A.   Because I cared about her.
14      Q.   Was there something that she was doing in
15  that moment that -- that made you believe that she
16  was on drugs or otherwise intoxicated?
17      A.   No.
18      Q.   Okay.
19          (Video playing on the screen.)
20  BY MS. HARTON:
21      Q.   And then she says -- she says something to
22  you in response there around nine- -- 19:14:41.
23          Did you hear what she said?
24      A.   Now or at the time?
25      Q.   Either.

153

1       A.   Well, play it again.  I caught something,
2   but I'm sure I didn't hear it when I was in the
3   front seat.
4       Q.   Okay.
5       A.   Oh, I don't talk to -- something.  I -- I
6   don't -- I guess that's what she said.
7          (Video playing on the screen.)
8   BY MS. HARTON:
9       Q.   Did you catch it that time?  Do you have
10  any idea what she said?
11      A.   No.  I -- I did -- Now I just heard I
12  don't take advice from -- and the rest is inaudible
13  to me.  I can't make out what she's saying.
14      Q.   Okay.  You didn't hear that when -- when
15  you were in the vehicle; right?
16      A.   I don't believe so.  If you keep playing
17  it, my response might --
18      Q.   Okay.
19      A.   I might have said, what?, or asked her to
20  repeat herself.
21      Q.   Yeah.  There are -- There are some things,
22  because she's sitting behind you, she has to sort of
23  raise her voice enough so that -- so that you can
24  hear it; fair?  Right?
25      A.   Yes, correct.

154

1          (Video playing on the screen.)
2   BY MS. HARTON:
3       Q.   So there -- there she said something --
4   she says, I'd rather be on drugs than -- something
5   about you deserting a child; right?
6       A.   Some- -- Yeah.  I -- I hear that now.  I
7   don't know if I heard -- Again, we'll have to keep
8   playing it.  I don't know if I heard that because
9   I -- I -- I think I asked her to repeat herself.
10      Q.   Okay.
11          (Video playing on the screen.)
12  BY MS. HARTON:
13      Q.   So I stopped it at 19:15:27.
14          You guys are talking about someone named
15  Amber and whether they do drugs; right?
16      A.   I'm sorry.  Repeat that.
17      Q.   I stopped --
18      A.   I didn't catch it.
19      Q.   I stopped it at 19:15:27 and you guys were
20  talking about someone named Amber and whether or not
21  she does drugs; right?
22      A.   Correct.
23      Q.   Amber is the girl you adopted and who is
24  Alexis's cousin; right?
25      A.   Correct.

155

1       Q.   Okay.  Let me just continue.
2          (Video playing on the screen.)
3   BY MS. HARTON:
4       Q.   Okay.  So I stopped it at where it says
5   current time 19:16:58.
6          And, Deputy, could I ask you to just scoot
7   back into the frame so I can see you?
8       A.   I'm sorry.  I just...
9       Q.   Okay.  No, I understand.
10          So -- So we just -- I stopped it at
11  19:16:58.  We watched a few moments of -- of this
12  video.
13          And -- And you guys were having sort of an
14  argument about Amber and the way you've treated her;
15  right?
16          MR. RAY:  Object to the form.
17      A.   I would say a disagreement.
18  BY MS. HARTON:
19      Q.   A disagreement, right.
20          And you were -- you were sort of
21  explaining your side of the situation and Alexis was
22  arguing back with you and -- and eventually you --
23  you turned up the radio; right?
24      A.   Yes.
25      Q.   Okay.  And you turned up the radio

156



1 because -- because you didn't want to listen to her
2 talk about the Amber situation; am I right?
3    A.  Yes.
4    Q.  Okay.
5        (Video playing on the screen.)
6 BY MS. HARTON:
7    Q.  So I've continued to play that video for
8 just a few more seconds and stopped it again at
9 19:17:05.
10       And the music is still playing quite
11 loudly; fair?
12    A.  Yes.  But I -- I'd like to kind of add a
13 little something to that.  The --
14    Q.  Well, let me ask -- let me ask a question,
15 though, because it appears as if Alexis is also
16 speaking while the music is playing; correct?
17    A.  Speaking to me while it's playing?
18    Q.  Yeah.  She -- It sounds like she is also
19 speaking while the music is playing; right?
20    A.  I didn't recall that.
21    Q.  Well, let me go back just a touch to
22 19:16:46.
23       (Video playing on the screen.)
24 BY MS. HARTON:
25    Q.  So would you agree with me that it sounds

157

1 like while you turn up the music, Alexis was -- was
2 still speaking?
3    A.  It sounded like she was saying, oh, well,
4 you want to bring up -- and then that was it.  So it
5 was kind of a disagreement that the reason that --
6 you know, about talking about Amber and then she was
7 going back to, oh, you want to bring up -- and I'm
8 only assuming my comment about when are you going to
9 get off the drugs.
10    Q.  Okay.  But you --
11    A.  In the video.
12    Q.  But you -- you couldn't hear her continue
13 to speak because you had turned up the music too
14 loud; correct?
15    A.  Correct.
16    Q.  Okay.  I'm going to skip ahead just a
17 little bit.
18       I'm at 19:18:26.  I'll play it.
19       (Video playing on the screen.)
20 BY MS. HARTON:
21    Q.  Okay.  So I stopped it at 19:19:49 again.
22       And it -- Alexis said that, you know, you
23 were driving too fast and recklessly throughout this
24 drive; right?
25    A.  Throughout the drive?  Not that I heard.

158

1 I remember hitting the ripples while -- while I was
2 trying to focus on her through the monitor, but I
3 couldn't help the -- The car was in the road.  We
4 were going over Fort Mountain at the time.
5    Q.  Yeah.
6       And you -- you recall this moment where
7 she -- she said that you were driving recklessly;
8 right?
9    A.  Yeah.
10    Q.  Okay.  I'm going to keep playing it.
11       (Video playing on the screen.)
12 BY MS. HARTON:
13    Q.  Okay.  So did you hear Alexis say, I want
14 to die, five times?
15    A.  Just now.  I didn't hear that then.
16    Q.  Yeah.  And in fact, as she was saying it,
17 the -- the volume of the -- the music rose; right?
18    A.  Yes because I believed she was still
19 arguing with me.
20    Q.  Yeah.  And so you turned up the music
21 while she was saying repeatedly, I want to die;
22 right?
23    A.  I didn't know she was saying, I wanted to
24 die.  I turned it up just like I did the -- the
25 first time.

159

1    Q.  Right.  You --
2    A.  I was trying...
3    Q.  Go ahead.
4    A.  It was my way of trying to end the
5 argument or the disagreement between us.
6    Q.  You consider a 16-year-old saying
7 repeatedly to you, I want to die, an -- an argument
8 or a disagreement to you?
9       MR. RAY:  Object to form.
10    A.  I did not hear her say that.
11 BY MS. HARTON:
12    Q.  And you didn't hear her say that because
13 you had turned up the music?
14    A.  I wasn't turning up the music to avoid
15 from hearing her say, I want to die.  I turned up
16 the music as a barrier between us because we were
17 arguing.
18    Q.  So throughout your interaction with
19 Sergeant Brooks and Stewart-Smith, they -- they said
20 that Alexis had claimed to have taken the drugs in a
21 different car, not your car; right?
22    A.  Yes.
23    Q.  But you believed that she had drugs in
24 your car or maybe had ingested drugs in your car
25 because you had found the methamphetamine in your

160



1    car; right?
2         A.   Yes.
3         Q.   As you sit here today, do you believe that
4    she ingested the drugs in your vehicle?
5         A.   I can't say that factually.  I'm -- I'm
6    looking at the video.  I don't know.  I saw her
7    reaching or digging between her crotch and -- I
8    don't know.  All I know is that she was there and so
9    was the substance and that's what I had.
10        Q.   And you -- you -- do you think there was
11   anything -- as you sit here today, anything that you
12   could have done to have prevented Alexis from taking
13   the meth- -- methamphetamine that she had in your
14   car?
15             MR. RAY:  Object to form.
16        A.   No.  I had no knowledge at that moment, at
17   that time.
18   BY MS. HARTON:
19        Q.   And there's -- there's nothing that you
20   could have done to have gained knowledge?
21        A.   No.  I had -- No.  I had no knowledge
22   until I found what I suspected to be crystal
23   methamphetamine left in the back seat.
24        Q.   You talked earlier about how you've worked
25   in -- in similar scenarios as some of the RYDC

                                                    161

1    officials where you are intaking detainees and
2    deciding whether or not they need to go -- they can
3    be admitted to a correctional facility or you need
4    to give them to medical; is that fair?
5         A.   No.
6         Q.   Okay.  What was inaccurate about what I
7    just said?
8         A.   What was inaccurate is I've never
9    experienced where I brought somebody in and they
10   refused them at that time.  I mean, their policy --
11   their procedure, not their policy -- but their
12   procedure changed since then.  So at the time I'd
13   never experienced -- there wasn't a time when I
14   brought in a juvenile and they refused to admit
15   them.  I never experienced it.
16        Q.   You never experienced a RYDC refusing to
17   admit a juvenile?
18        A.   Correct.
19        Q.   Okay.
20        A.   When I -- yeah.
21        Q.   And you said their policy has changed
22   since then.
23             What do you -- How do you understand their
24   policy to have changed?
25        A.   Not their pol- -- I'm sorry.  I apologize

                                                    162

1    for interrupting.
2             Not their policy.  I made a correction.  I
3    said, their procedure.
4         Q.   Okay.  Yeah.
5             So how -- what's your understanding of how
6    the procedure has changed?
7         A.   When we first arrived at -- in the
8    beginning, the officers, as we -- as we saw, would
9    come out to the vehicle, ask me my name -- ask
10   the -- the driver, the deputy, the officer their
11   name, ask --
12             I'll just focus on this.
13             -- ask me my name, and then the tag
14   number, and then the officer would call it over the
15   radio.
16             Now they actually speak with the juvenile
17   and ask the juvenile -- juvenile if they take -- if
18   they took any drugs or alcohol 24 hours before
19   coming.  Before coming here.
20        Q.   Do you know when that change happened?
21        A.   I don't.
22        Q.   Do you --
23        A.   I just know after...
24        Q.   Sorry.  Go ahead.
25        A.   I'm sorry.

                                                    163

1             I just know after.  Sometime after; I
2    don't know.
3         Q.   After Alexis Sluder died?
4         A.   Yes.
5         Q.   Okay.  Okay.
6         A.   My experience.
7         Q.   And you're -- you're speaking --
8             Sorry.  I just want to make sure.
9             Okay.  You're speaking about RYDC's
10   procedures, not Gilmer County sheriff's procedures;
11   right?
12        A.   Yes, correct.
13        Q.   Okay.  It's your understanding that after
14   Alexis Sluder passed away, the RYDC changed their
15   policy so that now juveniles are asked whether
16   they've taken some sort of intoxicating substance
17   before they're admitted, before the RYDC agrees to
18   take them; fair?
19        A.   Okay.  Not their policy.  I don't know if
20   they changed their policy.  I'm -- I'm speaking
21   about the procedure when I arrive.
22             Now, they could have -- I don't know.  It
23   depends on the employees.
24             All I know is that there was -- prior to
25   that incident, when I would bring a juvenile, they

                                                    164

1  would ask for my name, they would take the tag
2  number, and call it over their radio.
3          Now -- And I'm assuming, again, that it
4  was after that time because that had never
5  experienced before. But now, since the incident,
6  when I go there they ask me for my name, they --
7  they -- they do the -- they -- they -- they call in
8  the tag, but they actually have a conversation -- I
9  put the window down and they actually speak directly
10 to the juvenile themselves.
11     Q.  Okay. Before you -- you release them into
12 RYDC custody?
13     A.  Before they'll even let me through the
14 gate with the vehicle.
15     Q.  Okay. And now -- And if -- if the
16 juvenile says yes, that they have taken those
17 substances within the last 24 hours, what's the
18 procedure now that typically happens?
19     A.  Take them to the nearest hospital to be
20 medically cleared.
21     Q.  Okay.
22         (Plaintiffs' Exhibit Number 21 was
23         identified for the record.)
24 BY MS. HARTON:
25     Q.  I'm showing you Exhibit 21.

                                            165

1          Do you -- Do you recognize this picture?
2     A.  Yes.
3     Q.  Okay. This is a text message that you
4  sent to Marilyn Ortiz.
5          The -- The first one is a green bubble
6  with a text message at 7:58 to Marilyn Ortiz; right?
7     A.  Yes.
8     Q.  Okay. And you -- you recall sending this
9  message to Ms. Ortiz?
10    A.  Yes.
11    Q.  Okay. And Ms. Ortiz is -- or was Lexi's
12 probation officer; right?
13    A.  Yes.
14    Q.  And you say: She looks like an addict.
15 Pitiful.
16         What did -- What did you mean by the first
17 sentence, she looks like an addict?
18    A.  With her -- Ms. Ortiz was -- is, was --
19 her probation officer. We saw Alexis's journey in
20 juvenile court. Sometimes she looked good, healthy;
21 sometimes she didn't. And it was a back-and-forth
22 thing.
23         I'm trying to make sense of that time
24 because I didn't test the -- the suspected substance
25 until I arrived at patrol headquarters.

