## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

|  |  |
|---|---|
| MELANIE HOGAN SLUDER, et al. | |
| Plaintiff, | |
| v. | Civil Action File No.: 4:24-cv-00181-WMR |
| REBECKA PHILLIPS, et al., | |
| Defendants. | |

## DEFENDANT SHARON ELLIS' STATEMENT OF MATERIAL FACTS

In accordance with LR 56.1(B)(1), NDGa., Defendant Sharon Ellis presents the following material facts as to which there is no genuine issue to be tried in support of her Motion for Summary Judgment:

**1.**

At all times material to this action, Defendant Sharon Ellis worked for the Sheriff of Gilmer County, Georgia, as a Deputy Sheriff.[1]

---

[1] *See* Remote Video Conference Deposition of Sharon Ellis taken on June 17, 2025, attached to Defendant's Motion as Exhibit A, at 7: 24-25; 24: 8-11.

**2.**

In August of 2022, Ellis worked in the Court Services Division of the Gilmer County Sheriff's Department.[2]

**3.**

In this capacity, one of Ellis' duties included transporting pre-trial detainees to correctional facilities.[3]

**4.**

Based on her experience transporting detainees, Ellis was familiar with observing individuals for signs of suspected drug use through physical observation, including: coherence, slurring words, red and watery eyes, and erratic behavior but was not specifically trained to identify a drug-related emergency.[4]

**5.**

Regardless of these observational factors, it is difficult for a law enforcement officer in Ellis' position to definitively determine whether an individual is currently using drugs because individuals respond to drug toxicity differently.[5]

---

[2] *Id.* at 24: 8-11; 28: 8-12.
[3] *Id.* at 30: 8-23.
[4] *Id.* at 38: 11-25; 39: 1-9.
[5] *Id.* at 39: 10-22.

**6.**

Ellis had a general knowledge of how someone may present while using drugs but had no specific knowledge of what symptoms a person may present while using methamphetamine.[6]

**7.**

Ellis did not know, based upon her law enforcement experience, how to identify someone experiencing an overdose related to methamphetamine toxicity.[7]

**8.**

Ellis also had no knowledge of what medical treatment is required for someone experiencing an overdose related to methamphetamine toxicity.[8]

**9.**

As part of her job duties, Ellis had frequently transported juveniles to the State of Georgia Department of Corrections' Elbert Shaw Regional Youth Detention Center ("RYDC") in Dalton, Georgia.[9]

---

[6] *Id.* at 57: 5-10.
[7] *Id.* at 58: 15-25.
[8] *Id.* at 59: 1-4.
[9] *Id.* at 77: 10-25; 78: 1-3.

**10.**

The RYDC is a secure compound with a security gate which was monitored by an officer, and Ellis was required to drive through the gate when delivering juveniles to the custody of the State at the facility.[10]

**11.**

Prior to entering through the RYDC gate, an officer would ask Ellis her name and tag number and call this out over the radio, but the officers did not communicate with the juveniles.[11]

**12.**

After the gate was opened for her vehicle at the RYDC, Ellis would drive through, turn around, park, secure her weapons, and then assist the juvenile out of the back seat to be escorted with her and a State officer inside the facility.[12]

**13.**

Once inside the facility, Ellis was required to complete an intake form regarding the juvenile's condition when transferring custody.[13]

---

[10] *Id.* at 78: 4-18.
[11] *Id.* at 163: 5-19.
[12] *Id.* at 78: 4-18
[13] *Id.* at 78: 19-23; 84: 1-5.

4

**14.**

After relinquishing custody of a detainee to the State of Georgia, Ellis' procedure, as instructed by the Gilmer County Sheriff, was to pull her vehicle outside of the facility gate and perform a contraband search inside the vehicle.[14]

**15.**

On August 26, 2022, Ellis was tasked with transporting Alexis Sluder, a 16-year-old juvenile, from the Fannin-Gilmer County line to the State of Georgia's RYDC in Dalton.[15]

**16.**

Ellis received a call from dispatch at approximately 7:43 p.m. instructing her to transport Sluder because she had been reported as a runaway child and there was a runaway order requiring Ellis to pick up Sluder at the county line.[16]

**17.**

Ellis was familiar with Sluder because she was the cousin of Ellis' adopted child and had interacted with her multiple times prior to being assigned to transport her but had never interacted with Sluder outside of her professional duties in law

---

[14] *Id.* at 90: 5-15.

[15] *Id.* at 29: 13-20; 67: 5-10; 77: 16-25; 78: 1-3; 160: 6-10.