                                            166

1     Q.  Well, it looks like the first text that
2  you sent -- you say, she looks like an addict,
3  pitiful -- you sent her that at 7:58 p.m.
4     A.  Oh, yeah, yeah, yes.
5     Q.  And then the second --
6     A.  Yes.
7     Q.  -- text is a picture of the
8  methamphetamine test kit, and you sent that at
9  11:53 p.m.; right?
10    A.  Do you mind if I step -- I've got this
11 glare from the light.
12         Can I just move my seat so I can see
13 the...
14    Q.  (Adjusts document on the screen.)
15    A.  Okay. That helps. Thank you.
16         Yes. So yes. So -- And that's going off
17 of my initial observation. And so when I got
18 confirmation --
19         So I -- when I sent it to Marilyn, I was
20 just letting her know the condition that she looked
21 like at that time. Again, we'd -- we had seen her
22 journey. Sometimes she looked healthy, sometimes
23 she didn't. And all I was simply letting her know
24 is that that looks like, you know, she's doing drugs
25 again.

                                            167

1     Q.  Okay. And then you said: Pitiful.
2          What did you mean by that?
3     A.  It's exactly what I meant, it's pitiful.
4  Alexis was a beautiful girl, beautiful. You know,
5  when she was healthy, beautiful girl. And it's like
6  with any drug user, you know, when -- when you
7  get -- when the drugs change a person's look, yeah,
8  even with adults, it is, it -- it's pitiful. It --
9  It's sad. It's unfortunate. It was -- It was
10 exactly what I said, it was pitiful.
11    Q.  And then the next text that you send, it's
12 on Friday at 11:53 p.m. It's a picture of the test
13 kit. And it looks like right below that, on the
14 second page right below that picture, you also sent
15 a message confirming that the test kit was positive
16 for methamphetamine. Right?
17    A.  That's correct.
18    Q.  Okay. And then the next morning around
19 9:43 you get a text -- this is on Page 3 of
20 Exhibit 21 -- that Alexis had passed away from an
21 overdose; correct?
22    A.  Correct.
23    Q.  Okay.
24    A.  But it was something that -- that happened
25 prior to that.

                                            168



1     Q.   And this is the first time you learned
2  that Lexi had passed away; right?
3     A.   Yes.
4     Q.   Okay.  And I think this is my last
5  exhibit.  Oh, actually I've got one more, then I'm
6  done.
7          Okay.  Sorry.
8          Okay.  This is Exhibit 18(c).
9          (Plaintiffs' Exhibit Number 18(c) was
10         identified for the record.)
11 BY MS. HARTON:
12    Q.   And do you recognize this photo?
13    A.   I do.
14    Q.   Okay.  This looks like a picture of the
15 back seat of your vehicle with white powder on it;
16 right?
17    A.   Yes.  The -- The driver's side back
18 passenger's seat.
19    Q.   Okay.  This is the -- Sorry.
20         This is the back passenger's seat?
21    A.   Yes.
22    Q.   And --
23    A.   On the driver's side.
24    Q.   Okay.  This is on the driver's side.
25 Okay.

169

1          The -- The -- The portion of the seat
2  where -- that's on this picture where the
3  methamphetamine was was on the driver's side; right?
4     A.   Yes.
5     Q.   Okay.  And do you recall when you first
6  saw the methamphetamine if the meth- -- if you found
7  the methamphetamine on the side that Lexi had been
8  sitting or on the other side of the back passenger's
9  seat?
10    A.   Her seat.
11    Q.   Okay.  So based on this picture, Lexi was
12 sitting in the back passenger's seat on the driver's
13 side; right?
14    A.   Yes.
15    Q.   Okay.
16         MS. HARTON:  I think I'm done, guys.
17 Give me one second.
18         Okay.  I am done.  I'll pass the
19 witness, reserve the remainder of my
20 questions for trial.
21         MR. RAY:  I don't have any questions
22 unless someone -- someone else does.
23         MS. McGOVERN:  No questions.
24         MR. COLE:  No questions for me.
25         MR. GREEN:  No questions.

170

1          MR. DRIGGERS:  I don't have anything.
2  No questions for me.
3          MS. HARTON:  Okay.  I think that's
4  everyone.
5          THE COURT REPORTER:  All right.  And,
6  Counsel, before we go off the record, I'm
7  going to call each one of you, and if you
8  would let me know if you want to order a
9  copy of the transcript and if you need
10 regular delivery or rush.
11         Ms. Harton, I'll go with you first.
12         Did you want a...
13         MS. HARTON:  I'll just take a PDF,
14 just regular delivery.  And I will make
15 sure to send you the exhibits that I used
16 if I could just get your email.
17         THE COURT REPORTER:  Okay.  I will
18 give you that off the record, if you don't
19 mind, at the end.
20         MS. HARTON:  Thank you.
21         THE COURT REPORTER:  All right.  And,
22 Mr. Greiner, would you like to order a
23 copy of this transcript?
24         MR. GREINER:  Yeah.  Just an
25 electronic copy PDF and regular delivery.

171

1          THE COURT REPORTER:  Okay.  And
2  Mr. Cole?
3          MR. COLE:  Same order.
4          THE COURT REPORTER:  Okay.  A PDF and
5  regular delivery.
6          And Mr. Green?
7          MR. GREEN:  Same.
8          THE COURT REPORTER:  Okay.  And
9  Ms. McGovern?
10         MS. McGOVERN:  Same.
11         THE COURT REPORTER:  All right.
12 Mr. Driggers?
13         MR. DRIGGERS:  (No audible response.)
14         THE COURT REPORTER:  I'm sorry.  I
15 didn't hear a response.
16         Did you want the same order?
17         MR. DRIGGERS:  Same.
18         THE COURT REPORTER:  All right.  And
19 I believe I got everybody.
20         Mr. Boone, I am having you with
21 Ms Harton.
22         Anybody else?  Mr. Ray, did I ask
23 you?
24         MR. RAY:  You didn't, but it's the
25 same, PDF, just standard delivery.

172

```
1         THE COURT REPORTER:  Okay.  And I
2    have written down that we discussed
3    earlier to reserve signature.
4         And at this point we can go off the
5    record unless anybody has something else.
6              (No audible response.)
7         THE COURT REPORTER:  Okay.  Hearing
8    nothing, I'll go off the record.
9         (The right of the witness to read and
10   sign the deposition transcript is reserved.)
11   (The deposition concluded at 4:41 p.m. EST.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          173
```

```
1    Page_____/Line_____/Should Read:_____
2    Reason: _____
3
     Page_____/Line_____/Should Read:_____
4
     Reason: _____
5
6    Page_____/Line_____/Should Read:_____
7    Reason: _____
8
     Page_____/Line_____/Should Read:_____
9
     Reason: _____
10
11   Page_____/Line_____/Should Read:_____
12   Reason: _____
13
     Page_____/Line_____/Should Read:_____
14
     Reason: _____
15
16   Page_____/Line_____/Should Read:_____
17   Reason: _____
18
     _____ Check here if additional page(s) attached
19
20
21              _____
                SHARON ELLIS
22
     Sworn to and subscribed before me,
23
     _____, Notary Public.
24
     This _____ day of _____, _____.
25   My Commission Expires:
                                          175
```

```
1         E R R A T A   S H E E T
2
     IN RE:  Sluder and Curtis vs. Phillips, et al.
3              Deposition of SHARON ELLIS
                 (taken June 17, 2025)
4
5
6         Pursuant to Rule 30(e) of the Federal
     Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
7    any changes in form or substance which you desire to
     make to your deposition testimony shall be entered
8    upon the deposition with a statement of the reasons
     given for making them.
9
          To assist you in making any such
10   corrections, please use the form below.  If
     supplemental or additional pages are necessary,
11   please furnish same and attach them to this errata
     sheet.
12
13              -  -  -
14
          I, the undersigned, SHARON ELLIS, do
15   hereby certify that I have read the foregoing
     deposition and that said transcript is true and
16   correct, with the exception of the following changed
     noted below, if any:
17
18   Page_____/Line_____/Should Read:_____
19   Reason: _____
20
     Page_____/Line_____/Should Read:_____
21
     Reason: _____
22
23   Page_____/Line_____/Should Read:_____
24   Reason: _____
25   (continued)
                                          174
```

```
1              DISCLOSURE
2    STATE OF GEORGIA
     COUNTY OF COBB
3
4    DEPOSITION OF SHARON ELLIS
5
6         Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
7    Judicial Council of Georgia, I make the following
     disclosure:
8
9         I am a Georgia Certified Court Reporter.
     I am here as a representative of Lyon Reporting,
10   Inc.
11        I am not disqualified for a relationship
     of interest under the provisions of O.C.G.A.
12   9-11-28(c).
13        Lyon Reporting, Inc. was contacted by the
     offices of McCorkle Litigation Services, Inc., to
14   provide court reporting services for this
     deposition.
15        Lyon Reporting, Inc. will not be taking
     this deposition under any contract that is
16   prohibited by O.C.G.A. 15-14-37(a) and (b).
17        Lyon Reporting, Inc. has no exclusive
     contract to provide reporting services with any
18   party to the case, any counsel in the case, or any
     reporter or reporting agency from whom a referral
19   might have been made to cover this deposition.
20        Lyon Reporting, Inc. will charge its usual
     and customary rates to all parties in the case, and
21   a financial discount will not be given to any party
     to this litigation.
22
23        This, the 27th day of June, 2025.
24
25   _____
     LAURA B. GILDENBERG, CCR-B-1810
                                          176
```



```
1              C E R T I F I C A T E
2         I hereby certify that the foregoing
   transcript was reported, as stated in the caption;
3  that the witness was duly sworn and elected to
   reserve signature in this matter; that the
4  colloquies, questions and answers were reduced to
   typewriting under my direction; and that the
5  foregoing Pages 1 through 173 represent a true,
   correct, and complete record of the evidence given.
6
         I further certify that I am not
7  disqualified for a relationship of interest under
   O.C.G.A. 9-11-28(c); that I am a Georgia Certified
8  Court Reporter here as a representative of Lyon
   Reporting, Inc.; that I/Lyon Reporting, Inc., was
9  contacted by the party taking the deposition to
   provide court reporting services for this
10 deposition; that I will not be taking this
   deposition under any contract that is prohibited by
11 O.C.G.A. 15-14-37(a) and (b) or Article 7C of the
   Rules and Regulations of the Board; and by the
12 attached disclosure forms I confirm that I/Lyon
   Reporting, Inc., is not a party to a contract
13 prohibited by O.C.G.A. 15-14-37 or Article 7C of the
   Rules and Regulations of the Board.
14
         The above certification is expressly
15 withdrawn and denied upon the disassembly or
   photocopying of the foregoing transcript, unless
16 said disassembly or photocopying is done under the
   auspices of Lyon Reporting, Inc. and the signature
17 and original seal is attached thereto.
18         This, the 27th day of June, 2025.
19
20
21
22         _____
           LAURA B. GILDENBERG, CCR-B-1810
23
24
25
                                             177
```



**Exhibits**

**Exhibit 05**
134:4,5
**Exhibit 12**
132:24 133:1,13
**Exhibit 15**
126:18,19 131:4
**Exhibit 18C**
126:18,19 131:4
**Exhibit 21**
165:22,25 168:20
**Exhibit 28**
112:23 113:1
**Exhibit 40**
48:9,10 55:6
**Exhibit 45**
115:4,5,25 118:20,
24
**Exhibit 49**
83:17,18,25
**Exhibit 50**
135:23,24 137:3,4
**Exhibit 51**
137:5,6

**(**

**(b)**
5:17
**(c)**
5:17
**(d)**
5:17

**1**

**10**
61:20,25
**10.3**
50:13
**10.6**
51:1
**10:00**
134:18 146:10
**10:00-ish**
135:6
**10:33**
146:23
**10:33:51**
146:24
**113**
4:14
**115**
4:19
**11:53**
167:9 168:12
**12**
4:10 127:5 132:24
133:1,13 137:14
**126**
4:11
**12:23**
20:10
**12:25**
20:11
**1321**
140:4
**133**
4:10
**134**
4:9
**135**
4:22
**137**
4:24
**138**
4:17

**139**
4:15
**141**
4:16
**148**
4:20
**15**
4:11 126:18,19
131:4
**15-11-502**
51:6
**15-14-37(a)**
5:17
**16-year-old**
160:6
**165**
4:13
**169**
4:12
**18(c)**
4:12 169:8,9
**1850**
116:17
**18:43:55**
148:20
**19**
152:15
**1945**
133:16
**1999**
13:12,20
**19:14:39**
153:4
**19:14:41**
153:22
**19:15:27**
155:13,19
**19:16:46**
157:22
**19:16:58**
156:5,11
**19:17:05**
157:9
**19:18:26**
158:18
**19:19:49**
158:21
**1:09**
48:4
**1:21**
48:5