[16] *Id.* at 51: 23-24; 68: 12-16; 114: 8-14.

enforcement.[17]

**18.**

Ellis was aware, based on her prior interactions with Sluder, that Sluder had a history of drug use, including methamphetamine.[18]

**19.**

When Ellis arrived at the Fannin-Gilmer County line to pick up Sluder, she met with a deputy of the Sheriff of Union County, Vicky Stuart, who had Sluder in her custody.[19]

**20.**

Stuart discussed Sluder's status as a runaway with Ellis but did not provide Ellis with any further information.[20]

**21.**

When Ellis first saw Sluder that night, she was sitting handcuffed inside Stuart's patrol vehicle and Ellis observed that Sluder looked unhealthy and had sores on her face consistent with methamphetamine use; however, Elis was unaware if

---

[17] *Id.* at 62: 2-25; 63: 1-5.
[18] *Id.* at 62: 2-25
[19] *Id.* at 67: 5-17.
[20] *Id.* at 67: 14-25; 68: 1-4.

Sluder was, at that moment, under the influence of methamphetamine because Sluder was acting normally.[21]

### 22.

Ellis was also unaware as to whether Sluder had used any drugs recently prior to picking her up.[22]

### 23.

In addition, Ellis did not observe any indicators that Sluder required any medical treatment for drug use at the time.[23]

### 24.

Sluder was wearing tight clothing, including shorts, and Ellis believed a pat down would not reveal any information that a visual inspection would not also reveal, so Ellis checked Sluder's shoes and conducted a visual inspection of Sluder's crotch, breast area, and general person for contraband before placing her in the backseat of her patrol car.[24]

---

[21] *Id.* at 69: 18-25; 70: 1-16; 71: 2-11.
[22] *Id.* at 79: 17-18.
[23] *Id.* at 52: 6-12.
[24] *Id.* at 71: 22-25; 73: 6-10; 74:4-12; 75:10-24.

**25.**

From Ellis' observations of Sluder, she did not notice anything that raised a concern that Sluder was facing a medical emergency.[25]

**26.**

Ellis was transferred from Stuart's vehicle to Ellis' vehicle and Ellis placed her handcuffs on Sluder before removing Stuart's handcuffs.[26]

**27.**

Sluder was placed in the rear seat on the driver's side of Ellis' vehicle for the ride from the Fannin-Gilmer County line to the RYDC in Dalton.[27]

**28.**

During the ride, Ellis asked Sluder if she had taken her seatbelt off and then told her that she hoped that she would get off the drugs one day because Ellis cared about Sluder.[28]

**29.**

There was nothing that Sluder was doing at the time of this comment,

---

[25] *Id.* at 74: 21-25.
[26] *Id.* at 71: 18-24.
[27] *Id.* at 151: 2-12; 170: 11-14.
[28] *Id.* at 153: 3-13.

however, that made Ellis think that Sluder was on drugs or intoxicated at that specific time.[29]

## 30.

Though Ellis could not hear Sluder's exact response, Sluder said something including "I don't take advice from…"[30]

## 31.

Sluder then began to explain that she would rather be on drugs than desert a child, apparently accusing Ellis of deserting her cousin who was Sluder's adopted child.[31]

## 32.

A verbal disagreement then ensued between Sluder and Ellis, leading Ellis to turn up the volume of the music playing in her vehicle to avoid engaging in further disagreement regarding her adopted daughter.[32]

## 33.

After attempting to drown out Sluder's comments about her daughter with the

---

[29] *Id.* at 153: 14-17.
[30] *Id.* at 154: 4-20.
[31] *Id.* at 155: 3-25.
[32] *Id.* at 156: 13-24; 157: 1-3.

radio, Ellis did not hear Sluder speak until she complained that Ellis was driving recklessly because the tires of the vehicle ran over ripples on the road while driving over Fort Mountain.[33]

## 34.

Near the end of the transport, Sluder said "I want to die" approximately five times but Ellis did not hear her say this having turned up the volume of the music following the disagreement over her adopted daughter.[34]

## 35.

Ellis turned up the radio to avoid Sluder's arguments about her adopted daughter and not because Sluder said "I want to die," which Ellis did not hear.[35]

## 36.

Prior to transferring Sluder's custody to the RYDC, Ellis called Sluder's probation officer, Marilyn Ortiz, for the referral needed to properly relinquish custody of Sluder to the RYDC.[36]

---

[33] *Id.* at 158: 22-25; 159: 1-4.
[34] *Id.* at 159: 13-25.
[35] *Id.* at 159: 13-25.
[36] *Id.* at 54: 4-22.