**2**

**20**
16:18
**2006**
13:20
**2008**
14:11,12
**2009**
14:11
**2022**
28:9 29:14,19 30:5
45:9 49:5 50:22
51:15 54:18 61:6
62:3 67:3 84:7 114:5
116:17 140:2
**2022-8-26**
148:20
**2045**
133:18
**21**
4:13 165:22,25
168:20
**24**
54:10 163:18 165:17
**25**
16:2 17:8,11 38:17
39:6 57:12 58:21

**26th**
29:14,19 45:8,9 49:5
50:22 51:15 54:18
61:5 62:3 67:3 84:7
114:5 116:17 140:2
**28**
4:14 112:23 113:1

**3**

**3**
52:20 168:19
**32**
4:15 139:17,18,21
**33**
4:16 141:20,21
**35**
4:17 138:20,21
146:1
**3:16**
135:17
**3:30**
135:18
**3:54**
151:23

**4**

**4-0**
55:7
**40**
4:18 48:9,10 55:6,9
**45**
4:19 115:4,5,25
118:20,24
**46**
4:20 148:5,6 152:3
**48**
4:18
**49**
4:21 83:17,18,25
**4:06**
151:24
**4:41**
173:11

**5**

**5**
134:4,5
**50**
135:23,24 137:3,4
**51**
137:5,6
**535**
116:18

**7**

**7**
4:2
**7:43**
114:2,8
**7:50**
114:16
**7:58**
166:6 167:3

**8**

**8-**
153:3
**8/26/2022**
4:8,10,11,21 134:15
**83**
4:21
**8:45**
119:6 140:1

**8:46**
140:18
**8:46:54**
140:22
**8:50:33**
150:19

**9**

**9**
49:23 51:1 119:24
**9-**
144:18
**9-11-29(a)**
5:17
**911**
103:10,18 104:20
**99**
13:12
**9:00**
139:1
**9:06**
141:24 142:1
144:19,22 145:16
**9:07**
145:17
**9:07:06**
144:25
**9:10**
120:17,18
**9:13**
144:17
**9:14**
119:15 120:5 121:16
**9:43**
168:19
**9:49:36**
142:14
**9:50**
142:13 145:5,15
**9:50:53**
143:9

**A**

**ability**
19:2 28:21 42:17,18,
20 46:5 105:5
130:11,22
**academy**
13:12
**accept**
16:5,22,23 17:18
19:19 20:1,19 21:21
22:4,11 24:18 25:8
26:10,16 32:22
**acceptance**
66:9
**accepted**
15:8 18:1 19:14
22:18 54:10 107:24
**accepting**
22:20 26:22
**access**
40:19 72:13,22
73:12
**account**
63:19
**accurate**
118:2 119:11,14
140:11,14
**accused**
22:24 23:3,9,10,13,
22 30:21
**accusing**
23:24
**acronym**
77:17
**act**
23:6 39:3 50:18

**acting**
23:6 70:13
**action**
96:4
**actively**
39:8,12 58:10
**actual**
78:12 117:1,15
118:10,18 119:1
121:23 122:6 133:20
**add**
157:12
**added**
116:25 117:1
**addict**
166:14,17 167:2
**addicted**
57:16,18
**addiction**
37:24 41:13 55:23
62:12
**addressed**
18:23
**adjusts**
167:14
**admission**
77:11
**admit**
16:2 17:10 41:2
162:14,17
**admits**
98:22
**admitted**
94:2 97:10,11,14
99:20,21,22 101:2,6
102:5 107:24 111:23
120:23 130:5 162:3
164:17
**admitting**
126:4
**adopted**
62:20,22 63:7
155:23
**adult**
22:12 31:7 32:12
34:18 35:11 62:23
103:4 105:18
**adults**
36:24 56:21 168:8
**advance**
137:20
**advice**
98:6 154:12
**advise**
141:18
**affect**
79:2
**affirmative**
111:2
**affirmatives**
11:14
**afraid**
23:18
**agency**
13:21 116:19
**agent**
108:24 109:18
**agree**
6:24 7:3,5,7,9,11,14,
17 15:14,16,23
17:20 81:11 82:4,10,
14 157:25
**agrees**
164:17
**ahead**
6:9,11 12:5,6,21
36:7 75:16 85:7
99:23 109:24 110:22
127:25 131:1 139:13
140:18 141:24

**142:12,13 144:6**
145:4 146:22 152:14
158:16 160:3 163:24
**alcohol**
16:5 17:11 25:18
39:21 163:18
**alcoholics**
39:17
**Alexis**
4:11 17:5 29:13,17
45:10 49:5 50:23
54:5,7 61:2 63:2
69:18,19,21 70:2,5
71:18 73:2 79:22,25
80:15 82:1,18 83:5,
13 86:1,5,13 87:10
88:10 89:10 91:20
93:22 94:2,7,9,13,
21,23 95:8 96:9
97:3,13 98:18 99:4,
6,10,20 101:2 102:1,
5,14 104:6 106:5
107:3,21 108:16,19
109:3,11 111:22,25
112:10 114:11,17
120:23 122:13 126:4
128:12 129:25
131:6,12,24 133:12
140:7,15 142:5
146:15 148:14,15
150:20 152:22 153:4
156:21 157:15
158:1,22 159:13
160:20 161:12
164:3,14 168:4,20
**Alexis's**
80:3 96:19 97:22
108:4 113:11 114:6
145:21 155:24
166:19
**alleged**
10:3 51:7
**allowed**
19:7,10
**allowing**
19:1 113:13
**Amanda**
88:14,16 89:7,12
93:23 131:21 134:14
136:12 146:17 147:1
**Amber**
62:23 155:15,20,23
156:14 157:2 158:6
**amount**
58:18
**Annarita**
7:8
**answers**
11:11
**anticipate**
10:19
**anybody's**
81:22
**apologize**
129:16 162:25
**apparently**
25:20
**appearance**
57:22 58:6,9 60:14
**appeared**
70:8 75:8
**appearing**
71:13
**appears**
116:14 157:15
**applicable**
48:25
**applied**
51:14
**approached**
25:22



approaches
49:25
approximate
12:10 25:13
approximately
13:19 14:4,11
116:17
area
33:20 75:22,23
85:10 87:25
arguing
156:22 159:19
160:17
argument
156:14 160:5,7
armpits
33:12
arms
33:11
arrangements
66:12
arrest
19:25 22:10 89:3
arrested
27:2
arrival
85:3 133:22,23
arrive
77:15 78:8 164:21
arrived
23:16 119:6,12
133:16 140:6 141:17
163:7 166:25
article
33:4
asks
84:10
assigned
24:10 53:23
assist
39:3 78:17
assistance
39:4
assume
12:6 72:1,4 74:15
80:5,6
assumed
80:4
assuming
122:24 145:9 158:8
165:3
ate
94:22 95:5 99:8,11
127:7,17,22 128:9
129:1,11 130:18
attached
135:2
attempting
71:23
attention
17:15,16 19:12
52:12,15 139:10
attire
32:13
attorney
12:16,17,19
attorneys
11:20
attributes
57:15,19 58:8
audible
131:20 172:13 173:6
audio
14:21 119:8 149:1,
14,17,21,25 150:4,
17 151:14 152:7,10
August
28:9 29:14,19 30:5
45:8,9 49:5 50:22
51:15 54:18 61:5

62:3 67:3 84:7 114:5
116:17 140:2
avoid
160:14
aware
63:24 79:24 106:9

B

back
4:20 16:16 20:12
24:24 25:21 40:5
42:12 44:2,6,8,13,
14,18,19,24 46:3,9,
20 48:6 73:14,18,25
78:17 87:24 90:19
92:8 93:15 94:1
110:3,6 112:11
120:17 123:18,21
128:23 132:23
141:20 144:12,15,18
148:16 151:25 152:3
156:7,22 157:21
158:7 161:23
169:15,17,20 170:8,
12
back-and-forth
166:21
background
12:25 93:11
bag
76:24 124:5,9,14
125:6
Ballard
7:9 89:16
barrier
160:16
based
26:18 27:14 36:13
38:15 107:4 117:21
121:5 170:11
basic
13:11
basically
17:19 21:3 39:15
76:20
basis
9:7
beautiful
168:4,5
began
13:10 91:1 145:16
begin
77:7 90:6 144:23
beginning
138:25 163:8
begins
145:6
behalf
7:14
behavior
39:2 81:6,8,25
behaviors
58:5
believed
17:7,24 18:7 24:19
25:9 26:9,13,17
70:23 92:19 94:6
102:6,12 109:13
125:21 159:18
160:23
big
33:9 136:8
bigger
48:15
bit
11:8 16:16 55:13,14
78:4 102:24 112:21
119:4,21 128:18
142:12 143:1,20
144:10 149:5 158:17

blue
143:4
body
57:24 58:19
booking
32:24 110:4
Boone
172:20
bottom
83:23 137:15,25
139:1 140:1 142:15
148:19
boundaries
107:18
box
78:9
bra
75:25 76:7,15,24
break
20:5 21:14,17 47:8,
12 48:2 122:6
135:12 151:19
breast
75:21
breasts
33:10,11 76:12,13
bring
52:20,23 126:3
131:5,8 146:6 158:4,
7 164:25
bringing
80:22
Brooks
7:11 83:12 85:1
86:17,23 87:4,10,24
88:13 89:13,25
92:17 93:5 94:5
95:11 96:13 97:16
98:17 101:20
102:10,11,13 104:1,
5,19 106:5 108:24
109:17 112:13
120:7,11 121:16
122:11,20 123:11,20
126:3,5 127:2 128:9
131:3,5,17 132:15
133:8 143:22 144:4
147:8 160:19
brought
19:5 21:11 26:1,2
78:1 85:19 100:2
126:11 127:2 162:9,
14
bubble
166:5
building
90:1,7
bulges
36:16
bunch
117:22
buttock
33:20
buttocks
33:16
button
139:9

C

call
4:14 9:11,16,18,19
12:17 19:1 35:15,19,
24 36:12 37:4,5,11
54:1,10 66:2,4 68:19
69:3 78:9 92:15 98:3
99:18 100:6,12,15
103:18,24 105:1,18
110:17 112:11,16,17
113:23 114:3,8,13,

15 116:19 120:6,8,9,
10,13 121:15
122:10,11 123:1
136:23 139:9 163:14
165:2,7 171:7
called
68:8,9 92:9,12
120:18 121:4 141:17
calling
101:4,23 103:10
104:20 114:13
calls
113:7,18 118:14,15
camera
43:22,25 44:1,2,6,19
45:16 151:7,11
capacity
63:4
captain
15:17,18,20 20:23
23:25 24:1,2,3
25:21,22 26:9
car
44:9 73:14 90:5,19
91:7 92:8 94:3,6,8,
10,11,15,18,22,24
95:2,6,9,25 96:1,2,3,
17 97:14 98:4 99:5
100:6 112:1 120:12,
14 126:4 127:18,22
128:8,10 129:9
130:19 131:25
140:20 143:9 144:22
159:3 160:21,24
161:1,14
care
49:24 110:12
cared
153:13
career
13:10 27:13
careful
11:9
carry
60:18 124:20
cars
95:5 99:11 129:2
case
8:6,8 9:7,25 10:12
31:18 49:25 53:23
55:8 117:1 130:4,21
cases
9:20 36:19
catch
69:20 89:24 154:9
155:18
caught
103:3 127:6 154:1
cautious
36:22
cell
68:12,14,15 69:1
113:6 116:19
center
22:12 54:11 76:13
78:1
centers
77:19,22
chain
65:22
chances
42:24
change
57:23 58:7,10
121:19 163:20 168:7
changed
162:12,21,24 163:6
164:14,20
character-
57:14

characteristics
57:15,20
charge
80:23 129:25
charged
10:9
charges
10:10
check
76:22 96:10 106:3
144:11,15 145:24
checked
73:4 76:10,14
child
50:9,17,23 51:7,9,24
52:21,23 53:11
84:11 155:5
chooses
22:10
Chuck
7:6 150:3
circumstances
27:14 38:9
citations
22:8
city
19:5
claimed
95:8 160:20
clarification
23:5
clarify
12:3 21:24 38:10
40:3 64:6,11 79:9
129:7 145:23
clarity
127:13,14 128:15
129:22
clear
66:11 129:12,24
130:2 131:5
clearance
25:25 64:22 65:5
74:18
cleared
16:6 17:17 19:20
20:2 21:22 22:4,13
24:19 25:9 26:11,23
165:20
clearer
131:9
clipped
125:13
close
88:3 135:10
clothes
35:20,23 37:1 74:5
99:8
clothing
31:6 33:4,6,24 34:1,
23 35:12 36:14 43:9
76:23
coherent
38:24
Cole
7:6 150:5 170:24
172:2,3
collect
124:8,12 130:22,23
collected
124:1,8
collecting
124:3 125:4
command
65:22
comment
158:8
comments
67:22