**37.**

At approximately 8:45 p.m., Ellis arrived at the RYDC facility.[37]

**38.**

After passing through the security gate, Ellis entered the RYDC building with Sluder but they did not have any further conversations.[38]

**39.**

Ellis did not speak with Sluder while inside the RYDC building.[39]

**40.**

Ellis then filled out the intake form for Sluder and did not withhold any information about Sluder.[40]

**41.**

While completing the intake form, Ellis asked an RYDC officer, Amanda Stewart-Smith, if she was familiar with Sluder and she responded that she was aware of Sluder from her prior incarcerations at the RYDC.[41]

---

[37] *Id.* at 115: 2-14.
[38] *Id.* at 85: 24-25; 86: 1-6.
[39] *Id.* at 86: 13-15.
[40] *Id.* at 79: 20-25; 80: 20-25.
[41] *Id.* at 79: 20-25; 88: 12-25; 89: 1-15.

**42.**

Ellis did not mention that she thought that Sluder was a drug user in general because it would have been obvious based on Sluder's general appearance and Ellis had no reason to believe Sluder was actively under the influence of drugs.[42]

**43.**

Ellis also did not tell RYDC staff that she thought Sluder was actively under the influence of drugs because Sluder's behavior appeared typical of the behavior Ellis had previously witnessed and Ellis had no reason to believe Sluder was intoxicated at the time.[43]

**44.**

After completing the form, Ellis walked toward a hand sanitizer station toward the door of the facility and an employee at the RYDC, Sergeant Maevis Brooks, asked Ellis to wait because Brooks thought Ellis was leaving.[44]

**45.**

Ellis then advised Brooks that she was not yet leaving but merely using the

---

[42] *Id.* at 80: 1-25.
[43] *Id.* at 80:.13-25; 81: 1-25.
[44] *Id.* at 87: 3-18.

hand sanitizer.[45]

## 46.

After the RYDC accepted custody of Sluder and searched Sluder, Brooks advised Ellis that she was free to leave, indicating that custody of Sluder had been relinquished to the State.[46]

## 47.

After exiting the secured compound at the RYDC around 9:06 p.m., Ellis parked her vehicle outside the facility gate and began a contraband search of her vehicle in the rear where Sluder had been sitting in accordance with her procedure as instructed by the Sheriff.[47]

## 48.

While inspecting her vehicle, Ellis noticed a substance in the backseat.[48]

## 49.

After a visual investigation of the substance using her flashlight, Ellis believed the substance in her vehicle to be a crystallized version of methamphetamine.[49]

---

[45] *Id.*
[46] *Id.* at 82: 24-25; 83: 1 – 14; 88: 4-8.
[47] *Id.* at 90: 5-9; 144: 18-25; 145: 1-3.
[48] *Id.* at 90: 16-22.
[49] *Id.* at 91: 3-18.

**50.**

At this moment, Ellis first came to believe that Sluder may have had methamphetamine on her person while inside Ellis' vehicle.[50]

**51.**

Concerned that Sluder either still had methamphetamine on her person or had taken methamphetamine, Ellis immediately called RYDC and spoke with Sergeant Brooks and informed her that she had found suspected crystal meth in her vehicle.[51]

**52.**

After hearing this, Brooks told Ellis to "hold on" and there was a pause on the telephone line.[52]

**53.**

After a pause, Sergeant Brooks informed Ellis that Sluder had admitted to Smith that she ate meth in the "other cop car[,]…" apparently referring to the Union County vehicle.[53]

---

[50] *Id*. at 91: 19-22.
[51] *Id*. at 91: 19-25; 92: 1, 9-21.
[52] *Id*. at 92: 15-25; 93: 1-9.
[53] *Id*. at 93: 21-25; 94: 1-25.

**54.**

Though Ellis told Brooks that she had found what appeared to be meth in her vehicle, Brooks conveyed multiple times that Sluder claimed she ate meth in a different "cop car" than Ellis' vehicle.[54]

**55.**

After Ellis learned that Sluder admitted to eating meth in a different vehicle than hers, she was concerned and believed the RYDC staff should have been calling for a medical unit rather than talking to her.[55]

**56.**

At this point, after learning that Sluder admitted to eating meth, Ellis first believed that Sluder might potentially suffer a serious medical need that required treatment by a medical professional but she was unaware of any actual medical need necessitating treatment at that time.[56]

**57.**

Ellis requested a statement from the RYDC staff concerning Sluder's admission to eating meth but was not aware at the time of the amount of meth that

---

[54] *Id.* at 95: 7-18.
[55] *Id.* at 101: 1-7.
[56] *Id.* at 101: 1-7; 109: 2-8.