committed
50:18
commonly
59:7,12
communicate
66:21 68:20 78:25
79:12 80:2,14 81:15
82:15,17 122:25
123:19
communicated
69:6 94:14
communication
114:11
community
29:25 59:8
compare
118:9
complacency
99:3,16 100:22
complacent
101:22
complete
130:12 146:5
completed
5:10 79:20
completely
127:11
compound
78:11,14 90:9
con-
129:23
concern
74:25 75:24 84:13
97:1,13 137:22
138:3
concerned
91:19,23 96:19,23
97:2 110:12 129:22,
23
concerns
79:6 82:5
concluded
173:11
condition
74:18 84:10 167:20
conduct
10:2
confident
19:9 23:18
confirm
149:24
confirmation
167:18
confirmed
91:17
confirming
168:15
conflict
15:12,13
confuse
118:18
confused
55:9 118:17
confusion
137:1
connection
62:18
consistent
148:20
consume
58:17
contact
41:18 52:25 53:8
55:3
contacted
109:13 110:18,24
context
59:9
continue
156:1 158:12



continued
112:25 132:25 157:7
contraband
31:1,12 32:8 60:18
72:14 73:9,20 74:1,
7,16 76:5 96:10
142:8 144:11
conver-
125:23
conversation
10:18 19:17 45:20
86:23,24 88:5 93:4
94:5 99:24 100:1
101:3 111:9,13
114:25 122:19
126:10 132:8,12
144:1,3 145:19
148:1 165:8
conversations
86:5 104:5 125:24
convicted
30:22
cop
94:3,8,10,11,15,22,
23 95:5 97:14 99:11
126:4 127:18,22
128:10 129:2,8,19
130:19 131:25
copy
88:23 171:9,23,25
correct
8:1,2 10:1,14 14:25
15:21 19:9 29:20
32:18 45:11 46:17,
18 52:4 61:16,18
62:21 65:11 70:22
73:3 76:7 77:1,23
84:18,22 86:2,12
87:6 89:17 97:5
102:21 106:8 107:4,
8 109:15 110:25
115:9 116:21 119:9
120:7 124:18 125:10
131:21 132:5 133:18
136:5,13 142:5,18
147:8 148:3 151:4
154:25 155:22,25
157:16 158:14,15
162:18 164:12
168:17,21,22
corrected
133:20
correction
134:2 163:2
correctional
29:2 30:18 162:3
correctly
70:4 87:6 125:14
cough
33:16
Counsel
6:7,23 149:9 171:6
county
4:23 13:14 14:5,7,8,
10,18 26:22 28:11,
19 29:18 32:1 37:10,
13,18 48:22,25
49:16,20,23 51:5 59:5,
13 63:13 65:3 67:8,
12,15 68:6 69:9,13,
14,16,19 78:5 90:14
106:17,18,19,24
107:1,3,4,19,20,21,
22 108:1,5 110:7
113:24 132:21
137:12 164:10
couple
87:14 132:2
court
5:18 6:6,10,22 7:12,
15 11:15 20:9,12
24:10,25 28:10,13

29:4,7,25 40:6 48:3,
6 52:9,13,24,25
53:1,5,8,10,20 54:9
60:2 80:25 104:11,
14,16 116:9,18
124:22 132:21
135:16 149:8,13
151:22,25 152:10
166:20 171:5,17,21
172:1,4,8,11,14,18
173:1,7
courtesy
4:21 109:3 119:16,
25
courthouse
29:8,11,14 41:23
courtroom
42:1
cousin
155:24
cousins
62:19 63:7
covered
47:18 75:12
crime
29:2,4 30:22
criminal
9:24 10:10,12
Definitions
50:14
delay
11:8
deliberately
81:4
delinquent
50:9,17,18,23 51:2,7
52:23
Delivering
4:21
delivery
171:10,14,25 172:5,
25
demoted
15:2 27:6,7
demotion
15:10 22:18 27:8
department
13:24 24:8 29:18
106:1
departments
14:16
depending
32:12,13 41:5
depends
31:6 34:23 41:16,17
42:3,6,8,20 58:1
85:14 164:23
depo
67:18 115:21
deposition
6:4,16 8:4,18 9:12
10:16 11:11,21
115:20 116:6 137:20
173:10,11
deputy
7:24 8:3 9:3,9 10:4
14:24 15:2,6 24:5
28:8,10,11,13,18,23
30:1,9,15 38:2,16
46:16 47:16 49:1
55:15,21 59:5,10
63:13,18 66:1 67:8,
15,25 69:16 77:15
78:5 85:17 105:19,
20 107:19 132:11
150:9 152:3 156:6
163:10
describe
30:1 91:6 121:15
Description
4:7

day-to
30:11
day-to-day
30:11
days
70:16
deal
55:22
dealing
56:10 66:22
death
61:12 78:2 83:13
113:11 114:6 140:16
decade
59:6
decide
37:19 49:9
deciding
162:2
decision
19:2,3,4,8,10,25
21:3,20 22:2 27:6
decisions
23:19,21
defendant
8:6,10,11,20,22 9:7
Definitions
50:14
delay
11:8
deliberately
81:4
delinquent
50:9,17,18,23 51:2,7
52:23
Delivering
4:21
delivery
171:10,14,25 172:5,
25
demoted
15:2 27:6,7
demotion
15:10 22:18 27:8
department
13:24 24:8 29:18
106:1
departments
14:16
depending
32:12,13 41:5
depends
31:6 34:23 41:16,17
42:3,6,8,20 58:1
85:14 164:23
depo
67:18 115:21
deposition
6:4,16 8:4,18 9:12
10:16 11:11,21
115:20 116:6 137:20
173:10,11
deputy
7:24 8:3 9:3,9 10:4
14:24 15:2,6 24:5
28:8,10,11,13,18,23
30:1,9,15 38:2,16
46:16 47:16 49:1
55:15,21 59:5,10
63:13,18 66:1 67:8,
15,25 69:16 77:15
78:5 85:17 105:19,
20 107:19 132:11
150:9 152:3 156:6
163:10
describe
30:1 91:6 121:15
Description
4:7

deserting
155:5
designated
32:25 53:1,9 54:9
detain
18:6,15 28:23 31:3
63:14
detained
53:12
detainee
20:19,24 24:18 25:8
detainees
29:24 162:1
detaining
39:25 40:10 41:12
59:13,16 63:21
detainments
29:2
detect
39:16,19 75:5
detention
22:12 53:13 54:11
77:19,22 78:1 89:5
determine
31:11 39:12 40:25
60:13,23 70:13
determining
53:11 60:9
die
159:14,21,24 160:7,
15
died
164:3
differ
34:18
difficult
39:19 114:21,25
digging
161:7
direct
26:14 127:15,16
129:5
direction
65:17
directly
26:15 41:3,20 45:2
132:14 133:9 165:9
directs
106:10
disagreed
16:7
disagreement
156:17,19 158:5
160:5,8
disclose
64:1
disclosure
5:16,18
discover
92:6
discovered
102:11 110:20
discretion
31:10 32:6 37:10,19
43:14
discretionary
35:15,19,24 36:12
37:4,5
discussed
21:14 173:2
discussing
21:16 145:19
dispatch
68:10,11,20 69:1,8
113:23,25 114:3,9,
11 133:23 141:18
dispatched
68:7
display
58:4

displaying
57:9 115:2
displays
44:12
disposition
10:8
dispute
113:17,20,21
distress
63:20
disturbed
125:17
Division
24:11 116:18 132:22
DJJ
4:8
document
47:6 48:18 50:4
83:21,25 108:4,7,10,
14 115:2,8 116:5,21
117:9,10 126:23
127:1 128:22 133:4,
6 134:4,8 137:9,11
148:2 167:14
documents
115:19 118:14
door
144:12 145:10
doors
87:14 90:3 144:23
double-locking
72:9,10
drastically
57:23 58:7
dressed
150:20
Driggers
7:16,17 171:1
172:12,13,17
drive
78:15 158:24,25
driver
163:10
driver's
45:13 169:17,23,24
170:3,12
driving
44:11 158:23 159:7
drop
84:3
dropped
142:4
dropping
78:6
drug
37:23,24 38:3,13
39:17 41:12,13 42:4,
7 55:22,23 57:10
60:10 62:3,11,12
80:3,23 81:7 99:19
101:18 124:1 168:6
drug-related
38:7,19 41:7 55:24
drugs
16:4 25:18 36:11
37:2,23 38:2 39:8,
13,20 40:1,11,12,14,
19,25 41:4,9,14
42:4,7,20 47:20
55:23 56:1,4,5,9,16,
19 58:3 60:18 62:7
73:13 74:11 76:24
79:6,7 96:25 98:11
101:12 153:5,16
155:4,15,21 158:9
160:20,23,24 161:4
163:18 167:24 168:7
due
109:3
duties
9:3 59:9 63:3,9

duty
19:22 22:5

---

**E**

earlier
22:17 33:23 109:12
145:16,20 161:24
173:3
easier
112:21
eat
101:11
eaten
94:7,23 95:8 129:8
eating
94:2 97:14 120:23
126:4 131:24 133:12
Edgewood
13:24 14:3
edible
101:11
effect
103:4
effects
56:5,8
Elbert
77:7,24 85:20
electronic
171:25
elements
130:2
Ellijay
7:1,19
Ellis
4:10,14,19 7:4,18,24
116:18 137:16 138:1
150:9
else's
94:23 95:9 138:4
email
171:16
emer-
109:7
emergencies
55:24
emergency
38:8,13,19 66:9
74:23 103:11,19,20
104:21 109:4,7
emphasis
96:25
emphasized
96:14
emphasizing
95:16,22
employee
131:8
employees
79:13 81:15 83:7
164:23
EMT
105:25
encounter
55:21
end
5:18 160:4 171:19
enforcement
13:9,10,11 16:18
17:9 38:17 39:6
57:13 58:22 102:17
104:21 106:22
engaged
99:24 101:3 108:11
Engaging
45:20
enhances
46:5
ensure
43:3,16



ensuring
42:9
entailed
19:17
enter
85:4,9
entered
91:25
enters
78:13
entire
10:25
entirety
130:4
entry
120:5 121:15
equally
56:20
erratic
39:2
escort
78:18
essentially
27:5 54:24 87:5
EST
20:10,11 48:4,5
135:17,18 151:23,24
173:11
estimate
12:11 25:13
event
9:10 124:10
events
9:11 30:6 93:20
115:12 117:7,25
eventually
71:18 77:6 88:4
93:14 156:22
everybody's
28:6
evidence
9:17,18 124:2,5,9,14
125:6,21
Examination
4:2 7:22
examined
7:21
examples
22:23
exchanged
133:10
excuse
27:20 36:15 116:9
exhibit
4:7 48:9,10 55:5,6
83:17,18,25 112:23
113:1 115:4,5,25
118:20,24 126:18,19
131:4 132:24 133:1,
13 134:4,5 135:23,
24 137:3,4,5,6
138:20,21 139:17,
18,21 141:20,21
146:1 148:5,6 152:3
165:22,25 168:20
169:5,8,9
exhibits
55:9 171:15
expected
98:9 130:17
experience
17:8 38:17 39:7 56:4
57:13 58:22 105:16
164:6
experienced
162:9,13,15,16
165:5
experiencing
38:19 55:24 58:23
explain
30:6 32:20 65:7 83:3

explained
22:3 43:8 103:1
120:25
explaining
37:10 103:2 156:21
explains
107:17
explanation
11:12
express
65:3 82:21 103:22
105:10 112:3,6
expressed
19:11,16,21,22
20:18 64:14,21 65:9
97:13 99:19 104:1,
23,24 105:8 112:17
expressing
65:15 96:23
extent
110:14,15
extremely
71:5
eye
58:12 81:22
eyes
39:1