Sluder had ingested.[57]

## 58.

Instead of calling for medical assistance, Brooks asked Ellis if she could drive Sluder to the hospital to be checked out as a courtesy.[58]

## 59.

Ellis was not aware of any reason that the RYDC staff could not have called 911 to obtain medical services for Sluder.[59]

## 60.

Ellis was aware that Brooks claimed the RYDC was understaffed and wanted her to transport Sluder to the hospital but was never aware that the RYDC staff would not be calling 911 or other emergency services or otherwise arranging to transport Sluder for treatment.[60]

## 61.

Ultimately, Ellis was unable to transport Sluder to the hospital because Ellis had already relinquished custody of Sluder to the State at the RYDC[61]

---

[57] *Id.* at 128: 6-20.
[58] *Id.* at 101: 20-25; 102: 1-15.
[59] *Id.* at 103: 9-24.
[60] *Id.* at 104: 24-25; 105: 1-11.
[61] *Id.* at 106: 5-23.

**62.**

Ellis was unable to transport Sluder because she could not be responsible for her once custody was relinquished to the State under the runaway order which had authorized Ellis to transport Sluder outside her jurisdiction in the first place, and Whitfield County was outside of Ellis' jurisdiction in Gilmer County.[62]

**63.**

Ellis contacted her supervisor, Lieutenant Knight, about the situation and asked if she would be allowed to transport Sluder; Lieutenant Knight told Ellis that she was not permitted to transport Sluder to the hospital because she had already relinquished custody of Sluder to the State.[63]

**64.**

Ellis expressed to Brooks that she could not transport Sluder to the hospital because Sluder was currently outside of her jurisdiction.[64]

**65.**

Ellis returned to processing her vehicle, including placing the suspected

---

[62] *Id*. at 107: 6-25; 108: 1-2.
[63] *Id*. at 110: 1- 24; 111: 6-18.
[64] *Id*. at 112: 9-18.

methamphetamine in an evidence bag.[65]

**66.**

During this time, Ellis also contacted Ortiz, Sluder's probation officer, to inform her about finding methamphetamine found in her car where Sluder was sitting. [66]

**67.**

Ellis was not, and is not, aware of any policy the RYDC had or has that would have prevented the RYDC from calling 911 and having local rescue services, like an EMT, transport Sluder to the hospital.[67]

**68.**

At some point, Sergent Brooks came outside of the RYDC and gave Ellis a copy of a report from the individual stating that Sluder had eaten "all the meth" in a different cop car.[68]

**69.**

Ellis was unsatisfied by the report that was given to her because Sluder was

---

[65] *Id*. at 124: 1-5.
[66]. *Id.* at 110: 15-20.
[67] *Id*. at 103: 9-12; 105: 12-25
[68] *Id*. at 126: 5-8.

not directly quoted, and there was some ambiguity as to where Sluder actually consumed the methamphetamine."[69]

**70.**

Eventually Ms. Stewart-Smith, a member of the RYDC team, handed Ellis a new report with a statement from Smith stating that she had personally heard Sluder state she ate the methamphetamine "in the other cop car."[70]

**71.**

Ellis eventually left the RYDC and returned to Gilmer County. [71]

**72.**

Ellis had no knowledge that Sluder had ingested methamphetamine in her vehicle or in any other vehicle before relinquishing custody of Sluder to the State of Georgia at the RYDC.[72]

**73.**

On the following morning, August 27, 2022, Ellis received a text message from Ortiz indicating that Sluder had passed away from an overdose.[73]

---

[69] *Id*. at 127: 10-22.
[70] *Id*. at 131: 8-25; 132: 1-6.
[71] *Id*. at 132: 4-8.
[72] *Id*. at 161: 3-17.
[73] *Id*. at 168: 18-22.

Respectfully submitted by:

WOMACK, RODHAM & RAY, P.C.

*/s/ Ronald R. Womack*
Georgia Bar No. 773650
rwomack@wrrlawfirm.com

*/s/ Ryan L. Ray*
Georgia Bar No. 561765
rray@wrrlawfirm.com

P.O. Box 549
109 East Patton Street
LaFayette, Georgia 30728
Tel: (706) 638-2234
Fax: (706) 638-3173

ATTORNEYS FOR DEFENDANT
SHARON ELLIS

## CERTIFICATE OF SERVICE

On September 17, 2025, I electronically filed *Defendant Sharon Ellis'*
*Statement of Material Facts* with the Clerk of Court using the CM/ECF which will
automatically provide electronic service of this document to all counsel of record.

Submitted by:

WOMACK, RODHAM & RAY, P.C.

*/s/ Ryan L. Ray*
Georgia Bar No. 561765
rray@wrrlawfirm.com

P.O. Box 549
109 East Patton Street
LaFayette, Georgia 30728
Tel: (706) 638-2234
Fax: (706) 638-3173

OF COUNSEL FOR DEFENDANT
SHARON ELLIS