## F

face
33:13 71:2,9,13
faces
44:1,2,6
facilities
29:3 30:18
facility
16:11 18:1 54:12,22,
24 63:25 66:7
105:17,18 106:2
109:19 162:3
fact
71:17 99:5 101:22
159:16
factors
35:3
facts
9:10,16
factually
161:5
fair
11:2 12:7 18:3 22:21
24:6 26:7,8,12,23
31:12 35:4 40:2,11
46:10 50:22 54:2,25
55:18,24 56:10
59:10,19 62:20 63:9,
16 66:18,24 71:15
74:1,7,11,19 78:22
79:3,4,6,16 80:4
82:6,15,19 83:1,9,10
84:14,21 89:20,23
100:9 102:8 112:20
114:6,7,18 118:2,22
119:22 121:4 123:22
129:9 138:13 140:13
145:2 154:24 157:11
162:4 164:18
fall
39:4
falsely
22:24
familiar
57:5 79:21 82:1,2
89:9 103:9 105:13
Fannin
69:9
Fannin-gilmer
67:8 68:6

fast
158:23
fast-forward
149:6
fast-forwarded
144:10
fatally
58:19
feel
36:15 81:14
felonies
12:24
felt
74:5,9 77:5
female
19:6 32:23 33:8
field
124:16 125:9
figure
151:14,19
fill
84:4,25 85:2 86:11
88:21
filled
83:15 84:6 85:18
87:19
filling
78:20 85:22,24 86:4,
16
find
53:16 90:17 91:3
finding
96:25
fine
12:13 112:19 150:17
finger
72:6
fingers
124:9
finish
10:23,25 126:8
fire
105:25
five-minute
135:12
flashlight
91:1,15
Florida
13:11
fly
11:23,24
focus
98:3 99:15 100:3,4
159:2 163:12
focused
137:24
follow
48:25 49:10,13 52:2,
3
follow-up
111:19
Forgive
93:19
forgot
111:4 115:17
form
4:9,21 6:14 10:5
11:10 28:4 37:12
39:14 46:11 47:3
56:11,18 57:7 59:20
63:22 65:21 69:11
76:17 78:21 79:20
80:19 81:16 82:20
84:1,2,25 85:18,24
86:4,11,17 87:20
88:21,25 97:20
108:12,17 109:5,21
112:2 130:14
132:19,22 156:16
160:9 161:15

formal
108:4,7,10
format
10:21 117:10
forms
84:4 133:10 147:22
formulate
11:23
Fort
159:4
found
10:10 92:10,19
94:17 95:1,6,25
96:3,10,17 97:8 98:4
99:5,19 120:14,19
128:8 160:25 161:22
170:6
frame
156:7
Frankly
107:14
free
83:6,8,12 85:1 86:18
87:4 88:5,7 90:1
frequently
63:14 77:10
Friday
116:16 168:12
friends
127:6
front
4:17 78:12 125:15
139:23 142:19
146:2,7 147:4
152:19 154:3
froze
59:23
fully
13:4
function
39:18
functioning
39:17

## G

gained
161:20
Garrett
7:13
gate
4:15,16,17 78:13,15
90:4 139:3,24
140:15 142:2 144:23
146:2,7 147:4
165:14
gave
133:7,9,11,12
134:21
GBI
113:14 117:22,24
118:4
gears
55:12
geek
58:4
general
30:4 87:25 132:9,12
147:25
generalized
128:4,25
Georgia
7:1,19 108:6,25
109:18,22
Gilmer
4:23 14:8,10,18
26:22 28:11,18
31:24,25 37:9,13,18
48:22,25 49:16,20
53:15 59:5,13 63:13
65:2 78:5 90:14

106:19,24 107:1,4,
18,20,21 108:1,5
110:6 113:24 132:21
137:12 164:10
girl
21:11 24:15 25:4
155:23 168:4,5
give
10:15 11:12 22:8
42:3 53:7 36:17
68:2 98:6 126:6
131:10 132:17,19
136:19 162:4 170:17
171:18
giving
11:1 17:21 19:2
glare
167:11
glitch
14:21 119:8
glitched
56:12
glove
124:7,10,13
gloves
124:2
good
19:13 89:24 135:14
150:7 166:20
grass
139:6,7
green
7:10 166:5 170:25
172:6,7
Greiner
7:12,13 171:22,24
ground
28:2
guess
12:9 26:1 65:25
117:20 135:6 136:22
154:6
guidelines
10:16
guilty
10:10
guys
132:7 135:9 148:25
151:14 155:14,19
156:13 170:16

## H

hand
23:10 33:13,14,15
54:21 87:8,18,23
124:11 145:7
handcuffed
69:24 73:17
handcuffs
71:21,22,24 72:2,5,
7,12,20 87:9
handed
131:23
handle
73:13 76:6
hands
36:23 43:10 72:22
77:3 87:8
handwrote
132:22
Hang
152:15
hanitizer
87:23
happen
18:19 25:14
happened
19:15 20:16 163:20
168:24

happening
16:21
hard
39:16
harm
64:9 84:20
Harton
4:2 6:5,18 7:2,10,23
10:11 18:12 20:7,14,
15 24:23 25:11 28:7
37:15 39:23 40:4,13
46:14 47:5,9,14
48:1,8,12 50:2,5
52:14 55:6,11 56:14,
22 57:11 59:22,25
60:4,6 64:2 65:24
69:17 76:21 81:10,
18 82:23 83:20
97:21 104:18 109:9,
23 112:7 113:3
115:7 116:13 126:21
133:3 134:7 135:9,
19 136:1 137:8
138:23 139:15,20
141:23 148:8,25
149:4,12,15,17,21
150:1,3,6,8 151:18
152:2,12,13,17
153:2,20 154:8
155:2,12 156:3,18
157:6,24 158:20
159:12 160:11
161:18 165:24
169:11 170:16
171:3,11,13,20
172:21
head
11:14,15 26:2
123:16
headquarters
166:25
health
60:24 63:15,25 82:6,
9
healthy
166:20 167:22 168:5
hear
11:4 21:15 46:8 47:2
66:3 93:10 104:12
112:6 148:25 149:3,
17,25 150:3,5 152:7
153:7,23 154:2,14,
24 155:6 158:12
159:13,15 160:10,12
172:15
heard
112:4,5 154:11
155:7,8 158:25
hearing
160:15 173:7
helpful
60:8,12
helps
46:10,12 49:20
167:15
hidden
73:13 76:6
hiding
33:19 73:20 74:1,7
77:4
high
39:8 58:18
higher
14:24 16:2 17:11
history
37:23 38:3 41:12
42:3,7 55:23 62:3,7,
14
hitting
159:1



hold
49:23 83:16 92:21,
25 93:5,6,8,25
home
70:16,17
honestly
100:13 101:1 105:12
134:25
hope
153:4
hospital
38:6 102:14 104:7
111:16 119:17,25
165:19
hours
54:10 116:17
133:16,18 163:18
165:17
huh-uhs
11:13

**I**

idea
147:19 154:10
ideation
64:14 65:4
identified
4:7 48:11 83:19
91:13,16 113:2
115:6 126:20 133:2
134:6 135:25 137:7
138:22 139:19
141:22 148:7 165:23
169:10
identify
37:8,17 38:11 57:16
58:23 64:4 90:20
107:17
ill
13:5
illegal
101:18
illness
26:12 38:6 62:15
63:16,20
image
44:12
immediately
52:24 85:3 86:10
91:7 92:9,12 120:17
imminent
64:16,19 82:6 109:7
implying
96:22
important
10:20 11:10 12:1
18:2 28:2 30:25
39:24 40:8,15,17
46:1 49:13 59:17
65:19 66:20 73:11,
23 79:12 80:14,20
81:15 82:4,14 99:14
130:3
inaccurate
121:19 138:7 162:6,
8
inaudible
154:12
incarcerated
79:22
incident
4:8,22,24 17:4
18:21,23 20:16
22:15 24:14 25:3,17
31:21 115:15 116:12
117:1,15 118:10
121:23 134:2 136:5,
22,23 137:13 138:10
150:11,14,21 164:25
165:5

incidents
24:16 25:5,19
inclination
95:15
includes
38:6 84:19
including
28:14 76:24 101:17
incoming
114:8
incorrect
25:21
increase
42:8,24
indicating
35:3
indicative
57:21
indiscernible
85:6
individual
36:13,17 42:7 44:7
66:13 98:25
influence
16:4 19:6
inform
59:18 82:5 123:11
information
25:21 53:16 60:7
66:6,21 68:2 78:21
80:3,21 81:5 129:20
136:18
informed
67:25 70:1 79:23,24
92:9 114:16 122:20
informs
120:23
ingest
58:17
ingested
96:7 98:11 160:24
161:4
ingesting
99:20,21,22 101:6
102:5 111:23
initial
69:3 137:23 141:9
167:17
injuries
17:15
inmate
32:22 33:3,6
inputted
117:22
inside
33:24 73:8,16 76:6
78:18,19 85:19
88:20 92:9 99:18
110:17 112:14
124:13 125:16
insinuated
94:16
insinuating
94:19
inspect
90:11,16 91:2 142:8
inspected
75:11 91:3
inspecting
90:6 142:18
inspection
145:2,16 146:6
instance
16:1 32:22 33:8
instruct
33:9 53:25
instructed
16:22 21:19
instructions
33:3,7

instructs
12:19
intake
51:1 52:25 53:1,5,9,
20 54:9,13,17 66:7
79:20 84:1 87:20
88:25 108:12,17
intaking
162:1
interact
28:19 59:7 63:1,8
141:8
interacted
59:8,16 61:2,6,11,21
80:10
interacting
147:21
interaction
60:22 61:13,17
141:9 160:18
interactions
59:18 60:8
interrupted
5:9,10
interrupting
163:1
interviews
117:21
intoxicated
16:3 17:25 18:16
20:19,25 21:12
22:20 24:18 25:8,18
26:11 153:16
intoxicating
164:16
intoxication
17:11 26:18
investigated
14:20
investigator
113:14
involved
31:18 70:14
involving
22:19
isolated
18:21
issue
103:17
issues
55:22 60:24 63:15

**J**

jail
15:9,17 16:12,22,23
17:18 18:1,7,16
22:19 23:17 24:3,17
25:7,16,17 27:2,19
29:10,11 32:21
January
13:12
job
9:8 19:13 28:5,9
97:25
joined
31:25
journey
166:19 167:22
judge
41:21 53:2,10
jump
10:20 140:18
jurisdiction
106:14,17,18,21
107:7,10,12,18
108:15,19 110:8
Justice
29:18

justify
31:13,14,15
juvenile
4:18 29:18 31:8,17
32:12 34:18 35:11
36:19 48:21 49:4
52:24,25 53:1,5,8,
10,20 54:9,10 61:3
69:15 78:6,13,17,22
79:1 80:25 83:9 84:3
85:10 98:10 103:7
105:17 106:11
162:14,17 163:16,17
164:25 165:10,16
166:20
juvenile's
54:1
juveniles
36:25 56:10,17,21
62:11 103:14 164:15

**K**

keeping
28:14
kill
65:17
kind
10:19 15:13,22,25
18:13,14,20 26:1,2
31:20,21,22 32:20
55:12 56:12,19
57:10 64:22 94:4
103:3 117:20 120:1
122:8 125:20 127:14
128:15,25 130:21
140:22 143:5 152:18
157:12 158:5
kit
125:1,9 167:8
168:13,15
kits
124:16
knew
19:1 41:12 62:2,6,19
70:15,20 80:4,7,8
90:21 91:6,12,16
96:9 132:11 147:16
Knight
111:7,10 122:12
knowing
27:17 80:8 96:6
125:12
knowledge
59:17 82:8 161:16,
20,21

**L**

laid
114:23 115:12
118:11,19 125:15
land
31:22
landline
68:24
Laura
24:23 40:4 59:25
law
13:8,10,11 16:17
17:9 38:17 39:6
57:13 58:21 102:17
104:21 106:22
lawsuit
12:10,20,23,25 9:8
10:4
lay
31:22 33:5 117:24
layout
116:23 118:15

learn
36:2,4 60:22
learned
57:20 169:1
leave
87:17 90:7 146:20
leaving
87:7,16 132:1
141:25
led
101:21
left
135:5 143:3 161:23
legs
75:19
letting
19:18 95:4 97:8,9
167:20,23
Lexi
61:6,11 67:3,19
68:3,7 69:8 76:10
77:6 78:1 83:1 84:7
85:19 169:2 170:7,
11
Lexi's
54:4 166:11
lieutenant
15:9 21:11 23:6
24:17 25:7 26:20
111:6,7,10 122:11,
19 123:1
life
64:17
lift
33:9,10,11
light
91:14 97:17 167:11
lining
76:6,14,23
listen
157:1
Listening
45:21
local
102:17 106:21
located
4:12 7:1,19
location
32:14 34:24 41:16,
17
log
68:22
long
12:14 13:17 18:5
50:4 103:13 107:22
111:9
longer
83:4,8 99:1 107:25
108:19 110:11
looked
70:5,6,10,24 71:2,7
73:8 74:21 75:21,22
80:8 81:11 131:4
134:24 135:3 166:20
167:20,22
loose
72:5
lost
80:16 122:9
lot
11:22,25 25:16
57:25 78:12 100:18
128:18
loud
158:14
loudly
157:11

**M**

made
22:2 37:5 80:15
98:24 99:18 110:1
111:25 112:4,16
113:8,19 115:8
117:23 121:15
127:16,21 131:11,
12,23 134:1 153:15
163:2
main
28:18
maintain
18:2 44:17,23 73:24
make
11:16,25 12:14,22
19:1,3,9 21:20
23:20,21 28:20 31:4
35:15,19,24 36:13
37:7,11 40:1,10,15,
18 42:14 43:16
48:15 54:21,23
57:25 66:1,4,12,17
72:5,7,12 73:8,12,25
74:22 76:15 98:3
100:6,20 103:1,6
114:15,19 117:4
120:11 124:6 143:13
154:13 164:8 166:23
171:14
makes
9:13 18:23
making
19:7 23:18 33:17
65:16 82:18
male
32:24
man
35:11 140:19
mandatory
32:7 49:9
maneuver
72:13,21
Marilyn
54:6 166:4,6 167:19
marked
55:5
Marked/first
4:7
material
5:2 118:12
matter
9:25 39:21
Maveis
7:10 83:12
Mcgovern
7:8 170:23 172:9,10
Mckinney
7:14
meaning
50:10 88:25 92:22
means
11:22,24 53:17 83:3
106:16 107:15
meant
95:1 99:17 100:25
102:22 128:11
133:17 168:3
measures
38:4 42:14
medical
16:11 17:15,16,25
19:12 25:25 52:11,
15 59:2,3,24 62:4 65:4
74:18,22 101:4,23
102:7 103:11,19
104:21 105:21,25
109:4,13,19 162:4



**medically**
16:6 17:17 19:20
20:1 21:22 22:4,12
24:19 25:9 26:11,23
106:1 165:20

**medication**
13:6

**meet**
69:15 78:9

**memory**
138:15

**mental**
60:24 62:15 63:15,
20,25 82:5,9

**mess**
116:24

**message**
96:5,12 132:14
166:3,6,9 168:15

**messages**
4:13 118:14

**met**
67:7,12,15

**metal**
139:6

**meth**
4:12 91:7,13,20
92:7,11,20 94:2,7,23
95:1,9,24 98:4 99:20
101:2 120:14,15
127:7 128:5,8
129:11 131:24
133:12

**meth-**
161:13 170:6

**methamphetamine**
50:25 57:2,6,17,21
58:10,15,17,18,24
59:3 60:15 62:7
70:6,11 71:15 79:16
91:24 94:6,14 96:12
101:13 102:6,12,13
111:23 120:12,20
124:16 125:5,21,22
160:25 161:13,23
167:8 168:16 170:3,
6,7

**micromanaging**
23:11

**mind**
9:21 51:16 63:23
71:11 81:3,6,7,23,24
167:10 171:19

**mine**
71:24 137:24

**minimum**
101:4

**minute**
20:6 59:23 151:19

**minutes**
121:4

**mirror**
44:15,20 45:16

**mirrors**
148:13

**Miscellaneous**
4:24 137:12

**missing**
21:25

**mistake**
133:17

**mistaken**
112:13

**Misty**
24:2

**moment**
24:25 40:6 42:5
51:16 67:2 83:4
91:19 102:3 109:8
142:21 153:15 159:6
161:16

**moments**
156:11

**monitor**
44:12,16,19 45:15
46:2 148:12,13
159:2

**morning**
168:18

**Mountain**
159:4

**move**
167:12

**movements**
72:21

**moving**
143:1

**multiple**
18:19,22 61:19
79:23 80:11 95:7,11

**music**
157:10,16,19 158:1,
13 159:17,20
160:13,14,16

---

**N**

**naked**
81:22

**named**
155:14,20

**narrative**
136:8 137:14

**narratives**
138:14

**nature**
8:8 39:5 63:6

**nearest**
165:19

**necessarily**
27:12 31:2

**necklaces**
150:24

**needed**
21:22 26:10,23
27:18 74:18 109:13
127:12

**Negative**
109:6

**negatives**
11:13

**night**
13:5 23:4,10 27:17,
22 68:25 69:9 78:2
81:8 83:13 86:23
101:24 104:2
113:11,19 114:6
115:14 140:15
148:16

**nine-**
153:22

**nine-page**
137:11

**Noah**
7:10

**nodding**
11:14

**nonetheless**
23:8

**nonsecure**
54:12

**normal**
10:18 58:5 70:13

**nos**
11:12

**notating**
141:16

**NOTE**
5:8

**note-**
141:16

**notepad**
141:12

**notes**
116:25 117:12,15,22
121:20

**noticed**
75:9 79:14

**notify**
65:13,19

**noting**
149:9

**number**
25:13,23 48:10
83:18 113:1 115:5
126:19 133:1 134:5
135:24 137:6 138:21
139:18 141:21 148:6
163:14 165:2,22
169:9

---

**O**

**O.C.G.A.**
5:17 51:6

**object**
12:17 18:10 28:4
37:12 39:14 46:11
47:3 56:11,18 57:7
59:20 63:22 65:21
69:11 76:17 80:19
81:16 82:20 97:20
109:5,21 112:2
156:16 160:9 161:15

**objection**
10:5 104:12 143:2

**objections**
6:14

**observation**
33:18 35:13 43:10,
20 74:16 75:18 77:2
167:17

**observations**
38:15 80:14

**observe**
38:18 39:7 45:18
75:7

**observed**
52:8 74:24 79:18

**observing**
38:25

**obtain**
98:22,23

**obtained**
9:17

**obvious**
19:18 39:22 77:4
80:10,12 81:21 91:9
129:13,17

**occasions**
80:11

**occurred**
114:24 138:11,15
150:11,14

**occurrence**
66:15

**odor**
75:5

**offended**
12:3

**Offenders**
51:2

**offense**
19:23 22:6 41:8

**Offhand**
123:9

**office**
4:23 13:14 23:3,9,14
37:18 48:22 49:17,
20 53:15 88:20
90:14 106:19,25
108:2,6 110:7

**officer**
19:13,16,19,21
20:18 21:2,20 22:1
31:10 39:6 52:25
53:1,6,9,20,21 54:2,
5,13,17 69:22 78:9,
18,25 79:21 85:17
105:19 110:19
137:15 138:1
163:10,14 166:12,19

**Officer/worker**
4:21

**officers**
19:5 25:20 53:25
54:9 127:17 128:14
163:8

**officials**
162:1

**ongoing**
18:20

**open**
78:10,15 144:13,23
145:10

**operate**
106:17

**operating**
105:15

**operation**
98:14

**opposed**
11:13 18:1 68:12

**option**
52:16,22 53:25

**options**
51:10

**Orange**
13:13 14:5,7

**order**
26:14 39:12 51:24,
25 65:23 69:15
70:19 73:23 80:23
89:1 107:4 118:13
171:8,22 172:3,16

**ordered**
26:15

**orders**
15:14,16,22,24,25
17:21

**organizer**
125:15

**orient**
122:7

**original**
100:21

**Orlando**
13:25

**Ortiz**
54:6,19 166:4,6,9,
11,18

**outcome**
27:12

**outline**
11:18 111:5 122:4
135:13

**overdose**
56:4 168:21

**overdoses**
56:8

---

**P**

**p.m.**
20:10,11 48:4,5
114:16 120:18
121:16 134:18
135:17,18 139:1
151:23,24 167:3,9
168:12 173:11

**pages**
134:10

**paper**
126:6,14 130:17
145:6

**papers**
126:11 143:16

**paperwork**
54:20 88:22,24 89:1,
2,7 146:19

**paragraph**
121:8

**park**
78:16 144:22 146:12

**parking**
78:12

**part**
21:15 39:9 77:20
99:25 100:13
136:15,22,24 143:25
144:21 149:6

**pass**
66:5 170:18

**passed**
164:14 168:20 169:2

**passenger's**
45:4,11 151:3,12
169:18,20 170:8,12

**passing**
65:16 67:22

**past**
59:18 60:7 147:4

**pat**
33:21,25 43:4 73:3,
4,6

**pat-down**
32:14 33:22,24 34:3,
7,8,13,17,18,19
35:1,4,8,20,25 36:9
37:11,19 40:21,24
43:18,21 74:4,9
76:11,18

**patch**
139:5,7

**patrol**
24:6 125:2 166:25

**patted**
70:2

**patting**
41:10

**pausing**
27:20

**PDF**
171:13,25 172:4,25

**pen**
130:17

**people**
10:19 16:22 17:25
18:3,6,15 22:20
26:10,16,22,24 27:1,
19 28:15,24 29:1,25
30:12,20,21,25 31:3
32:2,3,6 35:2 37:22
38:2 39:25 40:9,18
42:14 44:18,23 46:2,
9,16,20 47:1 49:14,
21 55:16,17,22 56:2,
4 58:16 59:7,13 60:8
63:14 64:13 77:11
100:23

**perfectly**
12:13

**perform**
33:1 34:2,7,8,13,21
35:1,8,20,24 37:11,
19 74:4 76:11 85:11

**performed**
10:3 75:17

**performing**
35:14

**period**
16:21

**person**
17:14 21:4 34:8,14,
21 35:23 36:25
38:24 39:3,20 40:2,
11 42:16,20,24 43:3,
17 44:14 45:2,3,15
51:7 60:22 66:16,23
72:14,22 75:11,18
91:25 100:16 106:4
143:4,11 150:24

**person's**
168:7

**personal**
63:3 68:12

**perspective**
148:11

**pertinent**
79:1

**Phillips**
7:7 89:19

**phone**
9:18,19 68:12,14,15,
23 69:1,2 93:1,8,12
94:1 98:3,17 99:18
100:6,12,15 101:21
110:17 112:17
113:7,8,11,15,18
116:19 120:6,8,9,10,
13 122:22 141:18

**photo**
4:12 169:12

**physi-**
33:18

**physical**
32:15,16 33:3 38:25
40:21 43:21 57:15,
22 58:4,6,9 60:14

**physically**
38:25 45:1,5 54:19
85:19,25 93:6

**pick**
68:7 69:18

**picked**
69:14 70:21 114:17
148:21

**picking**
58:13

**pickup**
114:14

**picture**
166:1 167:7 168:12,
14 169:14 170:2,11

**pictures**
113:6,14 124:3

**piece**
33:4 126:6

**pieces**
91:5 124:8

**pitiful**
166:15 167:3 168:1,
3,8,10

**place**
32:14 53:12 89:11
100:1 117:25 124:9
125:16,24 132:2

**placing**
72:6

**plaintiff**
7:3

**plaintiffs'**
4:7 48:10 83:18
113:1 115:5 126:19
133:1 134:5 135:24
137:6 138:21 139:18
141:21 148:6 165:22
169:9

**play**
154:1 157:7 158:18

**playing**
138:25 139:14
148:24 149:10,16,20



152:6,16 153:1,19
154:7,16 155:1,8,11
156:2 157:5,10,16,
17,19,23 158:19
159:10,11
**point**
22:9 49:4 69:24 70:2
79:8 80:1 82:24,25
96:3,5 97:12 98:16
100:10 101:25
102:4,11 103:14
123:19 126:2,5
132:3 141:17 142:4,
7 173:4
**pol-**
162:25
**Police**
13:24
**policies**
31:24 49:20 98:14
105:13
**policing**
18:3 63:9
**policy**
16:1,10,23 26:4,5,7
27:23 28:3 37:9,17
49:16 50:10 52:3
53:17 103:10
106:10,13 107:17
162:10,11,21,24
163:2 164:15,19,20
**portion**
170:1
**pose**
56:2
**poses**
64:9
**position**
18:14 43:13 82:25
**positions**
14:14
**positive**
168:15
**possibly**
70:9 76:13
**potential**
109:4,11
**potentially**
72:13
**powder**
169:15
**pre-marked**
55:7
**prefer**
121:22
**preferred**
129:4
**prejudiced**
56:20
**preparation**
115:20 116:6
**prepared**
11:19 117:5
**prescriptions**
101:17
**present**
92:2
**press**
78:9 139:10
**pretty**
11:20 69:5 80:12
90:6 104:2 135:9
**prevented**
161:12
**primarily**
68:25
**prior**
13:21 41:10 47:22
49:4 51:25 60:22
61:5,11 64:17 70:16
75:12,15 84:25

85:22,24 132:1
164:24 168:25
**prisoners**
25:17,24
**private**
75:23
**privilege**
12:21
**probation**
53:21 54:2,5 110:19
166:12,19
**problem**
28:20 60:10
**problems**
66:15
**procedure**
30:4 162:11,12
163:3,6 164:21
165:18
**procedures**
4:18 48:21,24 49:4,
9,14 66:8 98:15
105:14,15 106:23
164:10
**process**
23:7 30:3 65:8 86:9
110:18
**processing**
123:18,21,25 125:4
126:7,8 127:3
**professional**
63:3 102:7
**programs**
62:11
**prohibited**
103:10
**promise**
55:10
**promoted**
14:13,19
**promotion**
15:8
**promotional**
23:7
**promptly**
52:24
**protect**
27:18
**protruding**
76:23
**provide**
11:10
**provided**
88:20 124:23
**proximity**
88:3
**public**
28:19
**pull**
76:19 112:22 119:3
122:6 144:19
**pulled**
90:9
**pulling**
47:7 83:17 146:9
**PUNCTUATION**
5:8
**pupils**
74:13 75:2
**purpose**
23:14
**purposes**
53:10
**pursuant**
5:17 51:6
**put**
6:2 29:22 36:23
71:22 72:1 93:6,8
124:2 125:5,11,13
128:13 142:25 165:9

**putting**
128:22 144:19

**Q**

**qualified**
106:1
**question**
6:15 9:5 10:24 11:1
12:2,6,17,20,22
18:11 20:21 21:8
24:22,24 25:1 40:5,7
42:11 65:25 84:19
85:23 100:21 144:7
157:14
**question-and-
answer**
10:21
**questions**
10:22 11:19,23,24,
25 34:11 47:10
84:10,17 111:20
120:3 129:17
170:20,21,23,24,25
171:2
**quick**
20:5 47:11
**quicker**
50:8 135:13
**quickly**
113:4
**quiz**
12:11
**quote**
130:13,15
**quoted**
5:1 128:2,12,13

**R**

**radio**
68:13,21,23,24 69:6
156:23,25 163:15
165:2
**raise**
37:1 154:23
**raised**
74:25 75:23
**ran**
70:17
**rank**
14:24
**Ray**
6:2,8,12,20 7:4 10:5
18:10 20:4,8 28:4
37:12 39:14 46:11
47:3,7,13 49:24 55:4
56:11,18 57:7 59:20
63:22 65:21 69:11
76:17 80:19 81:16
82:20 97:20 104:10,
13,15 109:5,21
112:2 116:8 135:14
149:3,19,23 150:2
151:21 156:16 160:9
161:15 170:21
172:22,24
**reach**
73:19
**reaching**
161:7
**reacted**
91:14
**read**
5:2 6:3 24:23 40:4
50:1 51:17,19 53:7
121:8,9,18 173:9
**reading**
48:17
**ready**
6:21 120:2,4 121:9,

11,13
**real**
47:11
**realized**
47:9 99:2
**rearview**
44:15,20 45:16
**reason**
13:2 52:7 68:5 84:20
105:4 113:17 158:5
**reasonable**
38:3 42:14 51:8
73:15
**Rebecka**
7:6 89:19
**recall**
8:9 9:1,20,21 12:13
14:20 17:1 25:15
32:9 35:5 36:8
37:14,21 38:14 61:7,
9,10 69:12 71:10
76:4 86:8,15 87:10
88:11 89:11 112:12
113:13,16 115:1
123:6,7,10,15
125:25 132:13
134:22,25 135:3,4
143:13,25 144:3
146:16 157:20 159:6
166:8 170:5
**receive**
19:12 32:22 54:16
65:17,23 89:2
**received**
9:18 10:8 37:9,17
54:22 60:7 69:2
88:22 113:8 114:3,
10 116:19 127:10
136:12
**receives**
25:16,17
**receiving**
15:15,17 54:21,24
85:10
**recently**
58:3 79:15,17
**recess**
20:10 48:4 135:17
151:23
**recklessly**
158:23 159:7
**recognize**
48:18 113:10 143:20
148:9,10 166:1
169:12
**recollection**
151:6
**record**
6:3,11,13 20:5,9,13
32:20 48:3,7,11
83:19 113:2 115:6
126:20 129:18 133:2
134:6 135:16,21,25
136:11 137:7 138:22
139:19 141:22 148:7
149:10 151:21,22
152:1 165:23 169:10
171:6,18 173:5,8
**recorded**
68:21,23
**records**
4:14 112:22 113:15
127:12 129:24
135:22
**red**
39:1
**refer**
32:19
**reference**
118:11,21,25 136:21

**referral**
54:13,16,24
**referring**
26:25 32:17 97:24
133:7
**reflect**
112:15
**reflects**
108:4
**refuse**
16:5,7 25:23 26:3
**refused**
19:12 20:17,24
25:24 162:10,14
**refusing**
20:18 162:16
**regional**
54:11 77:18,22,25
**regular**
171:10,14,25 172:5
**rehabilitation**
50:19
**related**
38:13 132:15
**relayed**
96:12
**relaying**
96:5
**release**
19:24 21:4,21 22:8
103:4 106:11 110:4,
5 165:11
**released**
53:11 90:8 107:25
**relin-**
106:20
**relinquished**
86:25 106:20 110:10
**remainder**
170:19
**remaining**
23:9
**remanded**
41:21,25
**remember**
69:7 70:4 76:2 87:6
93:21 100:13,14,16
101:25 122:21
125:14 132:11 134:1
136:20 141:1,4
159:1
**remembered**
122:1
**remind**
13:17 149:9
**reminded**
26:3
**remotely**
6:25 7:20
**remove**
33:4 71:23
**removed**
73:16
**repeat**
9:4 18:11 21:6 24:21
29:16 34:10 42:11
56:13 72:15 85:21
118:23 150:12
154:20 155:9,16
**repeated**
26:4,5
**repeatedly**
159:21 160:7
**repeating**
94:21 96:16
**rephrase**
9:4 12:4 35:21
**report**
4:22,24 22:14
112:15 114:23

**referral**
54:13,16,24
**referring**
26:25 32:17 97:24
133:7
**reflect**
112:15
**reflects**
108:4
**refuse**
16:5,7 25:23 26:3
**refused**
19:12 20:17,24
25:24 162:10,14
**refusing**
20:18 162:16
**regional**
54:11 77:18,22,25
**regular**
171:10,14,25 172:5
**rehabilitation**
50:19
**related**
38:13 132:15
**relayed**
96:12
**relaying**
96:5
**release**
19:24 21:4,21 22:8
103:4 106:11 110:4,
5 165:11
**released**
53:11 90:8 107:25
**relin-**
106:20
**relinquished**
86:25 106:20 110:10
**remainder**
170:19
**remaining**
23:9
**remanded**
41:21,25
**remember**
69:7 70:4 76:2 87:6
93:21 100:13,14,16
101:25 122:21
125:14 132:11 134:1
136:20 141:1,4
159:1
**remembered**
122:1
**remind**
13:17 149:9
**reminded**
26:3
**remotely**
6:25 7:20
**remove**
33:4 71:23
**removed**
73:16
**repeat**
9:4 18:11 21:6 24:21
29:16 34:10 42:11
56:13 72:15 85:21
118:23 150:12
154:20 155:9,16
**repeated**
26:4,5
**repeatedly**
159:21 160:7
**repeating**
94:21 96:16
**rephrase**
9:4 12:4 35:21
**report**
4:22,24 22:14
112:15 114:23

115:23,24 116:12
117:2,6,16 118:10,
18 119:1,4 121:23
122:7 123:9,17
130:2,11 133:20
134:2 135:2 136:5
137:2,13,19,23
138:3 140:10
**reporter**
5:18 6:6,10,22 7:12,
15 11:15 20:9,12
24:25 40:6 48:3,6
52:9,13 60:2 104:11,
14,16 116:9 135:16
149:8,13 151:22,25
152:10 171:5,17,21
172:1,4,8,11,14,18
173:1,7
**reporting**
4:9 25:20 137:15
138:1
**reports**
115:13 138:5,10
**representation**
140:14
**represented**
145:18
**reproduced**
5:2
**request**
109:25
**requested**
15:9 29:5 131:10
**requesting**
10:10 111:15,16
**Requests**
119:16,24
**require**
26:7,10 43:9 85:2
**required**
25:25 34:8,20 35:10
43:13 52:8,9,11
102:7
**requirement**
85:16
**rescue**
105:19,22,23
**reserve**
6:13 170:19 173:3
**reserved**
173:10
**residential**
54:12
**residue**
124:13
**respond**
122:23 123:5
**responded**
102:16
**responding**
70:18
**response**
23:11 94:17 131:20
153:22 154:17
172:13,15 173:6
**responsibilities**
28:14 30:2,9,15 38:1
46:16,21 55:15
63:11 77:14 78:5
**responsibility**
27:23 28:6,18 42:13
55:20 78:24 106:24
107:22 110:11
**responsible**
78:20
**responsiveness**
6:15
**rest**
146:19 154:12
**restricts**
72:20



result
27:8
retrieved
91:1
return
17:17
reverses
151:7,11
review
115:19 116:3 119:23
123:17 137:21
reviewed
49:3 116:2,6 137:20
ride
109:3
ripples
159:1
risk
26:12 38:7 64:5,9
82:6 92:3 101:9
risks
56:2
road
29:5,6 44:1 105:20
159:3
room
11:4 32:24 72:7
rose
159:17
rubbed
124:11
run
19:3 70:15 103:17
runaway
51:24 52:1 69:15
70:20 80:23 114:12
137:23
runner
68:1
rush
171:10
Russell
7:9 89:16
Ryan
7:4
RYDC
29:19 77:8,12,15,21,
25 78:7 79:3,13
81:15 82:15 83:1,7
84:1,4 85:20,25
86:3,10,14,19 88:13
89:14 91:25 92:13,
14,15 100:23 103:9,
14 106:12,20 107:3,
24 108:11 109:19
110:17 112:11
114:16 119:6,13,16,
24 120:18 121:4
127:17 130:8 131:8
132:4 135:5 139:3,
11,23 140:7,15
142:1,5 146:3
148:17 161:25
162:16 164:14,17
165:12
RYDC's
164:9
RYDCS
98:13

S

sacrifice
26:21
sad
168:9
safe
28:15,20 38:4 46:10,
13,16,22 47:17
49:14,21 55:16 59:6
62:1,2 66:23

safekeeping
125:19
safely
45:1,17
safest
125:16
safety
18:2 26:17,21 27:18
28:6 39:25 40:9,17
42:8 46:5 56:2
66:16,21 73:24 79:2
92:3 96:19,23 97:22
101:9
Sam
6:8 7:2 20:4 55:4
135:14
sanitize
87:8
sanitizer
87:8,18,23
sat
151:3
satisfied
127:11 145:22
scared
127:7 129:11
scenarios
161:25
scene
141:19
scenes
29:2,5
scoop
76:12
scoot
156:6
scope
63:2
screen
47:22 48:13 49:25
112:24 115:2 126:24
133:4 139:14 143:4
148:24 149:16,20
152:16 153:1,19
154:7 155:1,11
156:2 157:5,23
158:19 159:11
167:14
screenshot
115:1
screenshots
4:13,14 113:7,18
script
11:21
scroll
50:16 113:4
scrolling
150:18
search
30:25 31:4,11 32:3,
6,7,11,14,15,16,17,
19 33:1,2,5,22
34:14,17,18,19 35:2,
4,8,14 36:9 37:3
40:22,24 41:1 47:22
76:11 85:11 87:12
88:7
searches
34:3,7,8
searching
31:16 87:11
seat
4:20 44:8,13,14,18,
19,24 45:4,11,13
46:3 78:17 90:22,25
124:4,12 125:15
144:12,15 148:16
151:3,12 154:3
161:23 167:12
169:15,18,20 170:1,
9,10,12

seatbelt
152:22
seconds
157:8
section
5:17 50:14 51:1,13
52:3,20 54:8
secure
46:17,22 47:17
54:12 66:24 78:16
secured
71:24 78:11,14 90:8
125:20
security
26:21 27:19 28:6
40:17 41:23 42:9
46:6 66:16,21 73:24
79:2 87:14 92:3
96:20,24 101:10
seek
125:1
semi-personal
62:18
send
181:11 171:15
sending
166:8
sense
9:14 11:16,25 12:14,
22 18:24 30:10
57:25 95:14 98:1
103:2,6 117:4,21
166:23
sensed
99:16
sensing
100:22
sentence
5:9,10 166:17
separate
33:15
separately
117:24
sequence
93:20 117:6
sergeant
8:1 14:13,19,22,24
15:3,7,8 18:25 19:16
20:17 21:19 23:14,
17 85:1 86:17,21,23
87:4,10,24 88:13
89:13,25 92:17 93:5
94:5 95:11 96:13
97:16 98:17 101:20
102:10,11,13 104:1,
5,19 106:5 108:24
109:17 112:13
116:18 120:7,11
121:16 122:11,20
122:2 128:9 131:3,5,
17 132:15 133:8
143:21,22 144:4
145:5 146:14 147:8
150:9 160:19
series
84:9 113:6
seriousness
95:24
service
103:11 104:21
services
24:10 28:11,13 29:4
30:1 103:19 105:21
116:18 124:22
132:21
set
151:11
severity
58:2

shake
58:4
shaking
11:14
share
112:24 134:3
sharing
55:2
Sharon
4:10 7:4,18 116:18
137:15 138:1
Shaw
77:8,24 85:20
sheriff
65:3
sheriff's
4:23 9:3,9 10:4
13:14 37:18 48:22
49:1,17,20 53:15
59:10 90:14 106:19,
25 107:19 108:2,6
110:7 113:25 137:12
164:10
shift
139:13 141:24
142:12,13 144:6
152:14 158:16
shifted
125:17
shirt
143:4
shoe
73:19 74:1
shoes
73:4,7,8,14
shoplifting
127:6
short
32:11 35:13 37:3
41:1 122:15
short-
110:1
short-staffed
121:1
shorthanded
110:2
shortly
138:10
shorts
75:20
show
47:6 48:9 50:12
126:13 135:10,20,
21,23 137:3 139:16
145:25 148:4
showed
126:14 137:4 148:1
shower
32:25
showing
55:9 126:22 165:25
side
143:3 144:12 145:9
156:21 169:17,23,24
170:3,7,8,13
sign
6:3 108:18 173:10
signaled
71:14
signals
66:15
signature
173:3
signed
134:14
significant
92:3
signs
38:18 39:8,22 63:20
74:17
silly
129:17

similar
161:25
simply
33:25 167:23
Sir
104:14
sit
37:8,16 161:3,11
sitting
13:3 44:25 45:2,4,
10,12 69:21 154:22
170:8,12
situation
42:22 54:1,17 69:8
92:2 95:24 96:15
97:18 123:15 156:21
157:2
situations
42:2 55:17
skim
120:1
skinny
58:12 71:5
skip
139:13 141:24
142:12,13 144:6
152:14 158:16
skipped
144:10 145:4
skipping
146:22
sleep
13:5 27:17,21
Sluder
4:11 17:5 29:14,17
45:10 49:5 50:23
51:15 86:1 109:19
114:11 123:2,12,21
126:15,16 140:7
164:3,14
Sluder's
54:5,17 83:13
140:16
slurring
38:24
smaller
13:21
Smith
88:14,16 93:23
131:18 132:14
133:8,9 146:17
147:21
society
39:18
solely
29:7
Some-
155:6
somebody's
106:25
sores
57:23 58:13 71:2,13
80:15
sort
9:24 10:2 11:22
12:20 13:6 16:11
26:12 28:17 30:22
31:10 35:24 44:1
52:16 55:20 58:24
59:17,19 62:17
63:19 65:4 67:19
68:22 72:22 74:22
76:14 78:20 80:2
82:18,25 84:10 86:9
92:23 93:15 98:3
106:10 107:17
108:3,11 115:11
117:24 118:20,24
121:14 154:22
156:13,20 164:16

sorts
65:20 66:3
sounded
158:3
sounds
11:7 119:14 135:14
157:18,25
space
140:14
sparkled
91:6
speak
40:14 47:2 86:18
92:16 95:17 146:25
158:13 163:16 165:9
speaking
30:3 57:24 64:15
93:1,10 145:6
157:16,17,19 158:2
164:7,9,20
Special
4:8,22 136:4
specific
58:8 61:22 80:14
130:13
specifically
32:10,25 35:6 38:14
40:14 50:11 63:24
69:13 74:20,24 75:4,
11 96:18 99:4,10
100:24 106:13
109:2,17
speculate
12:10
speed
51:8
spoke
54:19 68:11,25 69:4
136:15
spoken
5:2
squat
33:16
stamp
142:15 150:19
stand
17:19 28:2
standard
98:14 105:15 172:25
standing
112:14,17 122:22
start
11:1 113:22 142:7
144:25 145:1 148:19
started
87:13
starts
132:4
State
108:6,24 109:18,22
state-
100:2 131:11
stated
16:1 99:10
statement
4:10,11,5:18 66:18
82:18 98:18,23,24
99:4 100:2 114:19
126:3,15,16 127:15,
16,20,21 128:2,11,
13 129:1,5,6 130:13,
14,22,23,25 131:2,6,
9,11,12,13,16,23
132:16,20 133:10,11
134:20,22 145:21
146:17 147:22
statements
65:18,20 66:3 67:23
112:1,4 147:24
status
52:1



staying
23:3
step
42:12 66:22 110:18
167:10
stepped
143:8
Stewart
93:23
Stewart-smith
88:16,17 89:7,12
131:19,21 132:3
134:14 136:12 147:1
160:19
stipulate
6:19
stipulation
6:12
stood
88:2
stop
55:2
stopped
155:13,17,19 156:4,
10 157:8 158:21
story
100:18
strange
95:19
street
41:19
strike
40:16 56:8 63:12
64:10 74:14 83:16
84:24 93:3 112:8
strike-out
148:2
strip
32:11,17,19 33:1,2
35:14 37:3 41:1
Stuart
67:14,25
Stuart's
69:22
stuff
29:22
sub-
130:6
subdued
39:2
subs-
90:17
substance
57:3 90:18,19 96:11
97:8,9 124:4 130:6
161:9 164:16 166:24
substances
42:10,16,25 43:4,17
79:15 165:17
substantial
64:9
sued
9:6 10:2,6
suffering
63:15 74:22
sufficient
35:12 43:11 77:2
129:3,7
suggested
81:9
suicidal
64:14,21 65:4,15
66:3,17 82:18,21
112:1,3,4
suicide
64:5,8 82:6
summary
134:11
sunken
71:9

supervisor
17:20 20:23 22:15
65:14,18,20 66:6,11,
12,22 110:25 111:1
112:9
supervisors
29:6
supplemental
115:13
supplements
137:14,22,25 138:6
support
23:20 33:12,14
supposed
16:11 47:16,21
55:16,17
surprised
102:25
suspect
36:17 130:15
suspected
4:12 16:3 91:17,18
92:10 96:11 97:9
98:10,11 99:19
120:14 130:6 161:22
166:24
suspicion
37:2
swear
6:23,24
sweating
75:8
sweep
76:20
sworn
7:20
symptoms
38:19,23 57:5,9
system
117:19,23

T

tag
163:13 165:1,8
taking
13:5 18:14 21:5 38:6
51:7,9 101:2 130:5
161:12
talk
20:22 28:9 30:8
31:21,25 67:2,18,20
86:13 88:12,18 89:7,
13,16,19 92:24
127:20 132:7 154:5
157:2
talked
55:14,15 93:15
94:13 98:2 127:6
142:11 161:24
talking
11:9 67:9 77:21,25
108:15 132:4 145:20
149:7 155:14,20
taught
34:25
Technically
57:8
telling
69:8 85:1 86:17
97:24 118:1 128:7
152:21
tells
88:5 89:25 112:9
122:12
tend
11:20
tendencies
82:21

tendered
5:18
term
107:11
terms
83:3
test
12:12 124:16 125:1,
8,9,13 166:24 167:8
168:12,15
testified
7:21
testify
13:3
testimony
31:9
text
4:13 118:14 166:3,6
167:1,7 168:11,19
Thereabouts
135:8
thing
18:20 32:23 42:23
43:2,7 55:21 87:3
103:3 105:2 137:21
139:6 145:25 166:22
things
11:16 22:25 23:22
39:4 42:19 46:24
48:15 58:14 60:21
62:12 72:22 79:5,11
84:11 99:15 118:11
129:18 132:2 135:12
154:21
thought
75:14 80:2 87:7,15
72:13,14 151:6
thoughts
65:15
ticket
19:24
ticketable
19:23 22:6
tight
35:12,20,23 36:14
37:1 72:6
tight-fitting
75:21
time
8:5,13,14,16 16:20,
21 33:4 35:15 64:17
67:5 69:5 70:12
80:9,22 87:11,12
88:10 93:22,24
94:12 109:14 112:14
114:24 116:24
118:23 119:12 130:7
133:22,23,24 135:5
141:17 142:15
148:21 150:19
153:24 159:4 156:5
159:4,25 161:17
162:10,12,13 165:4
166:23 167:21 169:1
time-stamped
145:15
timeline
4:19 100:5,19
115:11 116:14
117:23 118:14
times
8:11 11:22 18:19,22
25:12,14,24 61:5,11,
19,20 79:23 81:1
95:7,12 142:25
144:20 159:14
timing
122:8
today
6:25 13:3 14:22
37:8,16 55:10

11:5:21 116:6 138:16
161:3,11
told
16:6 19:12,24 21:2
22:4,9 23:17 25:22
26:2 69:14 83:11,12
87:16,17 88:7 92:19
93:25 94:2,7,21 95:1
102:5 106:6 111:14,
15 120:24 122:24
123:1 128:9,20
130:18
toolbox
43:16
top
75:21 123:16 134:11
136:4 137:13
touch
157:21
toxic
56:5,7 57:3 58:19
toxicity
58:24 59:3
train
23:15,19
trained
31:23 32:1,3,5,6,10
34:2,6,13 35:6
38:11,15,23 64:4
72:1,4,11 90:14
training
18:25 34:25 37:9,17
trans-
29:6 30:24 100:11
transcribed
152:11
transcript
5:1,18 6:4 171:9,23
173:10
transfer
77:11 83:1 106:11
108:5 109:3,18
transferred
67:16,19 71:18
94:25
transport
29:1 30:25 32:1
34:9,14 37:22 43:23
51:14 55:17 61:15
63:14 65:10,13
66:13 77:7,11 91:21
100:11 102:1,14
103:19 104:6,22
105:3,20 106:6
107:2 111:16 112:10
119:16,25 120:25
122:12 123:2
transportation
30:2
transported
29:17 78:22 90:11
107:21 148:17
transporting
29:13,24 30:4,12,17,
21 34:4,22 35:2,16
38:2 40:18 41:5,7,20
42:15 44:8,24 45:10,
15 46:3,9,19,21,25
47:17,22 49:5 51:23
59:12,15 63:24
66:17 75:12,15
76:10 78:25 103:13
105:9 107:7 114:18
123:12,20
transports
29:7
treated
156:14
treatment
50:19 59:2

trial
6:17 170:20
trouble
48:16
truth
12:14
truthfully
13:4
tucked
76:15
turn
45:1,2,5,17 78:15
158:1
turned
107:23 156:23,25
158:13 159:20,24
160:13,15
turning
160:14
twenty-
17:8
twenty-twenty-
twenty-
45:8
two-minute
47:8
type
64:24
typical
81:8,25 90:10
typically
10:17 124:20 165:18

U

Uh-huh
111:2
uh-huhs
11:14
under-
50:6
undergoing
59:3
underneath
33:11 76:12
understaffed
104:2 105:3
understand
8:19 12:1 20:21
31:23 35:18 43:12
49:8,19 50:9 51:13
53:17,24 56:1,23
57:14,21 58:9,15,22
64:8 76:5 77:18,21
82:24 92:23 95:23
101:9 105:17 107:14
108:23 156:9 162:23
understanding
16:15 39:11 52:2
53:19 65:2 163:5
164:13
understood
12:48:24 104:4
109:10 126:16
underweight
57:24 58:11 71:11,
12
unfortunate
168:9
ungovernable
51:23
unhealthy
58:11 71:7,13
unintelligible
52:8 104:10,13
116:8
Union
67:7
unit
29:6 101:4

unlawful
15:24,25
unsafe
18:7,15
unsecure
90:3
unsecured
87:10
unusual
75:3 91:12
update
146:14
urgency
130:9
usen
79:15
user
80:8 168:6
users
39:17

V

vaginal
33:20
variety
28:14
vehicle
4:20 36:10 43:23
44:2,7,13,14,18,24
46:3,10,20 69:22
71:19 73:3,18,25
77:7 90:6,11,16
91:13,21 92:11,20
97:9 110:18,20
120:20 123:18,22,25
125:4 127:3 130:7
132:5 139:2,24
140:3,15,20,23
142:2,8,18 144:23
145:2 146:6,7,12,25
147:5,11,14 152:19
154:15 161:4 163:9
165:14 169:15
verbal
11:11 127:16,19,21
Verbatim
136:20
Vicky
67:14,18 71:19
Vicky's
71:21,23
victim
130:15
video
4:15,16,17,20
138:25 139:14
140:12 142:11
147:18 148:9,24
149:11,16,20
150:10,13 152:11,16
153:1,19 154:7
155:1,11 156:2,12
157:5,7,23 158:11,
19 159:11 161:6
videos
116:3 135:11,21
148:11
view
139:22 143:5
violate
26:7
violently
39:3
visible
63:19
visual
33:2,18 35:13 40:21,
23 43:10,20 44:7,18,
23 47:1 74:15 75:17
77:2



visually
75:10
vitals
106:3
voice
152:18 154:23
volume
159:17
voluntary
15:9 22:18 27:8,10

**W**

waist
75:22
waited
68:18 125:23
waiting
125:25 126:2
146:13,17,18
walk
16:16 86:10 87:13,
23 90:1,5
walk-in
90:4
walked
85:25
walking
86:3 87:7 140:19
147:10
walks
147:4
wall
33:14,15
Walmart
127:6
wanted
19:8 27:13 54:20,21,
23 73:12 99:3,4,9
127:13,15,20,24
128:1,2,4,11,12,19
129:1,25 130:10
132:16 145:23
159:23
watch
25:25 138:24
watched
143:19 150:10,13
156:11
watching
44:19 144:1
watery
39:1
ways
31:15 46:4
weapon
76:25
weapons
31:5 36:11 37:2
40:12 47:21 60:18
74:11 78:16
wearing
31:7 35:12 36:13
43:9 74:5 75:20,25
150:23
weight
58:11 80:16
weird
31:21
well-being
110:13
white
90:18 147:11 169:15
Whitfield
106:17 107:3
Williams
24:2
window
165:9

withheld
81:4
withhold
80:21
witnessed
84:12
woman
146:24 147:4
words
10:7 29:23 38:24
96:21
work
13:23 14:2 31:24
37:13 53:14 68:14,
15 69:1 106:18
107:20 109:22
116:19 124:22
worked
13:13,21 23:4 32:21
59:6 161:24
working
88:20 136:24,25
works
6:18 32:23 65:8
worried
59:24
worse
70:24 81:11
write
19:24 111:4 117:6
writing
141:12,15
written
130:25 131:2 173:2
wrong
112:15
wrote
116:21 132:22
138:9,14 140:11

**Y**

y'all
150:16
year
16:24
years
13:19 14:2,4 16:18
17:2,9 38:17 39:6
57:12 58:21 100:20
103:15,16
yeses
11:12
youth
54:11 77:18,22,25
84:20

**Z**

zoom
6:25 50:3 51:18
119:21 136:7 141:11

